# **EXHIBIT A**

*USA v. Acct 263226700, et al*, Northern District of Illinois Case No. 1:93-cv-04483
Verified Complaint

FILED-ED4
93 JUL 26 PM 3:55
CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

93C 4483

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | No. JUDGE NORDBERG |
| v. | ) | Judge MAGISTRATE JUDGE BUCKLO |
| FUNDS IN ACCOUNT 263226700 HELD BY FIRST HERITAGE BANK IN THE NAME OF BOLA TINUBU, | ) | |
| FUNDS IN ACCOUNTS 39483134, 39483396, 4650279566, 00400220, 39936404, 39936383, HELD BY CITIBANK, N.A. IN THE NAME OF BOLA TINUBU OR COMPASS FINANCE & INVESTMENT CO., | ) | |
| FUNDS IN ACCOUNTS 52050-89451952, 52050-89451952, 52050-89451953 HELD BY CITIBANK, INTERNATIONAL IN THE NAME OF BOLA TINUBU, | ) | |
| Defendants. | ) | |

DOCKETED
JUL 28 1993

VERIFIED COMPLAINT FOR FORFEITURE

The United States of America, by its attorney, Michael J. Shepard, United States Attorney for the Northern District of Illinois, for its verified complaint for forfeiture, states as follows:

1. This is a forfeiture action under 21 U.S.C. § 881 and 18 U.S.C. § 981. This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

2. The defendant funds are located in the above-described accounts and were seized pursuant to process issued by this court.

This court has venue in this matter pursuant to 28 U.S.C. § 1355 because criminal activity giving rise to this forfeiture action occurred in this district.

3. This complaint is verified by the affidavit of Special Agent Kevin Moss which is attached hereto and incorporated by reference in this complaint.

4. As is stated more fully in the attached affidavit, beginning as early as 1988, Adegboyega Mueez Akande, with others, operated a organization which distributed white heroin, a controlled substance under Title 21 of the United States Code.

5. As is stated more fully in the attached affidavit, this distribution operation was conducted on a large scale and the proceeds of the operation were substantial. The defendant funds represent proceeds of this operation or property involved in money laundering.

6. By reason of facts set forth above and in the attached affidavit, there is probable cause to believe that the defendant funds represent proceeds of narcotics trafficking and further represent property involved in money laundering in violation of 18 U.S.C. §§ 1956 and 1957. The defendant funds are therefore forfeitable to the United States pursuant to 21 U.S.C. § 881 and 18 U.S.C. §981.

WHEREFORE, the United States requests:

1. that the defendant funds be proceeded against for forfeiture and condemnation, that warrants of seizure and monition issue and that due notice be give to all interested parties to appear and show cause why the forfeiture should not be decreed; and

2. that the Court adjudge and decree that the defendant funds be forfeited to the United States and that the defendant funds be disposed of according to law.

Respectfully submitted,

MICHAEL J. SHEPARD
United States Attorney

By: Marsha A. McClellan

MARSHA A. McCLELLAN
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-2814

FILED
JUL 26 1993
H. STUART CUNNINGHAM
CLERK, U. S. DISTRICT COURT

STATE OF ILLINOIS)
) ss
COUNTY OF COOK )

AFFIDAVIT

KEVIN MOSS, being duly sworn on oath, deposes and states as follows:

1. I have been a Special Agent with the Internal Revenue Service (hereafter "IRS"), in the Criminal Investigation Division, for over fifteen (15) years.

2. As is detailed more specifically below, there is probable cause to believe that funds in certain bank accounts controlled by Bola Tinubu, were involved in financial transactions in violation of 18 U.S.C. §§1956 and 1957 and represent proceeds of drug trafficking; therefore these funds are forfeitable to the United States under 18 U.S.C. §981 and 21 U.S.C. §881(a)(6).

3. My responsibilities include the investigation of tax fraud and other financial crimes, including money laundering. I have become familiar with the methods commonly used to launder money by persons engaged in narcotics trafficking through training and experience. I have also discussed and compared information that I have about the methods used to launder money with other experienced federal, state and local law enforcement agents. Through training and experience, I have learned that narcotics traffickers must take steps to conceal their receipt of huge cash

1-2

proceeds that represent the profits received from the operation of their narcotics trafficking organizations. These steps include hiding large amounts of cash in safety deposit boxes or other concealed safes and "laundering" the cash through financial transactions. Often, to disguise their involvement in the transaction, the drug dealers make use of nominees and/or aliases. Drug traffickers commonly purchase assets with U.S. currency to reduce or eliminate the paper trail generated by their financial transactions. Frequently, when individuals involved in narcotics trafficking acquire assets or expend money, they do so using relatives, associates, nominees and/or aliases. These tactics promote the operation of the narcotics enterprise and conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the narcotics enterprise. Also, I have known individuals, who derive income from narcotics trafficking, to engage in monetary transactions with property valued in excess of $10,000 that has been derived from criminal activity in violation of 18 U.S.C. §1957.

4. As part of my duties and responsibilities as a Special Agent with the IRS, I have been involved with other agents in an investigation of money laundering of the proceeds of a heroin distribution organization in the Chicago area. One aspect of this investigation concerns the money laundering activities of Adegboyega Mueez Akande. Through my own participation in this investigation and through information provided to me by other Special Agents of IRS, Drug Enforcement Administration in Hammond, Indiana, (hereafter "DEA") and the Federal Bureau of Investigation

in Merrillville, Indiana (hereafter "FBI"), I am familiar with all aspects of this investigation. The statements contained in this affidavit are based in part on information provided by Special Agents of the IRS, DEA, FBI, on information provided by confidential sources, and on my experience and background as a Special Agent of the IRS.

5. During this investigation, I have reviewed financial documents, including bank statements, Currency Transaction Reports, (hereafter CTRs), copies of money orders, cashier's checks and tax returns pertinent to this investigation and IRS records for the filing of 8300 forms. In addition to these documents, I have reviewed records of wire transfers of huge amounts of cash generated by individuals who are believed to be members of this heroin distribution organization.

6. Through my experience as a law enforcement officer, I have learned that large amounts of cash, often in small denominations, pose a significant logistical problem to drug traffickers. Thus, drug traffickers have a need to transform their illegal money into assets that appear to have been legitimately obtained or earned. This process usually entails the integration of the illegally obtained money into the banking system where it can be transferred to other accounts, both within the United States and overseas. The biggest hurdle in accomplishing this goal is often the initial integration of the illegal money into the banking system, in such a way that it appears legitimate, and the avoidance of IRS filing and reporting requirements. Debriefings of narcotics

trafficters and their associates by IRS, DEA and FBI Special Agents have revealed that these individuals are well aware of the paper trail that is created when cash over $10,000 is brought to a financial institution, and that they seek ways to avoid that paper trail.

FACTS AND CIRCUMSTANCES

7. Prior to and during 1988, the DEA became involved in the investigation of a white heroin trafficking network operating in Chicago, Illinois and Hammond, Indiana. The investigation disclosed that an individual known as Lee Andrew Edwards was a source of white heroin. Edwards is currently incarcerated for attempting to murder a federal agent while the agent was executing a search warrant. Cocaine, heroin, guns and paraphernalia used to distribute drugs were recovered during the execution of the warrant. Edwards entered a guilty plea to the charges arising from the attempted murder of the federal agent.

8. A DEA confidential source (Source A) has provided reliable information to the DEA in its investigation into this white heroin distribution network. Information provided by Source A has been corroborated by an ongoing DEA investigation, FBI investigations, surveillances of Source A, consensual recordings of conversations, and a review of FBI and DEA records.

9. Source A provided reliable information about Lee Andrew Edwards including the identity of a telephone number which

activated an electronic pager. Source A reported that this number was to be called to place an order for white heroin. According to records reviewed, this pager was subscribed to by Adegboyega Mueez Akande at 7504 South Stewart Avenue, Chicago, Illinois.

10. During February 1988, an individual identified as Abiodun Agbele arrived in the United States from Nigeria. According to investigating agents of DEA, Agbele identified Akande as his uncle and stated that Akande provided him (Agbele) an apartment in Hammond, Indiana.

11. The investigation disclosed through interviews with Agbele that Akande returned to Nigeria in mid 1990; however, before he left, he instructed Agbele to serve as a source of white heroin for Lee Andrew Edwards. According to DEA investigators, Agbele sold white heroin to Edwards on numerous occasions. With the assistance of Source A, DEA called Agbele to purchase a small amount of white heroin. On November 20, 1990, Agbele sold one ounce of white heroin to a law enforcement officer working in an undercover capacity for $7,000.

12. Subsequent to the sale of the white heroin to law enforcement officers, Agbele was arrested and agreed to cooperate by providing information regarding the white heroin distribution network of Akande.

13. During interviews with the law enforcement agents investigating this distribution network, Agbele confirmed that Akande was involved in the distribution of white heroin. As a result of his involvement in this business enterprise, Akande

generated huge profits that Agbele admitted he often wired to bank accounts on behalf of Akande.

14. According to Agbele, Akande controlled the operation of the white heroin distribution network from Nigeria in conjunction with other individuals in Nigeria and the United States. Much of the business, at the time the operation flourished, was conducted by telephone, although, according to Agbele, Akande occasionally travelled to the United States under an assumed name to retrieve portions of the drug profits.

15. During the course of the investigation, DEA agents learned that in November 1986, Adegboyega Mueez Akande completed a lease application for an apartment on which he listed his employment as an account representative for Globe-Link International. Akande listed his address as 7504 South Stewart Avenue, Chicago, Illinois and a former address as 7527 North Sheridan Road also in Chicago. On the application, Akande listed Audrey Akande as his spouse and his current landlord was identified as Christine Schaffer.

16. Further investigation by DEA disclosed that Abiodun Agbele also completed a lease application for an apartment in the same apartment complex located at 4050 W. 115th Street, Chicago, Illinois. In the application, Agbele stated that he was employed by Globe-Link as a sales representative. The investigators have confirmed that Adegboyega Mueez Akande maintained an apartment in this complex.

17. A review of the documents provided by the Secretary of State disclosed that Globe-Link International was owned by Mueez Adegboyega Akande. According to the 1985 corporate report, the company was located at 7527 North Sheridan Road and was in the business of consulting and business negotiations.

18. It is believed by this affiant that Adegboyega Mueez Akande and Mueez Adegboyega Akande are the same individual because of social security and tax information. Further, Agbele told agents investigating this matter that Nigerians often transpose their first and middle names or use aliases to avoid detection by immigration officials.

19. A review of the 1986 corporate report from the Secretary of State showed that Globe-Link was owned by Mueez A. Akande and other relatives. Audrey Akande was one of the relatives listed, and she was identified as Akande's wife. The business address remained 7527 North Sheridan Road, Chicago, Illinois.

20. A review of records from the IRS disclosed that Globe-Link was purportedly located at 7504 S. Stewart, Chicago, Illinois but received mail at a post office box. The building at this address is a two-flat with one of the residents being identified as Christine Schaffer, who is the mother of Audrey Akande and the mother-in-law of Adegboyega Mueez Akande. The IRS information further disclosed that Globe-Link filed one corporate tax return in 1987 showing taxable income in the amount of $9,105. No other returns have been filed. Interviews with investigators from the U.S. Customs Service have disclosed that the address at 7504 S.

Stewart Avenue is known as a drop-off point for packages from Nigeria that contain white heroin.

21. This investigation has disclosed the identity of other individuals, including relatives, who have worked for Akande with various duties in the distribution organization. One of these individuals has been identified by the investigation as Bola Tinubu.

22. According to bank records from the First Heritage Bank, Country Club Hills, Illinois, Tinubu opened an individual money market account and a "NOW" account in December 1989. In the application, Tinubu stated that his address was 7504 South Stewart, Chicago, Illinois. This is the same address used previously by Akande and Globe-Link. Upon opening this account, Tinubu deposited $1,000 in traveler's checks.

23. Bank records disclosed that five days after the account was opened, on January 4, 1990, $80,000 was deposited into the NOW account at First Heritage Bank by wire transfer through First Chicago from Banc One Houston. The transaction was completed at the direction of Mirbec A. Akande who resided at 7930 Corporate Drive, Houston, Texas. A review of a credit bureau report shows that Adegboyega Mueez Akande previously used this address. Further, the investigation disclosed through a review of bank records that an individual named Mueez Adegboyega Akande had three accounts at Banc One.

24. According to bank employees, when Bola Tinubu came to First Heritage Bank in December 1989 to open the accounts, he was

introduced to them by Adegboyega Mueez Akande who at that time maintained an account at the bank.

25. According to bank records, Bola Tinubu also opened a joint checking account in his name and the name of his wife, Oluremi Tinubu. Oluremi Tinubu previously opened a joint bank account also at this bank with Audrey Akande, the wife of Adegboyega Mueez Akande.

26. Bank records further disclosed that on January 6, 1990, Tinubu withdrew $20,000 from the "NOW" account to purchase a Certificate of Deposit for $10,000; the remaining $10,000 was deposited into the money market account.

27. On the same day, January 6, 1990, Tinubu completed a credit application for an $8,000 loan to purchase an automobile. Tinubu stated in the application that he resided at 7504 South Stewart and that Mueez A. Akande, his cousin, resided at 3515 Maple Lane, Hazel Crest, Illinois. Further, Tinubu stated in the application that his employer was Mobile Oil Nigeria Ltd., Fairfax, Virginia and that his take home pay was $2,400 per month. Additionally, Tinubu stated that he had no other sources of income. He listed his wife, Oluremi S. Tinubu, as a co-applicant. The application states that she resides at the same location and her employment is listed as housewife. This loan was secured with the certificate of deposit in the amount of $10,000 that Tinubu recently purchased.

28. A review of a Trans Union Credit report, however, showed that Tinubu resided at 7424 South Shore, Chicago, Illinois. The date of this credit report was December 28, 1989.

29. On January 8, 1990, a loan was given to Tinubu by First Heritage Bank and a check in the amount of $8,000 was made payable to the car dealership and him for the purchase of a car.

30. A review of records from the car dealership disclosed that on January 9, 1990, Bola Tinubu purchased a 1990 Nissan 240X (VIN: JN1H536P7LW121339) for $17,754.03 using cashier's checks purchased at First Heritage Bank from funds in his bank accounts. Tinubu provided 3515 Maple Lane, Hazel Crest, Illinois as his residence while completing paperwork at the car dealership.

31. Bank records also disclosed that on May 9, 1989, Adegboyega M. Akande opened a checking account number 263153800-2 at First Heritage Bank using social security number 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. The account remained open until September 1990 according to records from the bank. A review of the bank statements and cashier's checks from this checking account disclosed that it remained inactive except during January 1990 and February 1990. The account records showed a deposit of a cashier's check in the amount of $5,000. The cashiers's check was purchased by Bola Tinubu on January 11, 1990, seven days after the above described $80,000 wire transfer was received from Akande. Tinubu made the cashier's check payable to Audrey Akande and after endorsement with the names Audrey Akande and Adegboyega Akande, it was deposited into Adegboyega Mueez Akande's account.

32. Information received from the Social Security Administration and the IRS disclose that the social security number used by Adegboyega Mueez Akande to open the account at First Heritage Bank does not belong to him.

33. A review of records from the IRS disclosed the Mueez A. Akande and Audrey Akande last filed a joint income tax return in 1987 showing disposable income or adjusted gross income of $10,500 from self-employment. Akande listed his address as 7504 South Stewart, Chicago, Illinois. The records further disclose that Akande did not file income tax returns for any year following 1987.

34. Records from First Heritage Bank disclose that in 1990, Bola Tinubu deposited $661,000 into his individual money market account and in 1991, Tinubu deposited $1,216,500 into the same money market account. The balance in the account is approximately $980,967.

35. Bank records from Citibank Inc., disclosed that in January 1991, Tinubu began opening accounts at Citibank in the section known as the world-wide personal banking unit. A review of bank records disclosed that on January 25, 1991, Tinubu transferred $560,000 from his money market account at First Heritage Bank to one of the world-wide personal accounts at Citibank.

36. Account statements from the accounts at both First Heritage Bank and Citibank were forwarded to Bola Tinubu in care of Shola Ogunbode at 6641 Morningview Court, Alexandria, Virginia.

37. Representatives from Mobil Oil were interviewed regarding Tinubu's employment status. The representatives confirmed that

Tinubu was employed by Mobil Oil Nigeria Ltd. as a treasurer. This position, however, does not involve the transfer of large amounts of money between banking institutions. Mobil Oil representatives stated that under no circumstances would Tinubu be permitted to retain money belonging to Mobil Oil in accounts bearing Tinubu's name. Finally, Mobil Oil confirmed that the corporation never had any accounts in banks in the southern suburbs of Chicago.

38. IRS tax laws require the payment of taxes for resident and non-resident aliens on interest income from deposits made into U.S. banks. A review of IRS records has disclosed that Bola Tinubu has failed to file income tax returns since 1984 despite the receipt of interest income credited to the accounts in his name.

39. On January 10, 1992, applications for seizure warrants were presented to Magistrate Judge Rosemond of the Northern District of Illinois. After considering the applications and the attached affidavits, Magistrate Judge Rosemond issued seizure warrants for accounts at First Heritage Bank and Citibank in the name of Bola Tinubu. The amount of money seized from these accounts exceeded $1.4 million dollars.

40. Shortly thereafter, Mr. Tinubu contacted the First Heritage Bank to transfer money from his accounts and was advised that the accounts had been seized by the U.S. Treasury. Representatives from First Heritage Bank advised me of Tinubu's inquiries about his accounts. On January 13, 1992, I spoke to an individual who identified himself as Bola Tinubu at a telephone number in Nigeria that he provided to the employees of the bank.

During the course of the conversation, he advised me that he (Tinubu) knew Akande. Tinubu admitted that he had wire transferred $100,000 to Akande's bank account in Houston and that $80,000 of the funds used to open the bank accounts at First Heritage Bank had come from Akande. When asked to identify other accounts in his name, Tinubu stated that he had an account in Fairfax, Virginia and an account in London. Despite repeated requests for information regarding bank accounts, Tinubu denied having any additional accounts in the United States.

41. On January 14, 1992, I had another telephone conversation with the same individual who identified himself as Bola Tinubu. During this telephone conversation, Tinubu admitted to me that he knew Agbele and that he met Agbele through Akande. He further admitted that he (Tinubu) had associated with Akande and Agbele in the United States as well as Nigeria. Again during this conversation, he denied the existence of any other bank accounts in the United States.

42. The initial warrant served on Citibank seized accounts in a division referred to as Citibank, N.A. Further investigation disclosed that there was an additional banking unit known as Citibank, International with world-wide banking capabilities. Records from Citibank, International disclosed that accounts, in the name of Bola Tinubu and corporate accounts to which Tinubu had access existed in this separate international banking unit.

43. On January 24, 1992, a seizure warrant was issued in the Southern District of New York for the accounts held in the name of

Bola Tinubu by Citibank, International. Approximately $550,000 was seized from these accounts held by Citibank, International in the name of Bola Tinubu.

44. According to records from Citibank, International, there were two additional corporate accounts held in the name of Compass Finance and Investment Company, Ltd. which were controlled by Bola Tinubu.

45. The bank records from these accounts in the international division disclosed that when Bola Tinubu opened these accounts at Citibank, International, he provided certain corporate documents from Compass Finance and Investment Company, Ltd. including documents identified as a memorandum of association and articles of association. Both corporate documents identified Mueez Adegboyega Akande and Abiodun Olasuyi Agbele as directors of Compass Finance and Investment Company, Ltd.

46. A further review of the records from Citibank, International disclosed that the funds transferred from First Heritage Bank in Illinois to Citibank, N.A. were subsequently transferred to the Citibank, International accounts held in the name of Bola Tinubu and Compass Finance and Investment Company Ltd. Funds held in international accounts may be easily transferred into the international banking system or converted into foreign currency.

47. On January 30-31, 1992, Tinubu advised agents investigating this matter that he had no business association or financial relationship with Agbele or Akande. This information

contradicted his prior statements on January 13, 1992, when he advised law enforcement officers that the money used to open the account at First Heritage Bank had come from Akande.

48. For the reasons set forth above, there is probable cause to believe that the funds in the accounts, held by First Heritage Bank, Citibank, N.A. and Citibank, International, in the names of Bola Tinubu and Compass Finance and Investment Company, Ltd., represent property that was involved in transactions in violation of 18 U.S.C. §§ 1956 and 1957, or is property traceable to such property or represents the proceeds of drug trafficking making the fund in the accounts forfeitable to the United States pursuant to 18 U.S.C. §981 and 21 U.S.C. §881.

49. I have read the foregoing verified complaint and this affidavit; the averments contained therein are true and correct to the best of my knowledge, information and belief.

Kevin Moss
Kevin Moss
Special Agent
Internal Revenue Service

SWORN TO AND SUBSCRIBED BEFORE
ME THIS 20th DAY OF JULY, 1993.

Renee F. Swanson
NOTARY PUBLIC

"OFFICIAL SEAL"
Renee F. Swanson
Notary Public, State of Illinois
My Commission Expires 12/6/94

JS 44
(Rev. 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

FILED-ED4
93 JUL 26 PM 3:55
CLERK
U.S. DISTRICT COURT

CAT. 2

## I (a) PLAINTIFFS

UNITED STATES OF AMERICA

## DEFENDANTS

FUNDS IN ACCT 263226700 HELD BY FIRST HERITAGE BANK IN THE NAME OF BOLA TINUBU, et al.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ______
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Cook
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

MICHAEL J. SHEPARD
U.S. Attorney
219 South Dearborn
Chicago, Illinois 60604
Attn: MARSHA A. McCLELLAN, AUSA

ATTORNEYS (IF KNOWN)

93C 4483
JUDGE NORDBERG
MAGISTRATE JUDGE BUCKLO

## II. BASIS OF JURISDICTION (PLACE AN × IN ONE BOX ONLY)

- ☒ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN × IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

DOCKETED
JUL 28 1993

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355

## V. NATURE OF SUIT (PLACE AN × IN ONE BOX ONLY)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS — PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury — Med Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights

**FORFEITURE /PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☒ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt Relations
- ☐ 730 Labor/Mgmt Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS — Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

## VI. ORIGIN (PLACE AN × IN ONE BOX ONLY)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $

Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☐ NO

## VIII. REMARKS

In response to General Rule 2.21D(2) this case ☐ is not a refiling of a previously dismissed action
☐ is a refiling of case number ______ of Judge ______

DATE 7-26-93

SIGNATURE OF ATTORNEY OF RECORD Marsha A. McClellan

3

UNITED STATES DISTRICT COURT

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

## Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I. (a) Plaintiffs - Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

(c) Attorneys. Enter firm name, address, telephone number, and attorney or record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8 (a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an X in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III. Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**V. Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**VI. Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

(rev. 07/89)

**<u>EXHIBIT B</u>**

*USA v. Edwards et al*, Northern District of Indiana Case No. 2:92-cr-00113-RL
Document No. 778 Excerpt

SELECTED PAGES PREVIOUSLY SUBMITTED TO COURT
OF DEA SPECIAL AGENT VINCENT BALBO'S TESTIMONY
AT LEE ANDREW EDWARDS' SENTENCING HEARING

Agbele; did you also participate in the indictment and arrest of Abiodun Agbele?

A Yes, sir, I did.

Q And after Mr. Agbele was apprehended did he cooperate and was he interviewed by yourself and Special Agent Karen Pertuso of the FBI?

A Yes, he did.

Q And I believe several times you said Raymond Davis was interviewed by us or we asked him to be conservative; when you say we, would you be referring to youself and Special Agent Pertuso as there as well?

A Yes, sir.

Q And with regard to Mr. Agbele now, you indicated that you and Special Agent Pertuso interviewed Mr. Agbele; what did Mr. Agbele tell you about his activities in supplying the Edwards drug trafficking organization with heroin?

A He advised that he supplied Lee Edwards exclusively with white heroin.

Q And did Mr. Agbele tell you how he got into the business of supplying Mr. Edwards and how much he supplied Mr. Edwards?

A Yes, he said that he had come to the United States from Nigeria and enrolled in college and eventually got involved with his uncle who was distributing white heroin to Lee Edwards. And when his uncle went back to Nigeria his uncle introduced him to Mr. Edwards to hand him off as a client,

**EXHIBIT C**

Federal Bureau of Investigation June 10, 2024 FOIA Production

**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

June 10, 2024

Aaron Greenspan
956 Carolina Street
San Francisco, CA 94107

Greenspan v EOUSA, et al, (DDC)
Civil Action No.: 23-CV-1816.
FOIPA Request No.: 1553430-000
Subject: Lee Andrew Edwards, et al

Dear Mr. Greenspan:

The FBI has completed its interim review of records subject to the Freedom of Information/Privacy Acts (FOIPA) that are responsive to your request. The enclosed documents were reviewed under the FOIPA, Title 5, United States Code, Section 552/552a. Below you will find checked boxes under applicable statutes for the exemptions asserted to protect information exempt from disclosure. The appropriate exemptions are noted on the processed pages next to redacted information. In addition, a deleted page information sheet was inserted to indicate where pages were withheld entirely pursuant to applicable exemptions. An Explanation of Exemptions is enclosed to further explain justification for withheld information.

| **Section 552** | | **Section 552a** |
|---|---|---|
| ☐ (b)(1) | ☐ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☐ (j)(2) |
| ☑ (b)(3) | ☑ (b)(7)(C) | ☐ (k)(1) |
| 50 U.S.C. §3024(i)(1) | ☐ (b)(7)(D) | ☐ (k)(2) |
| | ☑ (b)(7)(E) | ☐ (k)(3) |
| | ☑ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☑ (b)(6) | | ☐ (k)(7) |

7 pages were reviewed and 4 pages are being released.

Please see the paragraphs below for relevant information specific to your request and the enclosed FBI FOIPA Addendum for standard responses applicable to all requests.

Based on the information you provided, we conducted a main entity record search of the Central Records System (CRS) per our standard search policy. For more information about records searches and the standard search policy, see the enclosed FBI FOIPA Addendum General Information Section.

In response to your narrowed/negotiated Freedom of Information/Privacy Acts (FOIPA) request, enclosed are the processed documents.

This is the ninth interim release of information responsive to your FOIPA request. This material is being provided to you at no charge.

The enclosed documents, consisting of Bates numbered pages FBI 23-CV-1816 - 1958 through FBI 23-CV-1816 – 1959, FBI 23-CV-1816 – 1963 through FBI 23-CV-1816 – 1964, represent the final consultation as reported in the Joint Status Report (JSR) to the Court dated 6/4/2024, and is the final response based on Plaintiff's agreement to pay up to $50 in duplication costs for the subject matter of the request.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. **"Part 1"** of the Addendum includes standard responses that apply to all requests. **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third party individuals. **"Part 3"** includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

Although your request is in litigation, we are required by law to provide you the following information:

If you are not satisfied with the Federal Bureau of Investigation's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of this response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please cite the FOIPA Request Number assigned to your request so it may be easily identified.

You may seek dispute resolution services by emailing the FBI's FOIA Public Liaison at foipaquestions@fbi.gov. The subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified. You may also contact the Office of Government Information Services (OGIS). The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Please direct any further inquiries about this case to the General counsel representing the Government in this matter. Please use the FOIPA Request Number and/or Civil Action Number in all correspondence or inquiries concerning your request.

Sincerely,



Michael G. Seidel
Section Chief
Record/Information Dissemination Section
Information Management Division

Enclosures

**FBI FOIPA Addendum**

**As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request. Part 1 of the Addendum includes standard responses that apply to all requests. Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information. Part 3 includes general information about FBI records, searches, and programs.**

**Part 1: The standard responses below apply to all requests:**

(i) **5 U.S.C. § 552(c).** Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)]. FBI responses are limited to those records subject to the requirements of the FOIPA. Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii) **Intelligence Records**. To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(i)(1)]. This is a standard response and should not be read to indicate that any such records do or do not exist.

**Part 2: The standard responses below apply to all requests for records on individuals:**

(i) **Requests for Records about any Individual—Watch Lists.** The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)]. This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii) **Requests for Records about any Individual—Witness Security Program Records.** The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)]. This is a standard response and should not be read to indicate that such records do or do not exist.

(iii) **Requests for Confidential Informant Records.** The FBI can neither confirm nor deny the existence of confidential informant records pursuant to FOIA exemptions (b)(7)(D), (b)(7)(E), and (b)(7)(F) [5 U.S.C.§ § 552 (b)(7)(D), (b)(7)(E), and (b)(7)(F)] and Privacy Act exemption (j)(2) [5 U.S.C.§ 552a (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records would reveal confidential informant identities and information, expose law enforcement techniques, and endanger the life or physical safety of individuals. This is a standard response and should not be read to indicate that such records do or do not exist.

**Part 3: General Information:**

(i) **Record Searches and Standard Search Policy.** The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems, such as the Central Records System (CRS), or locations where responsive records would reasonably be found. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions. The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS. The standard search policy is a search for main entity records in the CRS. Unless specifically requested, a standard search does not include a search for reference entity records, administrative records of previous FOIPA requests, or civil litigation files.

a. *Main Entity Records* – created for individuals or non-individuals who are the subjects or the focus of an investigation
b. *Reference Entity Records*- created for individuals or non-individuals who are associated with a case but are not known subjects or the focus of an investigation

(ii) **FBI Records.** Founded in 1908, the FBI carries out a dual law enforcement and national security mission. As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii) **Foreseeable Harm Standard.** As amended in 2016, the Freedom of Information Act provides that a federal agency may withhold responsive records only if: (1) the agency reasonably foresees that disclosure would harm an interest protected by one of the nine exemptions that FOIA enumerates, or (2) disclosure is prohibited by law (5 United States Code, Section 552(a)(8)(A)(i)). The FBI considers this foreseeable harm standard in the processing of its requests.

(iv) **Requests for Criminal History Records or Rap Sheets.** The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet. These criminal history records are not the same as material in an investigative "FBI file." An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service. For a fee, individuals can request a copy of their Identity History Summary Check. Forms and directions can be accessed at www.fbi.gov/about-us/cjis/identity-history-summary-checks. Additionally, requests can be submitted electronically at www.edo.cjis.gov. For additional information, please contact CJIS directly at (304) 625-5590.

## EXPLANATION OF EXEMPTIONS

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552**

(b)(1) (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2) related solely to the internal personnel rules and practices of an agency;

(b)(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9) geological and geophysical information and data, including maps, concerning wells.

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a**

(d)(5) information compiled in reasonable anticipation of a civil action proceeding;

(j)(2) material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1) information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2) investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3) material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4) required by statute to be maintained and used solely as statistical records;

(k)(5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6) testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7) material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

FEDERAL BUREAU OF INVESTIGATION
FOI/PA
DELETED PAGE INFORMATION SHEET
FOI/PA# 23-cv-1816

Total Deleted Page(s) = 3
Page 3 ~ b6 - 4; b7C - 4; b7F - 1;
Page 4 ~ b6 - 4; b7C - 4; b7F - 1;
Page 5 ~ b6 - -4; b7C - -4; b7F - -1;

XXXXXXXXXXXXXXXXXXXXXXXX
X Deleted Page(s) X
X No Duplication Fee X
X For this Page X
XXXXXXXXXXXXXXXXXXXXXXXX

0-93 (Rev. 01/25/91)

DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
COMMUNICATION MESSAGE FORM

TRANSMIT VIA:
[X] Teletype

PRECEDENCE:
[ ] Immediate
[X] Priority
[ ] Routine

CLASSIFICATION:
[ ] TOP SECRET
[ ] SECRET
[ ] CONFIDENTIAL
[X] UNCLAS E F T O
[ ] UNCLAS

DATE: 10/22/91

^PAGE 1 OF 1

[redacted] b6 -1 b7C -1

(12-14724-323)

FM DIRECTOR FBI ~~{92-19714-21}~~

[redacted]

BT b3 -5 b7E -8

UNCLAS E F T O

CITE: //0669//

PASS: [redacted]

[redacted]

AN FBI TASK FORCE INVESTIGATION IS FOCUSING ON A DRUG TRAFFICKING ORGANIZATION BASED IN GARY, INDIANA, WHICH IS HEADED BY SUBJECT LEE ANDREW EDWARDS. EDWARDS AND HIS PRESUMED SOURCE OF SUPPLY OF HEROIN, [redacted] WERE SUBSEQUENTLY ARRESTED ON OCTOBER 11, 1990, AND [redacted] RESPECTIVELY.

b6 -4 b7C -4
b3 -5 b7E -8

[redacted]

******* FOR COMM CENTER USE ONLY *******

NOTE: Copy Designations Are On The Last Page Of This Teletype!!!

Approved By [redacted] b6 -1 b7C -1

MRI/JUL 1006/201

ISN 054

Transmitted 2313 OCT 23 1991

23-cv-1816(FBI)-1958

0-93A (Rev. 01/25/91)

DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
COMMUNICATION MESSAGE FORM

^PAGE 2 UNCLAS E F T O

RECORDS SEIZED DURING THE SEPTEMBER 12, 1991 ARREST REVEAL THE FOLLOWING NAMES OF PERSONS AND BUSINESSES, AND TELEPHONE NUMBERS ASSOCIATED WITH AGBELE [redacted]

b3 -5
b6 -4
b7C -4
b7E -8

[redacted]

b6 -4
b7C -4
b7F -1

0-93A (Rev. 01/25/91)

DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
COMMUNICATION MESSAGE FORM

^PAGE 6 UNCLAS E F T O

[redacted] ANY QUESTIONS ARE TO BE DIRECTED TO THE ATTENTION OF [redacted] DRUG INTELLIGENCE UNIT, DRUG SECTION, ROOM 7325B, TELEPHONE NUMBER (202) 324-6486, SECURE [redacted]

b3 -5
b7E -8

b6 -1
b7C -1
b7E -3

BT

////

0-93A (Rev. 01/25/91)

DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION
COMMUNICATION MESSAGE FORM

^PAGE 7 UNCLAS E F T O

ADMINISTRATIVE NOTE/TICKLER COUNT:

RE: FBIHQ TELETYPE TO [redacted] DATED 10/22/91, [redacted]

b3 -5
b7E -8

NOTE: [redacted] FROM FBI INDIANAPOLIS (245F-IP-71386) [redacted]
TELETYPE DATED 10/17/91 CAPTIONED "LEE ANDREW EDWARDS, AKA ET AL;
OCDETF MATTER; OO: INDIANAPOLIS."

b3 -5
b6 -1
b7C -1
b7E -8

Drafted By: [redacted] (4) Room/TL #: 7325B/213 Phone No. 6486

COPY DESIGNATIONS:

1 - MR. [redacted] (INFO) (RM 18045)
[redacted]
1 - MS. [redacted]

b3 -5
b6 -1
b7C -1
b7E -8

[redacted]

APPROVED:
Director
Dep. Dir.
ADD-Adm.
ADD-Inv.
Adm. Servs. [redacted]
Crim. Inv.
Ident.
Info. Mgmt.
Inspection
Intell.
Laboratory
Gen. Coun.
Tech. Servs.
Training
Cong. Affs. Off.
Off. of EEO
Off. of Liaison & Int. Affs.
Off. of Public Affs.

**EXHIBIT D**

CIA World Factbook (2024): Nigeria

# Explore All Countries Nigeria

Africa

## INTRODUCTION

### Background

In ancient and pre-colonial times, the area of present-day Nigeria was occupied by a variety of ethnic groups with different languages and traditions. These included large Islamic kingdoms such as Borno, Kano, and the Sokoto Caliphate dominating the north, the Benin and Oyo Empires that controlled much of modern western Nigeria, and more decentralized political entities and city states in the south and southeast. In 1914, the British amalgamated their separately administered northern and southern territories into a Colony and Protectorate of Nigeria.

Nigeria achieved independence from Britain in 1960 and transitioned to a federal republic with three constituent states in 1963 under President Nnamdi AZIKIWE. This structure served to enflame regional and ethnic tension, contributing to a bloody coup led by predominately southeastern military officers in 1966 and a countercoup later that year masterminded by northern officers. In the aftermath of this tension, the governor of Nigeria's Eastern Region, centered on the southeast, declared the region independent as the Republic of Biafra. The ensuring civil war (1967-1970), resulted in more than a million deaths, many from starvation. While the war forged a stronger Nigerian state and national identity, it contributed to long-lasting mistrust of the southeast's predominantly Igbo population. Wartime military leader Yakubu GOWON ruled until a bloodless coup by frustrated junior officers in 1975. This generation of officers, including Olusegun OBASANJO, Ibrahim BABANGIDA, and Muhammadu BUHARI, who would all later serve as president, continue to exert significant influence in Nigeria to the present day.

Military rule predominated until the first durable transition to civilian government and adoption of a new constitution in 1999. The elections of 2007 marked the first civilian-to-civilian transfer of power in the country's history. National and state elections in 2011 and 2015 were generally regarded as credible. The 2015 election was also heralded for the fact that the then-umbrella opposition party, the All Progressives Congress, defeated the long-ruling (since 1999) People's Democratic Party and assumed the presidency, marking the first peaceful transfer of power from one party to another. Presidential and legislative elections in 2019 and 2023 were deemed broadly free and fair despite voting irregularities, intimidation, and violence. The government of Africa's most populous nation continues to face the daunting task of institutionalizing democracy and reforming a petroleum-based economy whose revenues have been squandered through decades of corruption and mismanagement. In addition, Nigeria faces increasing violence

from Islamic terrorism, largely in the northeast, large scale criminal banditry, secessionist violence in the southeast, and competition over land and resources nationwide.

## GEOGRAPHY

### Location

Western Africa, bordering the Gulf of Guinea, between Benin and Cameroon

### Geographic coordinates

10 00 N, 8 00 E

### Map references

Africa

### Area

**total :** 923,768 sq km

**land:** 910,768 sq km

**water:** 13,000 sq km

comparison ranking: total 33

### Area - comparative

about six times the size of Georgia; slightly more than twice the size of California

**Area comparison map:**



### Land boundaries

**total:** 4,477 km

**border countries (4):** Benin 809 km; Cameroon 1,975 km; Chad 85 km; Niger 1,608 km

### Coastline

853 km

### Maritime claims

**territorial sea:** 12 nm

**exclusive economic zone:** 200 nm

**continental shelf:** 200-m depth or to the depth of exploitation

### Climate

varies; equatorial in south, tropical in center, arid in north

### Terrain

southern lowlands merge into central hills and plateaus; mountains in southeast, plains in north

**Elevation**

**highest point:** Chappal Waddi 2,419 m

**lowest point:** Atlantic Ocean 0 m

**mean elevation:** 380 m

**Natural resources**

natural gas, petroleum, tin, iron ore, coal, limestone, niobium, lead, zinc, arable land

**Land use**

**agricultural land:** 78% (2018 est.)

arable land: 37.3% (2018 est.)

permanent crops: 7.4% (2018 est.)

permanent pasture: 33.3% (2018 est.)

**forest:** 9.5% (2018 est.)

**other:** 12.5% (2018 est.)

**Irrigated land**

2,930 sq km (2012)

**Major lakes (area sq km)**

**fresh water lake(s):** Lake Chad (endorheic lake shared with Niger, Chad, and Cameroon) - 10,360-25,900 sq km
note - area varies by season and year to year

**Major rivers (by length in km)**

Niger river mouth (shared with Guinea [s], Mali, Benin, and Niger) - 4,200 km
**note** – [s] after country name indicates river source; [m] after country name indicates river mouth

**Major watersheds (area sq km)**

Atlantic Ocean drainage: Niger (2,261,741 sq km)
Internal *(endorheic basin)* drainage: Lake Chad (2,497,738 sq km)

**Major aquifers**

Lake Chad Basin, Lullemeden-Irhazer Aquifer System

**Population distribution**

largest population of any African nation; significant population clusters are scattered throughout the country, with the highest density areas being in the south and southwest as shown in this population distribution map

**Natural hazards**

periodic droughts; flooding

**Geography - note**

the Niger River enters the country in the northwest and

flows southward through tropical rain forests and swamps to its delta in the Gulf of Guinea

## PEOPLE AND SOCIETY

### Population

**total:** 236,747,130

**male:** 119,514,449

**female:** 117,232,681 (2024 est.)
comparison rankings: female 6; male 6; total 6

### Nationality

**noun:** Nigerian(s)

**adjective:** Nigerian

### Ethnic groups

Hausa 30%, Yoruba 15.5%, Igbo (Ibo) 15.2%, Fulani 6%, Tiv 2.4%, Kanuri/Beriberi 2.4%, Ibibio 1.8%, Ijaw/Izon 1.8%, other 24.9% (2018 est.)

**note:** Nigeria, Africa's most populous country, is composed of more than 250 ethnic groups

### Languages

English (official), Hausa, Yoruba, Igbo (Ibo), Fulani, over 500 additional indigenous languages

### Religions

Muslim 53.5%, Roman Catholic 10.6%, other Christian 35.3%, other 0.6% (2018 est.)

### Demographic profile

Nigeria's population is projected to grow from more than 186 million people in 2016 to 392 million in 2050, becoming the world's fourth most populous country. Nigeria's sustained high population growth rate will continue for the foreseeable future because of population momentum and its high birth rate. Abuja has not successfully implemented family planning programs to reduce and space births because of a lack of political will, government financing, and the availability and affordability of services and products, as well as a cultural preference for large families. Increased educational attainment, especially among women, and improvements in health care are needed to encourage and to better enable parents to opt for smaller families.

Nigeria needs to harness the potential of its burgeoning youth population in order to boost economic development, reduce widespread poverty, and channel large numbers of unemployed youth into productive activities and away from ongoing religious and ethnic violence. While most movement of Nigerians is internal, significant emigration regionally and to the West provides an outlet for Nigerians looking for economic opportunities, seeking asylum, and increasingly pursuing higher education. Immigration largely of West Africans continues to be insufficient to offset emigration and the loss of highly skilled workers. Nigeria also is a major source, transit, and destination

country for forced labor and sex trafficking.

## Age structure

**0-14 years:** 40.4% (male 48,856,606/female 46,770,810)

**15-64 years:** 56.2% (male 66,897,900/female 66,187,584)

**65 years and over:** 3.4% (2024 est.) (male 3,759,943/female 4,274,287)

**2023 population pyramid:**



## Dependency ratios

**total dependency ratio:** 86

**youth dependency ratio:** 80.6

**elderly dependency ratio:** 5.5

**potential support ratio:** 18 (2021 est.)

## Median age

**total:** 19.3 years (2024 est.)

**male:** 19.1 years

**female:** 19.6 years
comparison ranking: total 211

## Population growth rate

2.52% (2024 est.)
comparison ranking: 19

## Birth rate

33.8 births/1,000 population (2024 est.)
comparison ranking: 17

## Death rate

8.4 deaths/1,000 population (2024 est.)
comparison ranking: 75

## Net migration rate

-0.2 migrant(s)/1,000 population (2024 est.)
comparison ranking: 110

## Population distribution

largest population of any African nation; significant population clusters are scattered throughout the country, with the highest density areas being in the south and southwest as shown in this population distribution map

## Urbanization

**urban population:** 54.3% of total population (2023)

**rate of urbanization:** 3.92% annual rate of change (2020-25 est.)

**Major urban areas - population**

15.946 million Lagos, 4.348 million Kano, 3.875 million Ibadan, 3.840 million ABUJA (capital), 3.480 million Port Harcourt, 1.905 million Benin City (2023)

**Sex ratio**

**at birth:** 1.06 male(s)/female

**0-14 years:** 1.04 male(s)/female

**15-64 years:** 1.01 male(s)/female

**65 years and over:** 0.88 male(s)/female

**total population:** 1.02 male(s)/female (2024 est.)

**Mother's mean age at first birth**

20.4 years (2018 est.)

**note:** data represents median age at first birth among women 25-49

**Maternal mortality ratio**

1,047 deaths/100,000 live births (2020 est.)
comparison ranking: 3

**Infant mortality rate**

**total:** 53.7 deaths/1,000 live births (2024 est.)

**male:** 58.9 deaths/1,000 live births

**female:** 48.2 deaths/1,000 live births
comparison ranking: total 15

**Life expectancy at birth**

**total population:** 62.2 years (2024 est.)

**male:** 60.4 years

**female:** 64.2 years
comparison ranking: total population 216

**Total fertility rate**

4.52 children born/woman (2024 est.)
comparison ranking: 14

**Gross reproduction rate**

2.19 (2024 est.)

**Contraceptive prevalence rate**

16.6% (2018)

**Drinking water source**

**improved:** urban: 95.3% of population

rural: 68.8% of population

total: 82.6% of population

**unimproved:** urban: 4.7% of population

rural: 31.2% of population

total: 17.4% of population (2020 est.)

**Current health expenditure**

3.4% of GDP (2020)

**Physician density**

0.38 physicians/1,000 population (2018)

**Sanitation facility access**

**improved:** urban: 81.6% of population

rural: 41.4% of population

total: 62.3% of population

**unimproved:** urban: 18.4% of population

rural: 58.6% of population

total: 37.7% of population (2020 est.)

**Major infectious diseases**

**degree of risk:** very high (2023)

**food or waterborne diseases:** bacterial and protozoal diarrhea, hepatitis A, and typhoid fever

**vectorborne diseases:** malaria, dengue fever, and sexually transmitted diseases: hepatitis B (2024)

**water contact diseases:** schistosomiasis

**animal contact diseases:** rabies

**respiratory diseases:** meningococcal meningitis

**aerosolized dust or soil contact diseases:** Lassa fever

**note 1:** on 4 May 2022, the Centers for Disease Control and Prevention issued a Travel Health Notice for a Yellow Fever outbreak in Nigeria; a large, ongoing outbreak of yellow fever in Nigeria began in September 2017; the outbreak is now spread throughout the country with the Nigerian Ministry of Health reporting cases of the disease in multiple states (Bauchi, Benue, Delta, Ebonyi, and Enugu); the CDC recommends travelers going to Nigeria should receive vaccination against yellow fever at least 10 days before travel and should take steps to prevent mosquito bites while there; those never vaccinated

against yellow fever should avoid travel to Nigeria during the outbreak (see attached map)

**note 2:** on 31 August 2023, the US Centers for Disease Control and Prevention (CDC) issued a Travel Alert for polio in Africa; Nigeria is currently considered a high risk to travelers for circulating vaccine-derived polioviruses (cVDPV); vaccine-derived poliovirus (VDPV) is a strain of the weakened poliovirus that was initially included in oral polio vaccine (OPV) and that has changed over time and behaves more like the wild or naturally occurring virus; this means it can be spread more easily to people who are unvaccinated against polio and who come in contact with the stool or respiratory secretions, such as from a sneeze, of an “infected” person who received oral polio vaccine; the CDC recommends that before any international travel, anyone unvaccinated, incompletely vaccinated, or with an unknown polio vaccination status should complete the routine polio vaccine series; before travel to any high-risk destination, the CDC recommends that adults who previously completed the full, routine polio vaccine series receive a single, lifetime booster dose of polio vaccine

**note 3:** on 20 September 2023, the Centers for Disease Control and Prevention updated a Travel Health Alert for a diphtheria outbreak in several states in Nigeria; vaccination against diphtheria is essential to protect against disease; if you are traveling to an affected area, you should be up to date with your diphtheria vaccines; before travel, discuss the need for a booster dose with your healthcare professional; diphtheria is a serious infection caused by strains of *Corynebacterium diphtheriae* bacteria that make a toxin from which people get very sick; diphtheria bacteria spread from person to person through respiratory droplets like from coughing or sneezing; people can also get sick from touching open sores or ulcers of people sick with diphtheria (see attached map)

**note 1: The Nigeria Centre for Disease Control (NCDC) is reporting yellow fever outbreaks in multiple states (Bauchi, Benue, Delta, Ebonyi, and Enugu). Unless vaccinated, travelers should not visit these areas. Yellow fever is caused by a virus transmitted through bites of infected mosquitoes. Travelers to Nigeria should take steps to prevent yellow fever by getting vaccinated at least 10 days before travel and taking steps to prevent mosquito bites. Map courtesy of CDC.:**

**note 3: There is an outbreak of diphtheria in several states in Nigeria. Vaccination against diphtheria is essential to protect against disease. If you are traveling to an affected area, you should be up to date with your diphtheria vaccines. Map courtesy of CDC.:**

**Obesity - adult prevalence rate**

8.9% (2016)
comparison ranking: 145

**Alcohol consumption per capita**

**total:** 4.49 liters of pure alcohol (2019 est.)

**beer:** 0.73 liters of pure alcohol (2019 est.)

**wine:** 0.09 liters of pure alcohol (2019 est.)

**spirits:** 0.4 liters of pure alcohol (2019 est.)

**other alcohols:** 3.27 liters of pure alcohol (2019 est.)
comparison ranking: total 88

**Tobacco use**

**total:** 3.7% (2020 est.)

**male:** 6.9% (2020 est.)

**female:** 0.5% (2020 est.)
comparison ranking: total 163

**Children under the age of 5 years underweight**

18.4% (2019/20)
comparison ranking: 25

**Currently married women (ages 15-49)**

66.2% (2023 est.)

**Child marriage**

**women married by age 15:** 12.3%

**women married by age 18:** 30.3%

**men married by age 18:** 1.6% (2021 est.)

**note:** due to prolonged insecurity concerns, some parts of states, including Borno state, were not sampled

**Education expenditures**

0.5% of GDP (2013)
comparison ranking: 196

**Literacy**

**definition:** age 15 and over can read and write

**total population:** 62%

**male:** 71.3%

**female:** 52.7% (2018)

## ENVIRONMENT

### Environment - current issues

serious overpopulation and rapid urbanization have led to numerous environmental problems; urban air and water pollution; rapid deforestation; soil degradation; loss of arable land; oil pollution - water, air, and soil have suffered serious damage from oil spills

### Environment - international agreements

**party to:** Biodiversity, Climate Change, Climate Change-Kyoto Protocol, Climate Change-Paris Agreement, Comprehensive Nuclear Test Ban, Desertification, Endangered Species, Hazardous Wastes, Law of the Sea, Marine Dumping-London Convention, Marine Dumping-London Protocol, Marine Life Conservation, Nuclear Test Ban, Ozone Layer Protection, Ship Pollution, Wetlands

**signed, but not ratified:** Tropical Timber 2006

### Climate

varies; equatorial in south, tropical in center, arid in north

### Land use

**agricultural land:** 78% (2018 est.)

arable land: 37.3% (2018 est.)

permanent crops: 7.4% (2018 est.)

permanent pasture: 33.3% (2018 est.)

**forest:** 9.5% (2018 est.)

**other:** 12.5% (2018 est.)

### Urbanization

**urban population:** 54.3% of total population (2023)

**rate of urbanization:** 3.92% annual rate of change (2020-25 est.)

### Food insecurity

**widespread lack of access:** *due to persistent civil conflict in the northern areas, floods, high food prices, and an economic slowdown* - about 25.3 million people are projected to face acute food insecurity during the June to August 2023 lean season; this would be a significant deterioration compared to last year, when 19.45 million people were estimated to be acutely food insecure; acute food insecurity is mostly driven by the deterioration of security conditions and conflicts in northern states, which have led to the displacement of about 3.17 million people as of March 2022 (the latest data available) and are constraining farmers' access to their lands; widespread flooding in 2022, affecting about 4.5 million people across the country, has further compounded conditions, particularly in areas already

facing high levels of insecurity; high food prices and the expected slowdown in economic growth in 2023 are additional drivers of acute food insecurity (2023)

**Revenue from forest resources**

1.02% of GDP (2018 est.)

comparison ranking: 53

**Revenue from coal**

0% of GDP (2018 est.)

comparison ranking: 86

**Air pollutants**

**particulate matter emissions:** 55.64 micrograms per cubic meter (2019 est.)

**carbon dioxide emissions:** 120.37 megatons (2016 est.)

**methane emissions:** 143.99 megatons (2020 est.)

**Waste and recycling**

**municipal solid waste generated annually:** 27,614,830 tons (2009 est.)

**Major lakes (area sq km)**

**fresh water lake(s):** Lake Chad (endorheic lake shared with Niger, Chad, and Cameroon) - 10,360-25,900 sq km
note - area varies by season and year to year

**Major rivers (by length in km)**

Niger river mouth (shared with Guinea [s], Mali, Benin, and Niger) - 4,200 km
**note** – [s] after country name indicates river source; [m] after country name indicates river mouth

**Major watersheds (area sq km)**

Atlantic Ocean drainage: Niger (2,261,741 sq km)
Internal *(endorheic basin)* drainage: Lake Chad (2,497,738 sq km)

**Major aquifers**

Lake Chad Basin, Lullemeden-Irhazer Aquifer System

**Total water withdrawal**

**municipal:** 5 billion cubic meters (2020 est.)

**industrial:** 1.97 billion cubic meters (2020 est.)

**agricultural:** 5.51 billion cubic meters (2020 est.)

**Total renewable water resources**

286.2 billion cubic meters (2020 est.)

## GOVERNMENT

## Country name

**conventional long form:** Federal Republic of Nigeria

**conventional short form:** Nigeria

**etymology:** named for the Niger River that flows through the west of the country to the Atlantic Ocean; from a native term "Ni Gir" meaning "River Gir"

## Government type

federal presidential republic

## Capital

**name:** Abuja

**geographic coordinates:** 9 05 N, 7 32 E

**time difference:** UTC+1 (6 hours ahead of Washington, DC, during Standard Time)

**etymology:** Abuja is a planned capital city, it replaced Lagos in 1991; situated in the center of the country, Abuja takes its name from a nearby town, now renamed Suleja

## Administrative divisions

36 states and 1 territory*; Abia, Adamawa, Akwa Ibom, Anambra, Bauchi, Bayelsa, Benue, Borno, Cross River, Delta, Ebonyi, Edo, Ekiti, Enugu, Federal Capital Territory*, Gombe, Imo, Jigawa, Kaduna, Kano, Katsina, Kebbi, Kogi, Kwara, Lagos, Nasarawa, Niger, Ogun, Ondo, Osun, Oyo, Plateau, Rivers, Sokoto, Taraba, Yobe, Zamfara

## Independence

1 October 1960 (from the UK)

## National holiday

Independence Day (National Day), 1 October (1960)

## Legal system

mixed legal system of English common law, Islamic law (in 12 northern states), and traditional law

## Constitution

**history:** several previous; latest adopted 5 May 1999, effective 29 May 1999

**amendments:** proposed by the National Assembly; passage requires at least two-thirds majority vote of both houses and approval by the Houses of Assembly of at least two thirds of the states; amendments to constitutional articles on the creation of a new state, fundamental constitutional rights, or constitution-amending procedures requires at least four-fifths majority vote by both houses of the National Assembly and approval by the Houses of Assembly in at least two thirds of the states; passage of amendments limited to the

creation of a new state require at least two-thirds majority vote by the proposing National Assembly house and approval by the Houses of Assembly in two thirds of the states; amended several times, last in 2018

## International law organization participation

accepts compulsory ICJ jurisdiction with reservations; accepts ICCt jurisdiction

## Citizenship

**citizenship by birth:** no

**citizenship by descent only:** at least one parent must be a citizen of Nigeria

**dual citizenship recognized:** yes

**residency requirement for naturalization:** 15 years

## Suffrage

18 years of age; universal

## Executive branch

**chief of state:** President Bola Ahmed Adekunle TINUBU (since 29 May 2023)

**head of government:** President Bola Ahmed Adekunle TINUBU (since 29 May 2023)

**cabinet:** Federal Executive Council appointed by the president but constrained constitutionally to include at least one member from each of the 36 states

**elections/appointments:** president directly elected by qualified majority popular vote and at least 25% of the votes cast in 24 of Nigeria's 36 states; president elected for a 4-year term (eligible for a second term); election last held on 25 February 2023 (next to be held on 27 February 2027) note - the president is chief of state, head of government, and commander-in-chief of the armed forces

**election results:**
*2023:* Bola Ahmed Adekunle TINUBU elected president; percent of vote - Bola Ahmed Adekunle TINUBU (APC) 36.6%, Atiku ABUBAKAR (PDP) 29.1%, Peter OBI (LP) 25.4%, Rabiu KWANKWASO (NNPP) 6.4%, other 2.5%

*2019:* Muhammadu BUHARI elected president; percent of vote - Muhammadu BUHARI (APC) 53%, Atiku ABUBAKAR (PDP) 39%, other 8%

## Legislative branch

**description:** bicameral National Assembly consists of: Senate (109 seats - 3 each for the 36 states and 1 for Abuja-Federal Capital Territory; members directly elected in single-seat constituencies by simple majority vote to serve 4-year terms)

House of Representatives (360 seats statutory, 258 current; members directly elected in single-seat constituencies by simple majority vote to serve 4-year terms)

**elections:** Senate - last held on 25 February 2023 (next to be held in February 2027)
House of Representatives - last held on 25 February 2023 (next to be held in February 2027)

**election results:** Senate - percent of vote by party - NA; seats by party - APC 59, PDP 36, LP 8, NNPP 2, SDP 2, YPP 1, APGA 1; composition - men 105, women 4, percentage women 3.7%

House of Representatives - percent of vote by party - NA; seats by party - APC 178, PDP 114, LP 35, NNPP 19, APGA 5, other 7, vacant 2; composition - men 344, women 14, percentage women 3.8%; note - total National Assembly percentage women 3.9%

## Judicial branch

**highest court(s):** Supreme Court (consists of the chief justice and 15 justices)

**judge selection and term of office:** judges appointed by the president upon the recommendation of the National Judicial Council, a 23-member independent body of federal and state judicial officials; judge appointments confirmed by the Senate; judges serve until age 70

**subordinate courts:** Court of Appeal; Federal High Court; High Court of the Federal Capital Territory; Sharia Court of Appeal of the Federal Capital Territory; Customary Court of Appeal of the Federal Capital Territory; state court system similar in structure to federal system

## Political parties

Accord Party or ACC
Africa Democratic Congress or ADC
All Progressives Congress or APC
All Progressives Grand Alliance or APGA
Labor Party or LP
New Nigeria People's Party or NNPP
Peoples Democratic Party or PDP
Young Progressive Party or YPP

## International organization participation

ACP, AfDB, ATMIS, AU, C, CD, D-8, ECOWAS, EITI (compliant country), FAO, G-15, G-24, G-77, IAEA, IBRD, ICAO, ICC (national committees), ICCt, ICRM, IDA, IDB, IFAD, IFC, IFRCS, IHO, ILO, IMF, IMO, IMSO, Interpol, IOC, IOM, IPU, ISO, ITSO, ITU, ITUC (NGOs), LCBC, MIGA, MINURSO, MNJTF, MONUSCO, NAM, OAS

(observer), OIC, OPCW, OPEC, PCA, UN, UNAMID, UNCTAD, UNESCO, UNHCR, UNIDO, UNIFIL, UNISFA, UNITAR, UNMIL, UNMISS, UNOCI, UNOOSA, UNWTO, UPU, WCO, WFTU (NGOs), WHO, WIPO, WMO, WTO

## Diplomatic representation in the US

**chief of mission:** Ambassador (vacant); Chargé d'Affaires Rabiu LAWAL, (since 10 June 2024)

**chancery:** 3519 International Court NW, Washington, DC 20008

**telephone:** [1] (202) 800-7201 (ext. 100)

**FAX:** [1] (202) 362-6541

**email address and website:**
info@nigeriaembassyusa.org

https://www.nigeriaembassyusa.org/

**consulate(s) general:** Atlanta, New York

## Diplomatic representation from the US

**chief of mission:** Ambassador (vacant); Chargé d'Affaires David GREENE (since 31 March 2023)

**embassy:** Plot 1075 Diplomatic Drive, Central District Area, Abuja

**mailing address:** 8320 Abuja Place, Washington DC 20521-8320

**telephone:** [234] (9) 461-4000

**FAX:** [234] (9) 461-4036

**email address and website:**
AbujaACS@state.gov

https://ng.usembassy.gov/

**consulate(s) general:** Lagos

## Flag description

three equal vertical bands of green (hoist side), white, and green; the color green represents the forests and abundant natural wealth of the country, white stands for peace and unity

## National symbol(s)

eagle; national colors: green, white

## National anthem

**name:** "Arise Oh Compatriots, Nigeria's Call Obey"

**lyrics/music:** John A. ILECHUKWU, Eme Etim AKPAN, B.A. OGUNNAIKE, Sotu OMOIGUI and P.O. ADERIBIGBE/Benedict Elide ODIASE

**note:** adopted 1978; lyrics are a mixture of the five top entries in a national contest

**National heritage**

**total World Heritage Sites:** 2 (both cultural)

**selected World Heritage Site locales:** Sukur Cultural Landscape; Osun-Osogbo Sacred Grove

## ECONOMY

**Economic overview**

largest African market economy; enormous but mostly lower middle income labor force; major oil exporter; key telecommunications and finance industries; susceptible to energy prices; regional leader in critical infrastructure; primarily agrarian employment

**Real GDP (purchasing power parity)**

$1.275 trillion (2023 est.)
$1.239 trillion (2022 est.)
$1.2 trillion (2021 est.)

**note:** data in 2021 dollars

comparison ranking: 26

**Real GDP growth rate**

2.86% (2023 est.)
3.25% (2022 est.)
3.65% (2021 est.)

**note:** annual GDP % growth based on constant local currency

comparison ranking: 113

**Real GDP per capita**

$5,700 (2023 est.)
$5,700 (2022 est.)
$5,600 (2021 est.)

**note:** data in 2021 dollars

comparison ranking: 171

**GDP (official exchange rate)**

$362.815 billion (2023 est.)

**note:** data in current dollars at official exchange rate

**Inflation rate (consumer prices)**

24.66% (2023 est.)
18.85% (2022 est.)
16.95% (2021 est.)

**note:** annual % change based on consumer prices

comparison ranking: 200

## Credit ratings

**Fitch rating:** B (2020)

**Moody's rating:** B2 (2017)

**Standard & Poors rating:** B- (2020)

**note:** The year refers to the year in which the current credit rating was first obtained.

## GDP - composition, by sector of origin

**agriculture:** 21.1% (2016 est.)

**industry:** 22.5% (2016 est.)

**services:** 56.4% (2017 est.)

comparison rankings: services 149; industry 127; agriculture 43

## GDP - composition, by end use

**household consumption:** 80% (2017 est.)

**government consumption:** 5.8% (2017 est.)

**investment in fixed capital:** 14.8% (2017 est.)

**investment in inventories:** 0.7% (2017 est.)

**exports of goods and services:** 11.9% (2017 est.)

**imports of goods and services:** -13.2% (2017 est.)

## Agricultural products

yams, cassava, maize, oil palm fruit, rice, taro, bananas, vegetables, sorghum, groundnuts (2022)

**note:** top ten agricultural products based on tonnage

## Industries

crude oil, coal, tin, columbite; rubber products, wood; hides and skins, textiles, cement and other construction materials, food products, footwear, chemicals, fertilizer, printing, ceramics, steel

## Industrial production growth rate

0.72% (2023 est.)

**note:** annual % change in industrial value added based on constant local currency

comparison ranking: 146

## Labor force

75.721 million (2023 est.)

**note:** number of people ages 15 or older who are employed or seeking work

comparison ranking: 7

**Unemployment rate**

3.07% (2023 est.)
3.83% (2022 est.)
5.39% (2021 est.)

**note:** % of labor force seeking employment

comparison ranking: 49

**Youth unemployment rate (ages 15-24)**

**total:** 5.8% (2023 est.)

**male:** 4.8% (2023 est.)

**female:** 7.1% (2023 est.)

**note:** % of labor force ages 15-24 seeking employment

comparison ranking: total 171

**Population below poverty line**

40.1% (2018 est.)

**note:** % of population with income below national poverty line

**Gini Index coefficient - distribution of family income**

35.1 (2018 est.)

**note:** index (0-100) of income distribution; higher values represent greater inequality

comparison ranking: 76

**Average household expenditures**

**on food:** 59% of household expenditures (2021 est.)

**on alcohol and tobacco:** 1% of household expenditures (2021 est.)

**Household income or consumption by percentage share**

**lowest 10%:** 2.9% (2018 est.)

**highest 10%:** 26.7% (2018 est.)

**note:** % share of income accruing to lowest and highest 10% of population

**Remittances**

5.65% of GDP (2023 est.)
4.26% of GDP (2022 est.)
4.42% of GDP (2021 est.)

**note:** personal transfers and compensation between resident and non-resident individuals/households/entities

**Budget**

**revenues:** $37.298 billion (2019 est.)

**expenditures:** $59.868 billion (2019 est.)

**Public debt**

21.8% of GDP (2017 est.)

comparison ranking: 182

**Taxes and other revenues**

3.4% (of GDP) (2017 est.)

comparison ranking: 204

**Current account balance**

-$805.777 million (2023 est.)
$1.019 billion (2022 est.)
-$3.254 billion (2021 est.)

**note:** balance of payments - net trade and primary/secondary income in current dollars

comparison ranking: 132

**Exports**

$60.261 billion (2023 est.)
$69.091 billion (2022 est.)
$50.856 billion (2021 est.)

**note:** balance of payments - exports of goods and services in current dollars

comparison ranking: 60

**Exports - partners**

Spain 13%, India 12%, France 7%, US 7%, Netherlands 6% (2022)

**note:** top five export partners based on percentage share of exports

**Exports - commodities**

crude petroleum, natural gas, fertilizers, refined petroleum, gold (2022)

**note:** top five export commodities based on value in dollars

**Imports**

$72.251 billion (2023 est.)
$77.049 billion (2022 est.)
$67.478 billion (2021 est.)

**note:** balance of payments - imports of goods and services in current dollars

comparison ranking: 55

**Imports - partners**

China 32%, Belgium 11%, Netherlands 10%, India 8%, US 5% (2022)

**note:** top five import partners based on percentage share

of imports

**Imports - commodities**

refined petroleum, wheat, garments, plastics, cars (2022)

**note:** top five import commodities based on value in dollars

**Reserves of foreign exchange and gold**

$35.564 billion (2022 est.)
$40.476 billion (2021 est.)
$36.73 billion (2020 est.)

**note:** holdings of gold (year-end prices)/foreign exchange/special drawing rights in current dollars

comparison ranking: 49

**Debt - external**

$26.847 billion (2019 est.)
$22.755 billion (2018 est.)

comparison ranking: 88

**Exchange rates**

nairas (NGN) per US dollar -

**Exchange rates:**
425.979 (2022 est.)
401.152 (2021 est.)
358.811 (2020 est.)
306.921 (2019 est.)
306.084 (2018 est.)

## ENERGY

**Electricity access**

**electrification - total population:** 60.5% (2022 est.)

**electrification - urban areas:** 89%

**electrification - rural areas:** 27%

**Electricity**

**installed generating capacity:** 11.697 million kW (2022 est.)

**consumption:** 31.57 billion kWh (2022 est.)

**transmission/distribution losses:** 5.41 billion kWh (2022 est.)

comparison rankings: transmission/distribution losses 167; consumption 65; installed generating capacity 61

**Electricity generation sources**

**fossil fuels:** 78.3% of total installed capacity (2022 est.)

**solar:** 0.1% of total installed capacity (2022 est.)

**hydroelectricity:** 21.5% of total installed capacity (2022 est.)

**biomass and waste:** 0.1% of total installed capacity (2022 est.)

**Coal**

**production:** 3.043 million metric tons (2022 est.)

**consumption:** 3.044 million metric tons (2022 est.)

**exports:** (2022 est.) less than 1 metric ton

**imports:** 1,000 metric tons (2022 est.)

**proven reserves:** 2.144 billion metric tons (2022 est.)

**Petroleum**

**total petroleum production:** 1.514 million bbl/day (2023 est.)

**refined petroleum consumption:** 515,000 bbl/day (2022 est.)

**crude oil estimated reserves:** 36.89 billion barrels (2021 est.)

**Natural gas**

**production:** 39.951 billion cubic meters (2022 est.)

**consumption:** 20.719 billion cubic meters (2022 est.)

**exports:** 19.722 billion cubic meters (2022 est.)

**proven reserves:** 5.761 trillion cubic meters (2021 est.)

**Carbon dioxide emissions**

118.699 million metric tonnes of CO2 (2022 est.)

**from coal and metallurgical coke:** 6.8 million metric tonnes of CO2 (2022 est.)

**from petroleum and other liquids:** 71.255 million metric tonnes of CO2 (2022 est.)

**from consumed natural gas:** 40.645 million metric tonnes of CO2 (2022 est.)

comparison ranking: total emissions 37

**Energy consumption per capita**

8.564 million Btu/person (2022 est.)

comparison ranking: 154

## COMMUNICATIONS

**Telephones - fixed lines**

**total subscriptions:** 97,000 (2022 est.)

**subscriptions per 100 inhabitants:** (2022 est.) less than 1

comparison ranking: total subscriptions 134

## Telephones - mobile cellular

**total subscriptions:** 222.225 million (2022 est.)

**subscriptions per 100 inhabitants:** 102 (2022 est.)

comparison ranking: total subscriptions 6

## Telecommunication systems

**general assessment:** one of the larger telecom markets in Africa subject to sporadic access to electricity and vandalism of infrastructure; most Internet connections are via mobile networks; market competition with affordable access; LTE technologies available but GSM is dominant; mobile penetration high due to use of multiple SIM cards and phones; government committed to expanding broadband penetration; operators to deploy fiber optic cable in six geopolitical zones and Lagos; operators invested in base stations to deplete network congestion; submarine cable break in 2020 slowed speeds and interrupted connectivity; Nigeria concluded its first 5G spectrum auction in 2021 and granted licenses to two firms; construction of 5G infrastructure has not yet been completed (2022)

**domestic:** fixed-line subscribership remains less than 1 per 100 persons; mobile-cellular subscribership is 91 per 100 persons (2021)

**international:** country code - 234; landing point for the SAT-3/WASC, NCSCS, MainOne, Glo-1 & 2, ACE, and Equiano fiber-optic submarine cable that provides connectivity to Europe and South and West Africa; satellite earth stations - 3 Intelsat (2 Atlantic Ocean and 1 Indian Ocean) (2019)

## Broadcast media

nearly 70 federal government-controlled national and regional TV stations; all 36 states operate TV stations; several private TV stations operational; cable and satellite TV subscription services are available; network of federal government-controlled national, regional, and state radio stations; roughly 40 state government-owned radio stations typically carry their own programs except for news broadcasts; about 20 private radio stations; transmissions of international broadcasters are available; digital broadcasting migration process completed in three states in 2018 (2019)

## Internet country code

.ng

## Internet users

**total:** 115.5 million (2021 est.)

**percent of population:** 55% (2021 est.)
comparison ranking: total 7

**Broadband - fixed subscriptions**

**total:** 65,313 (2020 est.)

**subscriptions per 100 inhabitants:** 0.03 (2020 est.)
comparison ranking: total 137

## TRANSPORTATION

**National air transport system**

**number of registered air carriers:** 13 (2020)

**inventory of registered aircraft operated by air carriers:** 104

**annual passenger traffic on registered air carriers:** 8,169,192 (2018)

**annual freight traffic on registered air carriers:** 19.42 million (2018) mt-km

**Civil aircraft registration country code prefix**

5N

**Airports**

47 (2024)
comparison ranking: 91

**Heliports**

15 (2024)

**Pipelines**

124 km condensate, 4,045 km gas, 164 km liquid petroleum gas, 4,441 km oil, 3,940 km refined products (2013)

**Railways**

**total:** 3,798 km (2014)

**standard gauge:** 293 km (2014) 1.435-m gauge

**narrow gauge:** 3,505 km (2014) 1.067-m gauge

**note:** as of the end of 2018, there were only six operational locomotives in Nigeria primarily used for passenger service; the majority of the rail lines are in a severe state of disrepair and need to be replaced
comparison ranking: total 52

**Roadways**

**total:** 195,000 km

**paved:** 60,000 km

**unpaved:** 135,000 km (2019)

comparison ranking: total 28

**Waterways**

8,600 km (2011) (Niger and Benue Rivers and smaller rivers and creeks)

comparison ranking: 17

**Merchant marine**

**total:** 928 (2023)

**by type:** general cargo 23, oil tanker 128, other 777

comparison ranking: total 25

**Ports**

**total ports:** 28 (2024)

**large:** 2

**medium:** 1

**small:** 1

**very small:** 24

**ports with oil terminals:** 23

**key ports:** Antan Oil Terminal, Bonny, Lagos, Pennington Oil Terminal

## MILITARY AND SECURITY

**Military and security forces**

Armed Forces of Nigeria (AFN): Army, Navy (includes Coast Guard), Air Force

Ministry of Interior: Nigeria Security and Civil Defense Corps (NSCDC); Ministry of Police Affairs: Nigeria Police Force (NPF) (2024)

**note 1:** the NSCDC is a paramilitary agency commissioned to assist the military in the management of threats to internal security, including attacks and natural disasters

**note 2:** the Office of the National Security Advisor is responsible for coordinating all security and enforcement agencies, including the Department of State Security (DSS), the NSCDC, the Ministry of Justice, and the Police; border security responsibilities are shared among the NPF, the DSS, the NSCDC, Nigeria Customs Service, Immigration Service, and the AFN

**note 3:** some states have created local security forces akin to neighborhood watches in response to increased violence, insecurity, and criminality that have exceeded the response capacity of federal government security forces, but official security forces remained the

constitutional prerogative of the federal government; in 2023, the federal government began deploying thousands of "agro rangers" across 19 states and the Federal Capital Territory to help safeguard farmland and mediate conflicts, especially in areas hit by farmer-herder clashes

**Military expenditures**

0.7% of GDP (2023 est.)
0.6% of GDP (2022 est.)
0.7% of GDP (2021 est.)
0.6% of GDP (2020 est.)
0.5% of GDP (2019 est.)

comparison ranking: 148

**Military and security service personnel strengths**

information varies; approximately 135,000 active-duty armed forces personnel (100,000 Army; 20,000 Navy/Coast Guard; 15,000 Air Force); approximately 80,000 Security and Civil Defense Corps; approximately 370,000 police (2023)

**Military equipment inventories and acquisitions**

the military's inventory consists of a wide variety of imported weapons systems of Chinese, European, Middle Eastern, Russian (including Soviet-era), and US origin; the military is undergoing a considerable modernization program, and in recent years has received equipment from nearly 20 countries with China and Russia as the leading suppliers; Nigeria is also developing a defense-industry capacity, including small arms, armored personnel vehicles, and small-scale naval production (2023)

**Military service age and obligation**

18-26 years of age for voluntary military service for men and women; no conscription (2023)

**Military deployments**

190 Sudan/South Sudan (UNISFA) (2024)

**note:** Nigeria has committed an Army combat brigade (approximately 3,000 troops) to the Multinational Joint Task Force (MNJTF), a regional counter-terrorism force comprised of troops from Benin, Cameroon, Chad, and Niger; MNJTF conducts operations against Boko Haram and other terrorist groups operating in the general area of the Lake Chad Basin and along Nigeria's northeast border; national MNJTF troop contingents are deployed within their own country territories, although cross-border operations are conducted periodically

**Military - note**

the Nigerian military is sub-Saharan Africa’s largest and regarded as one of its most capable forces; the military's primary concerns are internal and maritime security, and it faces a number of challenges; the Army is deployed in all 36 of the country's states; in the northeast, it is

conducting counterinsurgency/counterterrorist operations against the Boko Haram (BH) and Islamic State of Iraq and ash-Sham in West Africa (ISIS-WA) terrorist groups, where it has deployed as many as 70,000 troops at times and jihadist-related violence has killed an estimated 35-40,000 people, mostly civilians, since 2009; in the northwest, it faces threats from criminal gangs--locally referred to as bandits--and violence associated with long-standing farmer-herder conflicts, as well as BH and ISIS-WA terrorists; bandits in northwestern Nigeria are estimated to number as many as 30,000 and violence there has killed approximately 14,000 people since the mid-2010s; the military also continues to protect the oil industry in the Niger Delta region against militants and criminal activity; since 2021, additional troops and security forces have been deployed to eastern Nigeria to quell renewed agitation for a state of Biafra (Biafra seceded from Nigeria in the late 1960s, sparking a civil war that caused more than 1 million deaths)

the Navy is focused on maritime security in the Gulf of Guinea; since 2016, it has developed a maritime strategy, boosted naval training and its naval presence in the Gulf, increased participation in regional maritime security efforts, and acquired a number of new naval platforms, including offshore and coastal patrol craft, fast attack boats, and air assets

the Nigerian military traces its origins to the Nigeria Regiment of the West African Frontier Force (WAFF), a multi-regiment force formed by the British colonial office in 1900 to garrison the West African colonies of Nigeria (Lagos and the protectorates of Northern and Southern Nigeria), Gold Coast, Sierra Leone, and Gambia; the WAFF served with distinction in both East and West Africa during World War I; in 1928, it received royal recognition and was re-named the Royal West African Frontier Force (RWAFF); the RWAFF went on to serve in World War II as part of the British 81st and 82nd (West African) divisions in the East Africa and Burma campaigns; in 1956, the Nigeria Regiment of the RWAFF was renamed the Nigerian Military Forces (NMF) and in 1958, the colonial government of Nigeria took over control of the NMF from the British War Office; the Nigerian Armed Forces were established following independence in 1960 (2024)

## SPACE

**Space agency/agencies**

National Space Research and Development Agency (NARSDA; established 1999); NARSDA originated from the National Centre for Remote Sensing and National Committee on Space Applications (both established in 1987), and the Directorate of Science (established 1993); Defense Space Administration (DSA; established 2014) (2024)

**Space program overview**

has a formal national space program, which is one of the largest in Africa; focused on acquiring satellites for agricultural, environmental, meteorology, mining and disaster monitoring, socio-economic development, and security purposes; designs, builds (mostly with foreign assistance), and operates satellites; processes overhead imagery data for analysis and sharing; developing additional capabilities in satellite and satellite payload production, including remote sensing (RS) technologies; has a sounding rocket program for researching rockets and rocket propulsion systems with goal of launching domestically produced satellites into space from a Nigerian spaceport by 2030; has relations and/or cooperation agreements with a variety of foreign space agencies and industries, including those of Algeria, Bangladesh, Belarus, China, Ghana, India, Japan, Kenya, Mongolia, South Africa, Thailand, Turkey, the UK, the US, and Vietnam; has a government-owned satellite company and a small commercial aerospace sector (2024)

**note:** further details about the key activities, programs, and milestones of the country's space program, as well as government spending estimates on the space sector, appear in the Space Programs reference guide

## TERRORISM

### Terrorist group(s)

**Terrorist group(s):** Boko Haram; Islamic State of Iraq and ash-Sham – West Africa; Jama'atu Ansarul Muslimina Fi Biladis-Sudan (Ansaru)

**note:** details about the history, aims, leadership, organization, areas of operation, tactics, targets, weapons, size, and sources of support of the group(s) appear(s) in the Terrorism reference guide

## TRANSNATIONAL ISSUES

### Refugees and internally displaced persons

**refugees (country of origin):** 89,045 (Cameroon) (2023)

**IDPs:** 3.09 million (northeast Nigeria; Boko Haram attacks and counterinsurgency efforts in northern Nigeria; communal violence between Christians and Muslims in the middle belt region, political violence; flooding; forced evictions; cattle rustling; competition for resources) (2024)

### Illicit drugs

Nigeria is a major hub for transnational drug trafficking networks entrenched throughout the world and supplying cocaine to Asia and Europe, heroin to Europe and North America, and methamphetamine to South Africa, Southeast Asia, Australia, and New Zealand; also exporting massive quantities of opioids such as tramadol and captagon along with crack cocaine; a major source of precursor or essential chemicals used in the

production of illicit narcotics

**EXHIBIT E**

United States Census Table DP05 (2021) Data Excerpt

# ACS DEMOGRAPHIC AND HOUSING ESTIMATES

United States Census Bureau

**Note: This is a modified view of the original table produced by the U.S. Census Bureau. This download or printed version may have missing information from the original table.**

| Label | United States | | | |
|---|---|---|---|---|
| | Nigerian | | | |
| | Estimate | Margin of Error | Percent | Percent Margin of Error |
| SEX AND AGE | | | | |
| Total population | 530,661 | ±14,252 | 530,661 | (X) |
| Male | 276,966 | ±7,906 | 52.2% | ±0.7 |
| Female | 253,695 | ±8,214 | 47.8% | ±0.7 |
| Sex ratio (males per 100 females) | 109.2 | ±3.1 | (X) | (X) |
| Under 5 years | 42,927 | ±2,602 | 8.1% | ±0.4 |
| 5 to 9 years | 41,448 | ±2,249 | 7.8% | ±0.3 |
| 10 to 14 years | 40,413 | ±2,327 | 7.6% | ±0.4 |
| 15 to 19 years | 40,644 | ±2,204 | 7.7% | ±0.4 |
| 20 to 24 years | 38,055 | ±2,477 | 7.2% | ±0.4 |
| 25 to 34 years | 92,076 | ±3,605 | 17.4% | ±0.5 |
| 35 to 44 years | 89,863 | ±3,291 | 16.9% | ±0.6 |
| 45 to 54 years | 65,980 | ±3,119 | 12.4% | ±0.5 |
| 55 to 59 years | 27,180 | ±1,994 | 5.1% | ±0.3 |
| 60 to 64 years | 22,852 | ±1,592 | 4.3% | ±0.3 |
| 65 to 74 years | 22,331 | ±1,446 | 4.2% | ±0.3 |
| 75 to 84 years | 5,640 | ±609 | 1.1% | ±0.1 |
| 85 years and over | 1,252 | ±272 | 0.2% | ±0.1 |
| Median age (years) | 31.7 | ±0.4 | (X) | (X) |
| Under 18 years | 148,220 | ±5,656 | 27.9% | ±0.6 |
| 16 years and over | 397,861 | ±10,465 | 75.0% | ±0.6 |
| 18 years and over | 382,441 | ±9,900 | 72.1% | ±0.6 |
| 21 years and over | 358,053 | ±9,294 | 67.5% | ±0.6 |
| 62 years and over | 41,590 | ±2,245 | 7.8% | ±0.4 |
| 65 years and over | 29,223 | ±1,613 | 5.5% | ±0.3 |
| 18 years and over | 382,441 | ±9,900 | 382,441 | (X) |
| Male | 201,070 | ±5,899 | 52.6% | ±0.8 |
| Female | 181,371 | ±5,720 | 47.4% | ±0.8 |
| Sex ratio (males per 100 females) | 110.9 | ±3.5 | (X) | (X) |
| 65 years and over | 29,223 | ±1,613 | 29,223 | (X) |
| Male | 15,006 | ±1,174 | 51.3% | ±2.3 |
| Female | 14,217 | ±907 | 48.7% | ±2.3 |
| Sex ratio (males per 100 females) | 105.5 | ±9.6 | (X) | (X) |
| RACE | | | | |
| Total population | (X) | (X) | (X) | (X) |
| One race | (X) | (X) | (X) | (X) |
| Two or more races | (X) | (X) | (X) | (X) |
| One race | (X) | (X) | (X) | (X) |

## Table Notes

**ACS DEMOGRAPHIC AND HOUSING ESTIMATES**

**Survey/Program:** American Community Survey

**Year:** 2021

**Estimates:** 5-Year

**Table ID:** DP05

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the of population for the nation, states, counties, cities, and towns and estimates of housing units for states and counties.

Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Technical Documentation section.

Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section.

Source: U.S. Census Bureau, 2017-2021 American Community Survey 5-Year Estimates

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value sho margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of erro confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see ACS Technical Documentatio nonsampling error is not represented in these tables.

For more information on understanding Hispanic origin and race data, please see the America Counts: Stories Behind the Numbers article entitled, 2020 Census Illuminates Racial and Ethnic Composition of the 2021.

The Hispanic origin and race codes were updated in 2020. For more information on the Hispanic origin and race code changes, please visit the American Community Survey Technical Documentation website.

The 2017-2021 American Community Survey (ACS) data generally reflect the March 2020 Office of Management and Budget (OMB) delineations of metropolitan and micropolitan statistical areas. In certain ins and boundaries of the principal cities shown in ACS tables may differ from the OMB delineation lists due to differences in the effective dates of the geographic entities.

Estimates of urban and rural populations, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do n results of ongoing urbanization.

Explanation of Symbols:

-

The estimate could not be computed because there were an insufficient number of sample observations. For a ratio of medians estimate, one or both of the median estimates falls in the lowest interval or high ended distribution. For a 5-year median estimate, the margin of error associated with a median was larger than the median itself.

N

The estimate or margin of error cannot be displayed because there were an insufficient number of sample cases in the selected geographic area.

(X)

The estimate or margin of error is not applicable or not available.

median-

The median falls in the lowest interval of an open-ended distribution (for example "2,500-")

median+

The median falls in the highest interval of an open-ended distribution (for example "250,000+").

**

The margin of error could not be computed because there were an insufficient number of sample observations.

***

The margin of error could not be computed because the median falls in the lowest interval or highest interval of an open-ended distribution.

*****

A margin of error is not appropriate because the corresponding estimate is controlled to an independent population or housing estimate. Effectively, the corresponding estimate has no sampling error and the r treated as zero.

**EXHIBIT F**

May 28, 2026 FBI Production Cover Letter and “Section (1)” File:
Pointlessly Redacted IRS Special Agent Kevin Moss Affidavit

**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

May 28, 2026

Aaron Greenspan
440 N. Barranca Avenue
Number 6720
Covina, CA 91723

*Greenspan v EOUSA, et al. (D.D.C)*
Civil Action No.: 23-cv-1816
FOIPA Request No.: 1588244-000, 1593615-000
Subject*: Lee Andrew Edwards, Adegboyega Mueez, et al.*

Dear Mr. Greenspan:

You were previously advised we were consulting with another agency concerning information related to your Freedom of Information/Privacy Acts (FOIPA) request.

A portion of that information has been returned to the FBI and is enclosed. The documents were reviewed under the FOIA/FOIPA, Title 5, United States Code, Sections (s) 552/552a. Below you will find check boxes under the appropriate statute headings which indicate the types of exemptions asserted to protect information which is exempt from disclosure. The appropriate exemptions are noted on the enclosed pages next to redacted information. The checked exemptions used to withhold information are further explained in the enclosed Explanation of Exemptions.

| **Section 552** | | **Section 552a** |
|---|---|---|
| ☐ (b)(1) | ☑ (b)(7)(A) | ☐ (d)(5) |
| ☐ (b)(2) | ☐ (b)(7)(B) | ☐ (j)(2) |
| ☑ (b)(3) | ☑ (b)(7)(C) | ☐ (k)(1) |
| 18 USC 2518 | ☑ (b)(7)(D) | ☐ (k)(2) |
| 26 U.S.C. § 6103 | ☑ (b)(7)(E) | ☐ (k)(3) |
| | ☑ (b)(7)(F) | ☐ (k)(4) |
| ☐ (b)(4) | ☐ (b)(8) | ☐ (k)(5) |
| ☐ (b)(5) | ☐ (b)(9) | ☐ (k)(6) |
| ☑ (b)(6) | | ☐ (k)(7) |

116 pages were reviewed and 78 pages are being released.

☑ The appropriate redactions were made by the Internal Revenue Service:

If you have any questions, please write to: Internal Revenue Service, GLDS Support Services – Stop 93A, PO Box 621506, Atlanta, GA 30362. Please refer to case number 2026-10632.

You were previously advised we were consulting with other agencies concerning information related to your FOIA request. A portion of that information has been returned to the FBI and has been processed. These pages are Bates-numbered 23-cv-1816(FBI)3083 through 3084, 23-cv-1816(FBI)-3090 through 3093, 23-cv-1816(FBI)-3133 through 3142, 23-cv-1816(FBI)-3168 through 3184, 23-cv-1816(FBI)-3234 through 3248, 23-cv-1816(FBI)-323 through 3248, 23-cv-1816(FBI)-3249 through 3253, 23-cv-1816(FBI)-3255 through 3290, 23-cv-1816(FBI)-3293 through 3302, and 23-cv-1816(FBI)-3366 through 3368.

This is the 11**th interim release** of information responsive to your FOIPA request. This material is being provided to you at no charge.

Please refer to the enclosed FBI FOIPA Addendum for additional standard responses applicable to your request. **"Part 1"** of the Addendum includes standard responses that apply to all requests. **"Part 2"** includes additional standard responses that apply to all requests for records about yourself or any third-party individuals. **"Part 3"** includes general information about FBI records that you may find useful. Also enclosed is our Explanation of Exemptions.

Additional information about the FOIPA can be found at www.fbi.gov/foia. Should you have questions regarding your request, please feel free to contact fbi.foia@fbi.gov. Please reference the FOIPA Request number listed above in all correspondence concerning your request.

If you are not satisfied with the FBI's determination in response to this request, you may proceed under any or all of the following options:

- You may seek dispute resolution services through the FBI directly by emailing our FOIA Public Liaison at fbi.foia@fbi.gov. The subject heading should clearly state "Dispute Resolution Services." Please also cite the FOIPA Request Number assigned to your request so it may be easily identified.

- You may contact the Office of Government Information Services (OGIS), who serves as the federal FOIA Ombudsman. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

- You may file an administrative appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. **Pursuant to 28 C.F.R. § 16.8(a), your appeal must be postmarked or electronically transmitted within ninety (90) days of the date of this response to your request.** If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal." Please reference the FOIPA Request Number listed above in your correspondence so it may be easily identified. If possible, please provide a copy of your original request and this response letter with your appeal.

Note: Utilizing the FBI's dispute resolution services or requesting mediation through OGIS does not toll the ninety (90) day limit to file a timely appeal with OIP.

Sincerely,

Isabel Lara

Isabel Lara
Acting Section Chief
Record/Information Dissemination Section
Information Management Division

Enclosures

**FBI FOIPA Addendum**

**As referenced in our letter responding to your Freedom of Information/Privacy Acts (FOIPA) request, the FBI FOIPA Addendum provides information applicable to your request. Part 1 of the Addendum includes standard responses that apply to all requests. Part 2 includes standard responses that apply to requests for records about individuals to the extent your request seeks the listed information. Part 3 includes general information about FBI records, searches, and programs.**

**Part 1: The standard responses below apply to all requests:**

(i) **5 U.S.C. § 552(c).** Congress excluded three categories of law enforcement and national security records from the requirements of the FOIPA [5 U.S.C. § 552(c)]. FBI responses are limited to those records subject to the requirements of the FOIPA. Additional information about the FBI and the FOIPA can be found on the www.fbi.gov/foia website.

(ii) **Intelligence Records**. To the extent your request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1), (b)(3), and as applicable to requests for records about individuals, PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(1), (b)(3), and (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records is itself a classified fact protected by FOIA exemption (b)(1) and/or would reveal intelligence sources, methods, or activities protected by exemption (b)(3) [50 USC § 3024(h)(1)]. This is a standard response and should not be read to indicate that any such records do or do not exist.

**Part 2: The standard responses below apply to all requests for records on individuals:**

(i) **Requests for Records about any Individual—Watch Lists.** The FBI can neither confirm nor deny the existence of any individual's name on a watch list pursuant to FOIA exemption (b)(7)(E) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(7)(E), (j)(2)]. This is a standard response and should not be read to indicate that watch list records do or do not exist.

(ii) **Requests for Records about any Individual—Witness Security Program Records.** The FBI can neither confirm nor deny the existence of records which could identify any participant in the Witness Security Program pursuant to FOIA exemption (b)(3) and PA exemption (j)(2) [5 U.S.C. §§ 552/552a (b)(3), 18 U.S.C. 3521, and (j)(2)]. This is a standard response and should not be read to indicate that such records do or do not exist.

(iii) **Requests for Confidential Informant Records.** The FBI can neither confirm nor deny the existence of confidential informant records pursuant to FOIA exemptions (b)(7)(D), (b)(7)(E), and (b)(7)(F) [5 U.S.C.§ § 552 (b)(7)(D), (b)(7)(E), and (b)(7)(F)] and Privacy Act exemption (j)(2) [5 U.S.C.§ 552a (j)(2)]. The mere acknowledgment of the existence or nonexistence of such records would reveal confidential informant identities and information, expose law enforcement techniques, and endanger the life or physical safety of individuals. This is a standard response and should not be read to indicate that such records do or do not exist.

**Part 3: General Information:**

(i) **Record Searches and Standard Search Policy.** The Record/Information Dissemination Section (RIDS) searches for reasonably described records by searching systems, such as the Central Records System (CRS), or locations where responsive records would reasonably be found. The CRS is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled by the FBI per its law enforcement, intelligence, and administrative functions. The CRS spans the entire FBI organization, comprising records of FBI Headquarters, FBI Field Offices, and FBI Legal Attaché Offices (Legats) worldwide; Electronic Surveillance (ELSUR) records are included in the CRS. The standard search policy is a search for main entity records in the CRS. Unless specifically requested, a standard search does not include a search for reference entity records or administrative records of previous FOIPA requests.

a. *Main Entity Records* – created for individuals or non-individuals who are the subjects or the focus of an investigation
b. *Reference Entity Records*- created for individuals or non-individuals who are associated with a case but are not known subjects or the focus of an investigation

(ii) **FBI Records.** Founded in 1908, the FBI carries out a dual law enforcement and national security mission. As part of this dual mission, the FBI creates and maintains records on various subjects; however, the FBI does not maintain records on every person, subject, or entity.

(iii) **Foreseeable Harm Standard.** As amended in 2016, the Freedom of Information Act provides that a federal agency may withhold responsive records only if: (1) the agency reasonably foresees that disclosure would harm an interest protected by one of the nine exemptions that FOIA enumerates, or (2) disclosure is prohibited by law (5 United States Code, Section 552(a)(8)(A)(i)). The FBI considers this foreseeable harm standard in the processing of its requests.

(iv) **Requests for Criminal History Records or Rap Sheets.** The Criminal Justice Information Services (CJIS) Division provides Identity History Summary Checks – often referred to as a criminal history record or rap sheet. These criminal history records are not the same as material in an investigative "FBI file." An Identity History Summary Check is a listing of information taken from fingerprint cards and documents submitted to the FBI in connection with arrests, federal employment, naturalization, or military service. For a fee, individuals can request a copy of their Identity History Summary Check. Forms and directions can be accessed at www.fbi.gov/services/cjis. Additionally, requests can be submitted electronically at www.edo.cjis.gov. For additional information, please contact CJIS directly at (304) 625-5590.

## EXPLANATION OF EXEMPTIONS

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552**

(b)(1) (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2) related solely to the internal personnel rules and practices of an agency;

(b)(3) specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7) records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8) contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9) geological and geophysical information and data, including maps, concerning wells.

**SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a**

(d)(5) information compiled in reasonable anticipation of a civil action proceeding;

(j)(2) material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1) information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2) investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3) material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4) required by statute to be maintained and used solely as statistical records;

(k)(5) investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6) testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7) material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

# United States District Court

NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

ANY AND ALL ACCOUNTS HELD AT CITIBANK IN ALL BANKING UNITS IN THE NAME OF [redacted] INCLUDING BUT NOT LIMITED TO IMRA ACCOUNTS, MONEY MARKET ACCOUNTS AND CERTIFICATES OF DEPOSIT

## SEIZURE WARRANT

b7C per IRS

CASE NUMBER: 92M 4 15

TO: Any Authorized Special Agent of the IRS and any Authorized Officer of the United States

Affidavit(s) having been made before me by [redacted] who believe that in the NORTHERN District of ILLINOIS there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

b6 per IRS
b7C per IRS

ANY AND ALL ACCOUNTS HELD AT CITIBANK IN ALL BANKING UNITS IN THE NAME OF [redacted] INCLUDING BUT NOT LIMITED TO IMRA ACCOUNTS, MONEY MARKET ACCOUNTS AND CERTIFICATES OF DEPOSIT

b7C per IRS

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

YOU ARE HEREBY COMMANDED to seize within 10 days the property specified, serving this warrant and making the seizure (in the daytime—6:00 A.M. to 10:00 P.M.) (~~at any time in the day or night as I find reasonable cause has been established~~) leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to W. Thomas Rosemond, Jr. as required by law.

U.S. Judge or Magistrate

January 10, 1992 3:04 p.m. at CHICAGO, ILLINOIS
Date and Time Issued City and State

W. THOMAS ROSEMOND, JR.
United States Magistrate Judge
Name and Title of Judicial Officer

W. Thomas Rosemond, Jr.
Signature of Judicial Officer

23-cv-1816(FBI)-3168

JAN 13 '92 15:21 FROM DEA HAMMOND PAGE.002

AO 109 (2/90) Seizure Warrant ®

# United States District Court

NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

ANY AND ALL ACCOUNTS HELD AT CITIBANK IN ALL BANKING UNITS IN THE NAME OF [redacted] [redacted] INCLUDING BUT NOT LIMITED TO IMRA ACCOUNTS, MONEY MARKET ACCOUNTS AND CERTIFICATES OF DEPOSIT

## SEIZURE WARRANT

b7C per IRS

CASE NUMBER: 92M [illegible] 15

TO: Any Authorized Special Agent of the IRS and any Authorized Officer of the United States

Affidavit(s) having been made before me by [redacted] who has [redacted] believe that in the NORTHERN District of ILLINOIS there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

b6 per IRS
b7C per IRS

ANY AND ALL ACCOUNTS HELD AT CITIBANK IN ALL BANKING UNITS IN THE NAME OF [redacted] INCLUDING BUT NOT LIMITED TO IMRA ACCOUNTS, MONEY MARKET ACCOUNTS AND CERTIFICATES OF DEPOSIT

b7C per IRS

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

YOU ARE HEREBY COMMANDED to seize within 10 days the property specified, serving this warrant and making the seizure (in the daytime — 6:00 A.M. to 10:00 P.M.) (~~at any time in the day or night as I find reasonable cause has been established~~) leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to W. Thomas Rosemond, Jr.
U.S. Judge or Magistrate
as required by law.

January 10, 1992 3:04 p.m. at CHICAGO, ILLINOIS
Date and Time Issued / City and State

W. THOMAS ROSEMOND, JR.
United States Magistrate Judge
Name and Title of Judicial Officer

W. Thomas Rosemond, Jr.
Signature of Judicial Officer

23-cv-1816(FBI)-3169

JAN 13 '92 15:18 FROM DEA HAMMOND PAGE.002

JAN 15 '92 11:29 ... HILLS P.2/15

AO 109 (2/90) Seizure Warrant

# United States District Court

NORTHERN DISTRICT OF ILLINOIS

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

ANY AND ALL ACCOUNTS UNDER # 263226700 HELD AT THE FIRST HERITAGE BANK IN THE NAME OF [redacted] INCLUDING BUT NOT LIMITED TO MONEY MARKET & NOW ACCOUNTS AND CERTIFICATES OF DEPOSIT

## SEIZURE WARRANT

b7C per IRS

CASE NUMBER: 92M 1

TO: Any Authorized Special Agent of the IRS and any Authorized Officer of the United States

Affidavit(s) having been made before me by [redacted] who has reason to

b6 per IRS
b7C per IRS

believe that in the Northern District of Illinois there is now certain property which is subject to forfeiture to the United States, namely (describe the property to be seized)

Any and all accounts under #263226700 held at the First Heritage Bank in the Name of [redacted] Including but not limited to money market & NOW accounts and certificates of deposit

b7C per IRS

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the property so described is subject to seizure and that grounds exist for the issuance of this seizure warrant.

YOU ARE HEREBY COMMANDED to seize within 10 days the property specified, serving this warrant and making the seizure (in the daytime—6:00 A.M. to 10:00 P.M.) ~~(at any time in the day or night as I find reasonable cause has been established)~~ leaving a copy of this warrant and receipt for the property seized, and prepare a written inventory of the property seized and promptly return this warrant to W. Thomas Rosemond, Jr. as required by law.

U.S. Judge or Magistrate

January 10, 1992 3:02p.m. at Chicago, Illinois

Date and Time Issued — City and State

W. Thomas Rosemond, Jr.
United States Magistrate Judge

Name and Title of Judicial Officer

W. Thomas Rosemond, Jr.

Signature of Judicial Officer

PAGE.003

STATE OF ILLINOIS)
 ) SS
COUNTY OF COOK )

AFFIDAVIT

b6 per IRS
b7C per IRS

[redacted] being duly sworn on oath, deposes and states as follows:

1. I am a Special Agent with the Internal Revenue Service (hereafter"IRS"), in the Criminal Investigation Division for over fourteen (14) years.

2. As is detailed more specifically below, there is probable cause to believe that certain bank accounts and assets controlled by Adegboyega Mueez Akande described below were involved in financial transactions in violation of 18 U.S.C. §§1956 and 1957 and represent proceeds of drug trafficking therefore are forfeitable to the United States under 18 U.S.C. §981 and 21 U.S.C. §881(a)(6).

3. My responsibilities include the investigation of tax fraud and other financial frauds, including money laundering. I have become familiar with the methods commonly used to launder money by persons engaged in narcotics trafficking through training and experience. I have also discussed and compared information that I have about the methods used to launder money with other experienced federal, state and local law enforcement agents. Through training and experience, I have learned that narcotics traffickers must take steps to conceal their receipt of huge cash proceeds that represent the profits received from the operation of their narcotics trafficking organizations. These steps include hiding large amounts of cash in safety deposit boxes or other

concealed safes and "laundering" the cash through financial transactions. Often, to disguise their involvement in the transaction, the drug dealers make use of nominees and/or aliases. Drug traffickers commonly purchase assets with U.S. currency to reduce or eliminate the paper trail generated by their financial transactions. Frequently, when individuals involved in narcotics trafficking acquire assets or expend money, they do so using relatives, nominees and/or aliases. These tactics promote the operation of the narcotics enterprise and conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the narcotics enterprise. Also, I have known individuals, who derive income from narcotics trafficking, to engage in monetary transactions with property valued in excess of $10,000 that has been derived from criminal activity in violation of 18 U.S.C. §1957.

4. As part of my duties and responsibilities as a Special Agent with the IRS, I have been involved with other agents in an investigation of money laundering of the proceeds of a heroin distribution organization. One aspect of this investigation concerns the money laundering activities of Adegboyega Mueez Akande. Through my own participation in this investigation and through information provided to me by other Special Agents of IRS, Drug Enforcement Administration in Hammond, Indiana, (hereafter DEA) and the Federal Bureau of Investigation in Merrillville, Indiana (hereafter "FBI"), I am familiar with all aspects of this investigation. The statements contained in this affidavit are

based in part on information provided by Special Agents of the IRS, DEA, FBI, on information provided by confidential sources, and on my experience and background as a Special Agent of the IRS.

5. During this investigation, I have reviewed financial documents, including bank statements, Currency Transaction Reports, (hereafter CTRs), copies of money orders, cashier's checks and tax returns pertinent to this investigation and IRS records for the filing of 8300 forms. In addition to these documents, I have reviewed records of wire transfers of huge amounts of cash generated by individuals who are believed to be members of this heroin distribution organization.

6. Through my experience as a law enforcement officer, I have learned that large amounts of cash, often in small denominations, pose a significant logistical problem to drug traffickers. Thus, drug traffickers have a need to transform their illegal money into assets that appear to have been legitimately obtained or earned. This process usually entails the integration of the illegally obtained money into the banking system where it can be transferred to other accounts, both within the United States and overseas. The biggest hurdle in accomplishing this goal is often the initial integration of the illegal money into the banking system in such a way that it appears legitimate, and the avoidance of IRS filing and reporting requirements. Debriefings of narcotics traffickers and their associates by IRS, DEA and FBI Special Agents have revealed that these individuals are well aware of the paper trail that is created when cash over $10,000 is brought to a

financial institution, and that they seek ways to avoid that paper trail.

FACTS AND CIRCUMSTANCES

7. Prior to and during 1988, the DEA became involved in the investigation of a white heroin trafficking network operating in Chicago, Illinois and Hammond, Indiana. That investigation disclosed that an individual known as Lee Andrew Edwards was a source of white heroin. Edwards is currently incarcerated for attempting to murder a federal agent while the agent was executing a search warrant. Cocaine, heroin, guns and paraphernalia used to distribute drugs were recovered during the execution of the warrant. Edwards entered a guilty plea to the charges arising from the attempted murder of the federal agent.

8. A DEA confidential source (Source A) has provided reliable information to the DEA in its investigation into a white heroin distribution network. Information provided by Source A has been corroborated by an ongoing DEA investigation, FBI investigations, surveillances of Source A, consensual recordings of conversations, and a review of FBI and DEA records.

9. Source A provided reliable information about Lee Andrew Edwards including the identity of a telephone number which activates an electronic pager. Sou :e A reports that this number is to be called to place an order for white heroin. According to records reviewed, this pager is subscribed to by Adegboyega Mueez Akande at 7504 South Stewart Avenue, Chicago, Illinois.

10. During February 1988, an individual identified as Abiodun Agbele arrived in the United States from Nigeria. According to investigative agents of DEA, Agbele identified Akande as his uncle and stated that Akande provided him (Agbele) an apartment in Hammond, Indiana.

11. The investigation disclosed through interviews with Agbele that Akande returned to Nigeria in mid 1990, however, before he left, he instructed Agbele to serve as a source of white heroin for Lee Andrew Edwards. According to DEA investigators, Agbele sold white heroin to Edwards on numerous occasions. With the assistance of Source A, DEA called Agbele to purchase a small amount of white heroin. On November 20, 1990, Agbele sold one ounce of white heroin to a law enforcement officer working in an undercover capacity for $7,000.

12. Subsequent to the sale of the white heroin to law enforcement officers, Agbele was arrested and agreed to cooperate by providing information regarding the white heroin distribution network of Akande.

13. During interviews with the law enforcement agents investigating this distribution network, Agbele confirmed that Akande was involved in the distribution of white heroin. As a result of his involvement in this business enterprise, Akande generated huge profits that Agbele admitted he often wired to bank accounts on behalf of Akande.

14. According to Agbele, Akande controls the operation of the white heroin distribution network from Nigeria in conjunction with

other individuals in Nigeria and the United States. Much of the business is conducted by telephone, although, according to Agbele, Akande occasionally travels to the United States under an assumed name to retrieve portions of the drug profits.

15. During the course of the investigation, DEA agents learned that in November 1986, Adegboyega Mueez Akande completed a lease application for an apartment on which he listed his employment as an account representative for Globe-Link International. Akande listed his address as 7504 South Stewart Avenue, Chicago, Illinois and a former address as 7527 North Sheridan Road also in Chicago. On the application, Akande listed Audrey Akande as his spouse and his current landlord was identified as Christine Schaffer.

16. Further investigation by DEA disclosed that Abiodun Agbele also completed a lease application for an apartment in the same apartment complex located at 4050 W. 115th Street, Chicago, Illinois. In the application, Agbele stated that he was employed by Globe-Link as a sales representative. The investigators have learned that Adegboyega Mueez Akande currently maintains an apartment in this complex.

17. A review of the documents provided by the Secretary of State disclosed that Globe-Link International is owned by Mueez Adegboyega Akande. According to the 1985 corporate report, the company is located at 7527 North Sheridan Road and is in the business of consulting and business negotiations.

18. It is believed by this affiant that Adegboyega Mueez Akande and Mueez Adegboyega Akande are the same individual because of social security and tax information. Further, Agbele told agents investigating this matter that Nigerians often transpose their first and middle names or use aliases to avoid detection by immigration officials.

19. A review of the 1986 corporate report from the Secretary of State showed that Globe-Link was owned by Mueez A. Akande and other relatives. Audrey Akande was one of the relatives listed, and she was identified as Akande's wife. The business address remained 7527 North Sheridan Road, Chicago, Illinois.

20. A review of records from the IRS disclosed that Globe-Link was located physically at 7504 S. Stewart, Chicago, Illinois but received mail at a post office box. The information further disclosed that Globe-Link filed one corporate tax return in 1987 showing taxable income in the amount of $9,105. No other returns have been filed. Interviews with investigators from the U.S. Customs Service have disclosed that the address at 7504 S. Stewart Avenue is known as a drop-off point for packages from Nigeria that contain white heroin.

21. This investigation has disclosed the identity of other individuals, including relatives, who have worked for Akande with various duties in the distribution organization. One of these individuals has been identified by the investigation as [redacted].

b7C per IRS

22. According to bank records from the First Heritage Bank, Country Club Hills, Illinois, [redacted] opened an individual money market account and a "NOW" account. In the application, [redacted] stated that his address was 7504 South Stewart, Chicago, Illinois. This is the same address used previously by Akande and Globe-Link. The building at this address is a two-flat with one of the residents being identified as Christine Schaffer who is the mother of Audrey Akande and the mother-in-law of Adegboyega Mueez Akande. Upon opening this account, [redacted] deposited $1,000 in traveler's checks.

b7C per IRS

23. Bank records disclosed that five days later, on January 4, 1990, $80,000 was deposited into the NOW account at First Heritage Bank by wire transfer through First Chicago from Banc One Houston. The transaction was completed at the direction of Mirbec A. Akande who resided at 7930 Corporate Drive, Houston, Texas. A review of a credit bureau report shows that Adegboyega Mueez Akande previously used this address. Further, the investigation disclosed through a review of bank records that an individual named Mueez Adegboyega Akande had three accounts at Banc One.

~~24.~~

25. When [redacted] came to First Heritage Bank in December 1989 to open the accounts, according to bank employees, [redacted] was introduced to them by Adegboyega Mueez Akande who at that time maintained an account at the bank.

b7C per IRS

26. According to bank records, [redacted] also opened a joint checking account in his name and the name of his wife,

b7C per IRS

[redacted] previously opened a joint b7C per IRS account also at this bank with Audrey Akande, the wife of Adegboyega Mueez Akande.

27. Bank records further disclosed that on January 6, 1990, [redacted] withdrew $20,000 from the "NOW" account to purcha b7C per IRS Certificate of Deposit for $10,000; the remaining $10,000 was deposited into the money market account. b7C per IRS

28. On the same day, January 6, 1990, [redacted] completed a credit application for an $8,000 loan to purchase an automobile. [redacted] stated in the application that he resided at 7504 South Stewart and that Mueez A. Akande, his cousin, resided at 3515 Maple Lane, Hazel Crest, Illinois. Further, [redacted] stated in the application that his employer was Mobile Oil Nigeria Ltd., Fairfax, Virginia and that his take home pay was $2,400 per month. Additionally, [redacted] stated that he had no other sources of income. He listed his wife, [redacted] as a co-applicant. The application states that she resides at the same location and her employment is listed as housewife. This loan was secured with the certificate of deposit in the amount of $10,000 [redacted] recently purchased.

29. A review of a Trans Union Credit report, however, showed that [redacted] resided at [redacted] The date of this credit report was December 28, 1989. b7C per IRS

30. On January 8, 1990, a loan was given to [redacted] by Heritage Bank and a check in the amount of $8,000 was made payable to the car dealership and him for the purchase of a car.

31. A review of records from the car dealership disclosed that on January 9, 1990, [redacted] purchased a 1990 Nissan 240X (VIN: JN1H536P7LW121339) for $17,754.03 using cashier's checks purchased at First Heritage Bank from funds in his bank accounts. [redacted] provided 3515 Maple Lane, Hazel Crest, Illinois as his residence while completing paperwork at the car dealership.

b7C per IRS

32. Bank records also disclosed that on May 9, 1989, Adegboyega M. Akande opened a checking account number 263153800-2 at First Heritage Bank using social security number [redacted]. The account remained open until September, 1990 according to records from the bank. A review of the bank statements and cashier's checks from this checking account disclosed that it remained inactive except during January 1990 and February 1990. The account records showed a deposit of a cashier's check in the amount of $5,000. The cashiers's check was purchased by [redacted] on January 11, 1990, seven days after the above described $80,000 wire transfer was received from Akande. [redacted] made the cashier's check payable to Audrey Akande and after endorsement with the names Audrey Akande and Adegboyega Akande, it was deposited into Adegboyega Mueez Akande's account.

b3 per IRS
b7C per IRS

33. Information received from the Social Security Administration and the IRS disclose that the social security number used by Adegboyega Mueez Akande to open the account at First Heritage Bank does not belong to him.

34. A review of records from the IRS disclosed the Mueez A. Akande and Audrey Akande last filed a joint income tax return in

1987 showing disposable income (A.G.I.) of $10,500 from self-employment. Akande listed his address as 7504 South Stewart, Chicago, Illinois. The records further disclose that Akande did not file income tax returns for any year following 1987.

35. Records from the Social Security Administration also disclose that the only earnings reported by Adegboyega Mueez Akande were $10,500 in 1987.

36. Records from First Heritage Bank disclose that in 1990, [redacted] deposited $661,000 into his individual money market account and in 1991, [redacted] deposited $1,216,500 into the same money market account. These records also disclose that the funds came from Lagos, Nigeria. The present balance in the account is $980,967.

b7C per IRS

37. Bank records from Citibank Inc., disclose that in January, 1991, [redacted] began opening accounts at Citibank in the section known as the world-wide personal banking unit. A review of bank records disclosed that on January 25, 1991, [redacted] transferred $560,000 from his money market account at First Heritage Bank to one of the world-wide personal accounts at Citibank.

b7C per IRS

38. Account statements from the accounts at both First Heritage Bank and Citibank are being forwarded to [redacted] in care of Shola Ogunbode at 6641 Morningview Court, Alexandria, Virginia.

b7C per IRS

39. Representatives from Mobil Oil were interviewed regarding [redacted] employment status. The representatives confirmed that

b7C per IRS

[redacted] is employed by Mobil Oil Nigeria Ltd. as a treasurer. This position, however, does not involve the transfer of large amounts of money between banking institutions. Mobil Oil representatives stated that under no circumstances would [redacted] be permitted to retain money belonging to Mobil Oil in accounts bearing [redacted] name. Finally, Mobil Oil confirmed that the corporation does not have any accounts in banks in the southern suburbs of Chicago.

40. IRS tax laws require the payment of taxes for resident and non-resident aliens on interest income from deposits made into U.S. banks. A review of IRS records has disclosed that [redacted] b7C per IRS has failed to file income tax returns since 1984 despite the receipt of interest income credited to the accounts in his name.

41. For the foregoing reasons, there is probable cause to believe that the contents of the accounts is subject to forfeiture because the money is property involved in financial transactions that represent the proceeds of some form of unlawful activity, namely drug trafficking, therefore the accounts are subject to forfeiture pursuant to 18 U.S.C. §981 and 21 U.S.C. §881.

[redacted] b6 per IRS
b7C per IRS
Special Agent
Internal Revenue Service

SWORN TO AND SUBSCRIBED BEFORE
ME THIS ______ DAY OF JANUARY, 1992.

______________________________
MAGISTRATE JUDGE





PAGE.015

JAN 13 '92 15:28 FROM DEA HAMMOND

U.S. Department of Justice

Federal Bureau of Investigation

In Reply, Please Refer to
File No. 245F-IP-71386, Sub AAAAAAA

Post Office Box 1186
Indianapolis, Indiana 46206
November 2, 1992

312-886-4510

[redacted]
IRS - Criminal Investigations,
175 East Hawthorn Parkway,
Suite 200,
Vernon Hills, Illinois 60061 [redacted]

b6 per IRS
b7C per IRS

RE: Seizures of United States Currency from [redacted] Accounts

b6 -4 per FBI
b7C -4

Dear [redacted]

b6 per IRS
b7C per IRS

Reference is made to your telephone conversation on October 28, 1992, with [redacted] of this office.

b6 -1 per FBI
b7C -1

As you instructed, the DAG-71 Form submitted by the Metro Drug Task Force, Indianapolis Police Department, is being enclosed to you for further processing.

It is requested that you furnish both this office and Metro Drug Task Force with periodic updates on the status of this request.

[redacted]

[redacted]

b6 -1 per FBI
b7C -1

Searched [redacted]
Serialized [redacted]
Filed
Indexed

[redacted]

[redacted]

23-cv-1816(FBI)-3183

245F-IP-71386 Sub AAAAAAA - 4

245F-IP-71386, Sub AAAAAAA
[redacted] Accounts

b6 -4 per FBI
b7C -4

If you have any questions, please contact either this office or the Metro Drug Task Force at telephone number (317) 631-1826.

Sincerely yours,

Wayne R. Alford
Special Agent in Charge

1 - Addressee (Enc. 1)
1 - Metro Drug Task Force
P.O. Box 1744
Indianapolis, Indiana 46206
(Attn: [redacted]
2 - Indianapolis (245F-IP-71386, Sub AAAAAAA)
[redacted]
(4)

b6 -1,5 Per FBI
b7C -1,5