**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AARON GREENSPAN,<br><br>Plaintiff,<br><br>v.<br><br>EXECUTIVE OFFICE FOR U.S. ATTORNEYS, *et al.*,<br><br>Defendants. | Civil Action No. 23-cv-1816 (BAH)<br><br>Judge Beryl A. Howell |

# MEMORANDUM OPINION

Over four years ago, plaintiff Aaron Greenspan began submitting a series of twelve requests, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to multiple federal agencies, including defendants Federal Bureau of Investigation ("FBI") and the Drug Enforcement Administration ("DEA"), for criminal investigative documents generated during a federal investigation of a Chicago-based money-laundering and heroin-trafficking operation in the early 1990s. *See* Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") at 1, ECF No. 85-1. Two individuals implicated in this federal investigation were specifically named in plaintiff's FOIA requests: Bola Ahmed Tinubu, the current president of Nigeria and intervenor-defendant in this lawsuit, and Abiodun Agbele. *See id.* at 1, 4. When defendants responded to the FOIA requests by issuing *Glomar* responses, refusing to confirm or deny whether the requested records existed, plaintiff, proceeding *pro se*, filed the instant lawsuit and successfully challenged those *Glomar* responses in a prior round of summary judgment motions. *See Greenspan v. Exec. Off. for U.S. Att'ys*, No. 23-cv-1816 (BAH), 2025 WL 1040834, at *1 (D.D.C. Apr. 8, 2025).[1] Central

[1] The term "*Glomar*" stems from a case in which the D.C. Circuit upheld the Central Intelligence Agency's refusal to confirm or deny any relationship to "a ship named the '*Hughes Glomar Explorer*,'" because "doing so would compromise national security or divulge sensitive intelligence sources and methods" and "now *Glomar* responses are

to that prior summary judgment decision rejecting defendants' reliance on *Glomar* responses was the fact that public court filings from the early 1990s had already disclosed the fact that both Tinubu and Agbele were criminally investigated in relation to the drug trafficking operation. *See id.* at *7-9.

Defendants have since processed hundreds of pages of records responsive to plaintiff's requests, withholding, in full or in part, the vast majority. *See* Defs.' Cross-Mot. for Summ. J. & Opp'n to Pl.'s Mot. ("Defs.' Opp'n") at 4-5, ECF 100. Strikingly, none of the records released to plaintiff include the name "Tinubu." *See* Pl.'s Mem. at 1. The FBI even produced a redacted version of the federal agent's affidavit that was referenced in the Court's prior summary judgment decision—withholding, among other details, intervenor-defendant's name—despite the fact that the same affidavit had already been filed, with *no* redactions, on public dockets both when originally submitted to another court in 1993 and again in this Court in 2024. *See id.* at 6.

The parties have now cross-moved for summary judgment once again, with plaintiff challenging the adequacy of the FBI's search and the propriety of defendants' assertions of various FOIA exemptions from the disclosure requirements of this law, and defendants insisting they have satisfied their obligations under FOIA. *See* Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 85; Defs.' Opp'n. For the reasons that follow, plaintiff's motion for summary judgment is denied and defendants' cross-motion is granted in part and denied in part. Also requiring judicial attention are several motions filed by plaintiff and a non-party regarding discovery, amicus participation, and the review of *ex parte*, *in camera* declarations, each of which is denied.

---

proper 'if the fact of the existence or nonexistence of agency records falls within a FOIA exemption.'" *Greenspan*, 2025 WL 1040835, at *1 n.1 (first quoting *Phillippi v. CIA*, 655 F.2d 1325, 1329-31 (D.C. Cir. 1981); then quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).

## I. BACKGROUND

Background for this FOIA dispute is described at length in this Court's prior decision resolving the parties' first round of summary judgment briefing, which was limited to the propriety of defendants' asserted *Glomar* responses, *see Greenspan*, 2025 WL 1040834 at *1, and that background is incorporated by reference here. Following a brief review of the factual and procedural background, including the conclusions reached in that prior decision, the ensuing proceedings in this case are summarized.

### A. Plaintiff's FOIA Requests

During 2022 and 2023, plaintiff submitted twelve FOIA requests to six federal government agencies or components thereof—*i.e.*, the FBI, DEA, Central Intelligence Agency ("CIA"), Internal Revenue Service ("IRS"), Executive Office of United States Attorneys ("EOUSA"), and United States Department of State, Second Am. Compl. ("SAC") ¶¶ 21-117, ECF No. 35—seeking "information about a joint investigation conducted by the FBI, IRS, DEA, and the U.S. Attorney's Offices for the Northern District of Indiana and Northern District of Illinois into the activities, including money laundering, of a Chicago heroin ring that operated in the early 1990s," *Greenspan*, 2025 WL 1040834, at *1 (citing SAC ¶¶ 1-2). "Each of plaintiff's FOIA requests sought criminal investigative records about four named individuals allegedly associated with the drug ring: Bola Ahmed Tinubu, Lee Andrew Edwards, Mueez Abegboyega Akande, and Abiodun Agbele." *Id.* at *1; *see also* SAC ¶¶ 21-117. As the parties recognize, Bola Ahmed Tinubu is the current President of Nigeria. *See* Pl.'s Mem. at 1; Defs.' Opp'n at 2; Intervenor-Def.'s Am. Opp'n to Pl.'s Mot. ("Intervenor-Def.'s Am. Opp'n") at 9, ECF No. 115.

All but two of the government agencies that received plaintiff's FOIA requests have been dismissed as defendants in this case, *see* Stipulation of Dismissal, ECF No. 40; Min. Order (Aug. 13, 2024) (dismissing defendants EOUSA, Department of State, and IRS from this case);

Order (Apr. 8, 2025), ECF No. 47 (entering judgment in favor of defendant CIA), and only four of plaintiff's FOIA requests remain in dispute, *see* Joint Status Report ¶¶ 5-6 (Aug. 8, 2024), ECF No. 39 (stating that plaintiff "agrees to waive all challenges related to" Counts 2, 7, 10, and the portion of Count 9 pertaining to Lee Andrew Edwards in the second amended complaint and that "[p]laintiff forever waives all additional arguments" beyond the issues listed in paragraph 6).[2] The remaining FOIA requests to the FBI and DEA are described briefly below.

### 1. *FOIA Requests Submitted to the FBI*

On March 29, 2023, plaintiff submitted to the FBI an electronic FOIA request seeking "[t]he entire FBI file for Bola Ahmed Tinubu, DOB 3/29/1952, President-Elect of Nigeria as of February 2023." SAC ¶ 54; SAC Ex. 22 at 2, ECF No. 35-22. Less than a week later, the FBI, by letter, acknowledged receipt of the request, notified plaintiff that the request was assigned Request Number 1588244-000, and informed plaintiff that "the FBI will neither confirm nor deny the existence of such records," invoking FOIA Exemptions 6 and 7(C), 5 U.S.C. §§ 552(b)(6), (7)(C), to justify this response, since "[t]he mere acknowledgement of the existence of FBI records on third party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy." SAC ¶¶ 55-56; SAC Ex. 23 at 1, ECF No. 35-23. Plaintiff challenged the FBI's response to this FOIA request in Count 5 of his second amended complaint. SAC ¶¶ 54-61, 138-142.

In May 2023, plaintiff submitted to the FBI an electronic FOIA request for any "FBI 302 interviews with Bola Tinubu from FBI Case No. 245-IP-71386-UUUUUU during the timeframe

---

[2] Although plaintiff puzzlingly asserts, contrary to his prior narrowing of the issues to resolve this case, that seven FOIA requests "are still at issue," including those related to Counts 3, 4, and 10 of the Second Amended Complaint, Pl.'s Mem. at 3, requests for records regarding Lee Andrew Edwards and Mueez Adegboyega Akande, *see id.*, are no longer at issue in this case. As previously recognized, plaintiff agreed to "narrow the issues for summary judgment briefing to defendants' *Glomar* responses, redactions, and withholdings as to Tinubu and Agbele only," so FOIA requests that "do not involve Tinubu or Agbele . . . are not at issue," *Greenspan*, 2025 WL 1040834, at *2 (citing Joint Status Report ¶¶ 5-6 (Aug. 8, 2024)).

1992-1993." SAC ¶ 62; SAC Ex. 26 at 2, ECF No. 35-26.[3] Roughly a week later, the FBI, by letter, acknowledged receipt of the request, informed plaintiff that the request was assigned Request Number 1593615-000, and, as with plaintiff's March 29 request, further advised that "the FBI will neither confirm nor deny the existence of such records," again pursuant to FOIA Exemptions 6 and 7(C), since merely acknowledging the existence of any such records "could reasonably be expected to constitute an unwarranted invasion of personal privacy." SAC ¶¶ 63-64; SAC Ex. 27 at 1, ECF No. 35-27. Plaintiff challenged the FBI's response to this FOIA request in Count 6 of his second amended complaint. SAC ¶¶ 62-70, 143-147.

**2. *FOIA Requests Submitted to DEA***

On July 21, 2022, plaintiff submitted to DEA a FOIA request seeking "[a]ny records from the DEA's Hammond, Indiana or Washington, D.C. offices concerning the Nigerian heroin distribution organization active from approximately 1988 to 1994 or later involving any of the following third parties Tinubu, Bola Ahmed and Edwards, Lee Andrew." SAC ¶ 87; SAC Ex. 41 at 1-2, ECF No. 35-41. The request explained that the "organization is described in a civil forfeiture complaint and IRS CI affidavit in ILND Case No. 1:93-cv-04483." SAC ¶ 87; SAC Ex. 41 at 2. DEA assigned reference number 22-00892-F to the request on the same day. SAC ¶ 88; SAC Ex. 42, ECF No. 35-42. One month later, plaintiff was informed, by letter, that DEA would "neither confirm nor deny the existence of such records pursuant to Exemptions 6 & 7(C) of the FOIA," since "[e]ven to acknowledge the existence of law enforcement records on another individual could reasonably be expected to constitute an unwarranted invasion of personal

[3] The parties' filings are inconsistent as to whether this request was filed on May 23, 2023, *see* SAC ¶ 62; Pl.'s Mem. at 3, or May 25, 2023, *see* Defs.' Opp'n at 3, although the FBI's affiant notes that the request was dated May 25, 2023, *see* Defs.' Opp'n, Decl. of Christina L. Driver, Assistant Section Chief of the Record/Information Dissemination Section, FBI's Information Management Division ("Driver Decl.") ¶ 7, ECF No. 100-1.

privacy." SAC ¶ 89; SAC Ex. 43 at 1, ECF No. 35-43. Plaintiff challenged DEA's response to this FOIA request in Count 9 of his second amended complaint. SAC ¶¶ 87-94, 158-162.[4]

On December 5, 2023, plaintiff submitted to DEA another FOIA request seeking "[t]he DEA case file for Abiodun Agbele, located in either the Northern District of Indiana or the Northern District of Illinois, from January 1, 1990 - December 31, 1995." SAC ¶ 105; SAC Ex. 52 at 3, ECF No. 35-52. DEA assigned the request reference number 24-00201-F the same day. SAC ¶ 106; SAC Ex. 53 at 1, ECF No. 35-53. Approximately three weeks later, DEA informed plaintiff that it would "neither confirm nor deny the existence of such records," again pursuant to FOIA Exemptions 6 and 7(C), due to the "unwarranted invasion of personal privacy" that "could reasonably be expected" were such records acknowledged. SAC ¶ 107; SAC Ex. 54 at 1, ECF No. 35-54. Plaintiff challenged DEA's response to this FOIA request in Count 11 of his second amended complaint. SAC ¶¶ 105-12, 168-72.

### B. First Round of Cross-Motions for Summary Judgment

Plaintiff, proceeding *pro se*, filed the instant lawsuit on June 12, 2023, initially naming the FBI, DEA, IRS, EOUSA, and Department of State as defendants, and subsequently amended his complaint to add the CIA as an additional defendant. *See Greenspan*, 2025 WL 1040834, at *4. A few months later, on October 20, 2023, plaintiff filed an emergency motion requesting "a hearing to compel defendants immediately to produce records responsive to his FOIA requests" and "citing the Nigerian Supreme Court's plan to begin hearing arguments in three days' time in litigation contesting Bola Tinubu's election as the President of Nigeria," which motion was denied "for failure to satisfy any of the requirements for emergency injunctive relief." *Id.* (citations omitted) (noting that a subsequent motion for reconsideration was also denied). Soon after, Nigerian

---

[4] Plaintiff has waived any claims relating to Lee Andrew Edwards arising from this same count of the second amended complaint and the underlying FOIA request. *See* Joint Status Report ¶ 5 (Aug. 8, 2024).

President Tinubu filed a motion to intervene in the case, citing his privacy interests in his "confidential tax records" and "documents from federal law enforcement agencies that fall within the Privacy Act or exceptions to FOIA and should not be disclosed," Intervenor-Def.'s Mot. to Intervene at 1, ECF No. 18, which motion was granted over plaintiff's opposition, *see* Pl.'s Opp'n to Bola A. Tinubu's Mot. to Intervene, ECF No. 19; Min. Order (Nov. 27, 2023).

Plaintiff filed the operative second amended complaint in March 2024, challenging each agency's response to his twelve separate FOIA requests. *See* SAC ¶¶ 118-77. After defendants answered this complaint, the parties jointly informed the Court, in August 2024, that plaintiff had narrowed all FOIA requests at issue in the case "to only those documents . . . already . . . analyzed for processing by the respective agency defendants as of . . . July 11, 2024," Joint Status Report ¶ 4 (Aug. 8, 2024), and that plaintiff wished to proceed to summary judgment briefing, *id.* ¶ 5. "To enable this 'atypical' step, plaintiff agreed to waive 'all challenges related to claims where processing' was not yet complete, resulting in the waiver of any claims relating to Counts 2, 7, and 10 of the second amended complaint, as well as any records related to Lee Edwards in Count 9, and 'any corresponding allegations related to these requests raised in' Count 13, which sought declaratory judgment." *Greenspan*, 2025 WL 1040834, at *4 (quoting Joint Status Report ¶ 5 (Aug. 8, 2024)). Plaintiff also agreed to "limit summary judgment briefing to challenges to the 'FBI, DEA, and CIA's *Glomar* responses as to Tinubu,' the DEA's *Glomar* response as to Agbele, and any redactions and withholdings as to Tinubu and Agbele." *Id.* (quoting Joint Status Report ¶ 6 (Aug. 8, 2024)). Pursuant to the parties' agreement, defendants EOUSA, IRS, and Department of State were dismissed from this litigation, *see* Joint Status Report ¶ 7 (Aug. 8, 2024); Min. Order (Aug. 13, 2024), and the parties subsequently completed, in mid-January 2025, summary judgment

briefing on the propriety of the FBI, DEA, and CIA's *Glomar* responses to the five remaining FOIA requests at issue, concerning Agbele and Tinubu, *see Greenspan*, 2025 WL 1040834, at *4.

In April 2025, summary judgment was granted to plaintiff "as to each of the four *Glomar* responses asserted by [the] FBI and DEA," while summary judgment was granted to the CIA, "since its *Glomar* response was properly asserted." *Id.* at *13. Core to the determination that the FBI and DEA's *Glomar* responses were improper was the fact that plaintiff identified documents constituting an official acknowledgment by the FBI and DEA that they investigated Agbele and Tinubu and that public acknowledgement precluded those agencies from asserting a *Glomar* response for investigative records about Agbele and Tinubu. *See id.* at *7-9 (regarding DEA's *Glomar* response as to Agbele); *id.* at *9 (regarding the FBI and DEA's *Glomar* responses as to Tinubu). In particular, plaintiff attached to his first motion for summary judgment "a verified complaint and accompanying affidavit, filed in the Northern District of Illinois by [the United States Department of Justice ('DOJ')], on July 26, 1993, seeking the civil forfeiture of funds allegedly connected to the drug trafficking investigation." *Id.* (citing Pl.'s First Mot. for Summ. J., Ex. A, Verified Compl. for Forfeiture, *United States v. Funds in Acct. 263226700 Held by First Heritage Bank in the Name of Bola Tinubu*, No. 1:93-cv-04483, ECF No. 41-4 at 2 [hereinafter Forfeiture Compl.]; Pl.'s First Mot. for Summ. J., Ex. A, Aff. of IRS Special Agent Kevin Moss, attached to Forfeiture Compl., ECF No. 41-4 at 5 [hereinafter Moss Aff.]). As to Agbele, the Moss Affidavit "explicitly disclose[d], in at least four separate paragraphs, that DEA investigated Agbele," *id.* at *7, and "'specifically' detail[ed] why 'there [was] probable cause to believe that funds in certain bank accounts controlled by Bola Tinubu[] were involved in financial transactions in violation of 18 U.S.C. §§ 1956 and 1957 and represent proceeds of drug trafficking,'" *id.* at *9 (quoting Moss Aff. ¶ 2).

Despite defendants' protestations that "the mere 'filing of the IRS agent's affidavit as an exhibit to a complaint does not transform the affidavit into an official disclosure of the Department of Justice and its components,'" *id.* at *8 (citation omitted), the Court recognized that "public court filings by DOJ constitute official acknowledgment of the filed documents, which acknowledgment binds not only DOJ but also any of its components," including the FBI and DEA, *id.*; *see also id.* at *9-10. In addition, the Moss Affidavit was explicitly incorporated by reference into the federal prosecutor office's complaint in the forfeiture action, so its contents were "legally considered to be part of the complaint." *Id.* at *8. By contrast, summary judgment was granted to the CIA because plaintiff "failed to show that the CIA has ever officially acknowledged the existence or nonexistence of records responsive to his FOIA request." *Id.* at *13.

The FBI and DEA were also found to have "failed to meet their burden to show that they properly invoked FOIA Exemptions 6 and 7(C), 5 U.S.C. § 552(b)(6), (7)(C), as the rationale for their *Glomar* responses." *Id.* at *11. Although the parties did not dispute that plaintiff's FOIA requests to the FBI and DEA sought law enforcement investigative records and thus met the threshold requirement for invoking Exemption 7(C), *see id.* at *11 & n.9, defendants did not "establish[] a cognizable privacy interest to support their *Glomar* responses," *id.* at *12; *see also id.* at * 11 (noting that "all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C)" (quoting *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011))). As to Agbele, the only explanation DEA gave for issuing its *Glomar* response was that confirming or denying the existence of responsive documents "would reveal whether a DEA investigation of Agbele existed." *Id.* at *9. "[S]ince the existence of a DEA investigation of Agbele has already been publicly acknowledged," *id.*, DEA's asserted need to protect the existence of records from public disclosure was "neither logical nor plausible," *id.*

(quoting *ACLU v. CIA* (*ACLU/CIA*), 710 F.3d 422, 430 (D.C. Cir. 2013)). As to Tinubu, two distinct privacy interests were identified to be possibly at play in responding to plaintiff's FOIA request "(1) Tinubu's interest in keeping secret the *fact* that he was under investigation, and (2) Tinubu's privacy interest in the *contents* of [any] investigative files," *id.* at *12 (internal quotation marks and citation omitted), but only the former interest was at issue in determining the validity of defendants' *Glomar* responses. Since the affidavits provided by the FBI and DEA "[did] not even acknowledge that the existence of the criminal investigation of Tinubu has already been made public, much less explain why, in light of that reality, a cognizable privacy interest still exists to support the asserted *Glomar* responses," those defendants "failed to meet their burden to sustain their *Glomar* responses." *Id.*

### C. Subsequent Releases of Records

Following plaintiff's successful challenge to the FBI and DEA's *Glomar* responses to his FOIA requests in the first round of summary judgment briefing, *see Greenspan*, 2025 WL 1040834, at *9-12, the FBI and DEA were ordered to "search for and produce non-exempt records responsive to plaintiff's FOIA requests (FBI Requests Nos. 1588244-000 and 1593615-000, and DEA Request Nos. 22-00892-F and 24-00201-F)," Order (Apr. 8, 2025), at 2. Defendants' compliance with that order required substantial supervision by the Court. *See, e.g.*, Min. Order (Feb. 3, 2026) (directing defendants to make timely releases of processed records to plaintiff and to submit affidavits to explain extensive processing delays and requiring the parties to submit joint status reports on a biweekly basis).

The FBI eventually made six interim releases of records to plaintiff responsive to his FOIA requests, between February 13, 2026, and June 1, 2026. Defs.' Opp'n at 4 (citing Defs.' Opp'n, Decl. of Christina L. Driver, Assistant Section Chief of the Record/Information Dissemination Section, FBI's Information Management Division ("Driver Decl.") ¶¶ 5-13, ECF No. 100-1). The

FBI processed a total of 399 pages of responsive records, releasing 30 pages in full, withholding 59 pages in full as duplicative of other processed pages, and withholding 247 pages in part and 63 pages in full "pursuant to one or more of the following applicable FOIA exemptions: 3, 5, 6, 7(C), 7(D), 7(E), and 7(F)." Driver Decl. ¶ 5.[5] As part of this processing, the FBI completed consultations with DEA, EOUSA, IRS, and ICE, each of which recommended withholding certain information pursuant to FOIA exemptions. *Id.* ¶¶ 10-13; *see also* Driver Decl., Ex. H, Decl. of Natasha Hudgins, Attorney-Advisor, EOUSA ("Hudgins Decl."), Ex. I, Decl. of Anamaria Bianca Mircan, Tax Law Specialist, IRS Privacy, Governmental Liaison and Disclosure Division ("Mircan Decl."), Ex. J, Decl. of Kenneth N. Clark, Ph.D., Assistant Director, ICE Office of Information Governance and Privacy ("Clark Decl."), ECF No. 100-2.

DEA likewise completed its searches for responsive records and provided further releases to plaintiff in response to the Court's order. *See* Defs.' Opp'n at 5. DEA processed a total of 240 pages, none of which were released in full. *Id.*; *see also* Defs.' Opp'n, Decl. of Angela C. Davis, Unit Chief, Freedom of Information/Privacy Act Unit of the DOJ, DEA ("Davis Decl.") ¶¶ 24-25, ECF No. 100-4. Instead, 4 pages were determined to be nonresponsive, 172 pages were withheld in full and 50 pages were withheld in part based on DEA's review alone, and 2 pages were withheld in full and 12 pages were withheld in part after consultation with the FBI. *See* Davis Decl. ¶¶ 24-25 (explaining that the withholdings were pursuant to FOIA Exemptions 3, 6, 7(C), 7(D), 7(E), and 7(F)).

Two aspects of defendants' productions of responsive records are notable. First, the term "Tinubu" does not appear in any of the records released to plaintiff by either the FBI or DEA. *See*

[5] After consultation with the IRS, the FBI initially withheld certain information pursuant to FOIA Exemption 7(A), but "[t]he IRS no longer asserts 7(A)" as a basis for withholding records and that information has been withheld pursuant to other exemptions. Driver Decl. ¶ 12 & n.5.

Defs.' Cross-Mot., Ex. 6, Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ("Defs.' Resp. to Pl.'s SUMF") at 9, ECF No. 100-6. Second, indicative of the questionable withholdings in this case, the FBI released to plaintiff a redacted version of the Moss Affidavit, *see* Pl.'s Mem. at 6; Pl.'s Mot., Ex. 3, Decl. of Plaintiff Aaron Greenspan in Supp. of Pl.'s Mot. ("Pl.'s Decl."), Ex. F, May 28, 2026, FBI Production Cover Letter & Redacted Moss Aff. ("FBI's Redacted Moss Aff."), ECF No. 85-4, which had been publicly posted in full, without redactions, on this case's docket for several years and was central to the resolution of the first round of summary judgment briefing, *see Greenspan*, 2025 WL 1040834, at *7-9 (citing Moss Aff.).

### D. Continued Litigation and the Instant Cross Motions for Summary Judgment

While defendants were processing and releasing records, plaintiff and defendant-intervenor Bola Ahmed Tinubu continued unabated to engage in motion practice.[6] For example, in September 2025, plaintiff moved to compel production and to impose contempt sanctions, asserting that defendants were "actively engaged in a deliberate effort to defy this Court's Order due to what they perceive as a politically-sensitive topic," protesting defendants' continued assertions of FOIA Exemptions 6 and 7(C), and requesting immediate disclosure of responsive records. *See* Pl.'s Mot. to Compel and for Contempt Sanctions at 1-2, ECF No 55. The same day, intervenor-defendant Tinubu moved to have "the Court confirm that [the FBI and DEA] can and should withhold or redact records that identify Intervenor, pursuant to Exemption 7(c) and the Privacy Act." *See* Intervenor-Def.'s Mot. to Confirm Exemptions at 1, ECF No. 56. Both motions were denied as meritless, premature, and "predicated on a misapprehension of the prior [summary

[6] This motion practice unnecessarily consumed judicial resources and those of the parties. For example, plaintiff filed a motion to strike a joint status report filed by defendants, alleging the omission of two pictures that he intended to include in his section of the report. *See* Pl.'s Mot. to Strike, ECF No. 80. The parties fully briefed this motion, with subsequent briefs clarifying that plaintiff's inability to view the pictures was the result of a mere "technical difficulty," and the motion was denied. Min. Order (June 8, 2026).

judgment] decision issued in this matter," which "was limited to the appropriateness of the agencies' blanket *Glomar* responses" and did not evaluate "the applicability of Exemptions 6 and 7(C) to specific records." Min. Order (Oct. 15, 2025) (citing *Greenspan*, 2025 WL 1040834, at *6, 9, 13). Plaintiff then moved a second time, in February 2026, to compel production and impose contempt sanctions, which motion was again denied as premature and unnecessary in light of defendants' declarations submitted to the Court explaining the reasons for delays in the processing of records. *See* Min. Order (Apr. 8, 2026).

Plaintiff filed his second motion for summary judgment on June 25, 2026. *See* Pl.'s Mot. Following three requests by defendants to extend the applicable deadline, which were "reluctantly" granted, Min. Order (Aug. 20, 2026), defendants, on August 28, 2026, filed a combined cross-motion for summary judgment and opposition to plaintiff's motion, as well as *ex parte, in camera* declarations in support of that cross-motion. *See* Defs.' Opp'n; Defs.' Notice of Compliance, ECF No. 101. Those cross-motions became ripe for resolution in September 2026. *See* Intervenor-Def.'s Am. Opp'n; Pl.'s Opp'n to Defs.' Cross-Mot. & Reply in Supp. of Pl.'s Mot. ("Pl.'s Opp'n"), ECF No. 104; Defs.' Reply in Supp. of Defs.' Cross-Mot. ("Defs.' Reply"), ECF No. 110; Pl.'s Surreply in Opp'n to Defs.' Cross-Mot. ("Pl.'s Surreply"), ECF No. 113.

Meanwhile, during the briefing of the pending cross-motions for summary judgment, plaintiff has continued to file multiple additional motions. *See* Pl.'s Mot. for Entry of Procedural Safeguards Governing Def. FBI's *Ex Parte*, *In Camera* Submissions ("Pl.'s Mot. for Entry of Procedural Safeguards"), ECF No. 97; Pl.'s Mot. for Leave to Serve Limited Discovery on Bola A. Tinubu and DCI Group ("Pl.'s Discovery Mot."), ECF No. 105; Pl.'s Mot. for Judicial Notice in Supp. of Pl.'s Discovery Mot. ("Pl.'s Mot. for Judicial Notice"), ECF No. 116. In addition, a non-party has sought leave to file a brief as *amicus curiae,* in support of plaintiff's summary

judgment motion, but plaintiff opposes. *See* Motion for Leave to File Amicus Brief by Karl Von Batten ("Non-Party Mot. for Leave to File Amicus Br."), ECF No. 102. These motions will be addressed, and denied, in the discussion below. *See* discussion *infra* notes 17 & 22 and Part III.C.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 entitles a party to summary judgment "only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (citation omitted); *see also* FED. R. CIV. P. 56(a). Most FOIA cases "can be resolved on summary judgment." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 584 (D.C. Cir. 2020) (quoting *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011)).

"Agencies may withhold from disclosure information that falls within one of [FOIA's] nine enumerated exemptions," but "[t]hose 'limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Hum. Rts. Def. Ctr. v. U.S. Park Police*, 126 F.4th 708, 712-13 (D.C. Cir. 2025) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)); *see also Jud. Watch, Inc. v. U.S. Dep't of Def.*, 913 F.3d 1106, 1108 (D.C. Cir. 2019) (explaining that Congress "provided nine specific exemptions" from disclosure because "legitimate governmental and private interests could be harmed by release of certain types of information" (quoting *FBI v. Abramson*, 456 U.S. 615, 621 (1982))). Even when a record falls within a FOIA exemption, except Exemption 3, "[a]n agency shall withhold information" only if it "reasonably foresees that disclosure would harm an interest protected by [the] exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). This foreseeable harm requirement "impose[s] an independent and meaningful burden on agencies," and requires agencies to "independently demonstrate[]" the "basis and likelihood" of harm that would result from release of each record or group of similar

records. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (quoting *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019)). Moreover, FOIA's segregability requirement "extends to both steps of FOIA's sequential inquiry: Even if an exemption covers an entire agency record, the agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects." *Leopold v. U.S. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024) (citing 5 U.S.C. § 552(b), (a)(8)(A)(ii)(I)-(II)).

FOIA's "strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents." *Hum. Rts. Def. Ctr.*, 126 F.4th at 713 (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). "The agencies may carry that burden by submitting declarations attesting to the basis for the agency's decision." *Am. First Legal Found. v. U.S. Dep't of Agric.*, 126 F.4th 691, 694 (D.C. Cir. 2025) (internal quotation marks omitted) (quoting *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 58 F.4th 1255, 1262 (D.C. Cir. 2023)). "In a FOIA action, '[s]ummary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Eddington v. U.S. Dep't of Def.*, 35 F.4th 833, 837 (D.C. Cir. 2022) (quoting *Evans*, 951 F.3d at 584). In other words, "agency affidavits that are relatively detailed and non-conclusory, and . . . submitted in good faith . . . are accorded a presumption of good faith." *Evans*, 951 F. 3d at 584 (internal quotation marks omitted) (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)).

## III. DISCUSSION

Plaintiff challenges the adequacy of the FBI's search for responsive records, as well as the propriety of the FBI and DEA's withholdings, which he asserts are not justified with sufficient specificity and improperly withhold information that has already entered the public domain. *See* Pl.'s Mem. at 1-2; Pl.'s Opp'n at 1-2. Defendants counter that the FBI conducted an adequate search and that they properly withheld records pursuant to FOIA Exemptions 3, 5, 6, 7(C), 7(D), 7(E), and 7(F). *See* Defs.' Opp'n at 2. The adequacy of the FBI's search is considered before addressing each asserted exemption in turn and disposing of plaintiff's separate requests for limited discovery and for the Court to take judicial notice.

### A. FBI's Search Was Adequate

The adequacy of an agency's search for documents responsive to a FOIA request is "determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Kowal v. U.S. Dep't of Just.*, 107 F.4th 1018, 1027 (D.C. Cir. 2024) (quoting *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011)). Indeed, only the search process, not the results, must be adequate. *See id.* "An agency fulfills its obligations under FOIA . . . if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Canning v. U.S. Dep't of State*, 346 F. Supp. 3d 1, 13 (D.D.C. 2018) (internal quotation marks omitted) (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999)); *see also Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) ("The court applies a 'reasonableness' test to determine the 'adequacy' of a search methodology" (internal citation omitted)). To obtain summary judgment as to search adequacy, an agency may submit a "reasonably detailed affidavit" that "set[s] forth the search terms and the type of search performed, and aver[s] that all files likely to contain responsive materials . . . were searched." *Reps. Comm. for Freedom of the Press v. FBI*, 877 F.3d 399, 402 (D.C. Cir. 2017)

(quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). The agency affidavits "are accorded a presumption of good faith," and a court "will not credit '[m]ere speculation that . . . uncovered documents may exist' as a basis for finding an agency's search inadequate." *Kowal*, 107 F.4th at 1027 (quoting *SafeCard Servs., Inc.*, 926 F.2d at 1200). "In the absence of contrary evidence, such affidavits or declarations are sufficient to demonstrate an agency's compliance with FOIA." *North v. U.S. Dep't of Just.*, 774 F. Supp. 2d 217, 222 (D.D.C. 2011) (citing *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982)).

The FBI's search satisfies this reasonableness standard. *See Morley*, 508 F.3d at 1114. In a 46-page declaration, the FBI's Assistant Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division, described in detail (a) her familiarity with the procedures followed by the FBI in responding to FOIA requests, Driver Decl. ¶ 3; (b) her specific knowledge of how the FBI handled plaintiff's FOIA request, *id.*; (c) how the FBI's Central Records System ("CRS") is organized and the comprehensive set of records, information, and data it contains, *id.* ¶¶ 15-20; (d) the FBI's basis for believing that a search of the CRS automated indices, accessed via a search in Sentinel, combined with a manual indices search would be the most reasonable means to locate responsive records, some of which may predate the implementation of Sentinel, *see id.* ¶ 21; (e) that, since plaintiff's FOIA requests 1588244-000 and 1593615-000 sought a specific file, *i.e.*, "FBI File Number 245-IP-71386-UUUUUU," a search of the CRS was unnecessary and the agency processed the records contained in that previously identified file, *id.* ¶ 23; (f) that, following this Court's first summary judgment decision, the FBI searched that "previously identified multi-subject file using the terms: 'Bola' and 'Tinubu,'" and located 399 pages of responsive documents, *id.*; and (g) that "there is no basis for the FBI to conclude that a search elsewhere would reasonably be expected to locate responsive records subject to the FOIA,"

*id.* ¶ 24. Responding to plaintiff's further challenges in his reply brief, *see* Pl.'s Opp'n at 11-12, the FBI submitted a second declaration from an Assistant Section Chief of the RIDS, Information Management Division, clarifying that (a) the term search for "Bola" and "Tinubu" was conducted "along with *a manual page-by-page review* within th[e] multi-subject file"; (b) the search term "Bola" and the search term "Tinubu" were utilized separately; (c) the entire subfile number 245-IP-71386-UUUUUU was reviewed; and (d) all segregable, non-exempt information was provided to plaintiff. Defs.' Reply, Second Decl. of Shannon R. Hammer, Assistant Section Chief of the Record/Information Dissemination Section, FBI's Information Management Division ("Second Hammer Decl.") ¶¶ 3-4, ECF No. 110-1 (emphasis in original).[7]

These declarations are sufficiently detailed as to the "the search terms and the type of search performed" to satisfy the FBI's burden as to search adequacy. *Reps. Comm.*, 877 F.3d at 402. Indeed, plaintiff's challenges to the adequacy of the FBI's search has already narrowed significantly in recent months as the agency explained its search methodology through these declarations. *Compare* Pl.'s Mem. at 9-11 (objecting to the FBI's nondisclosure of search terms, term search of the case file, and failure to explain whether it located the specific investigative file mentioned in plaintiff's FOIA request), *with* Pl.'s Surreply at 4-5 (conceding that the FBI's declarations resolved certain search questions and left only one question open). Plaintiff's sole remaining question as to the adequacy of the FBI's search is whether the FBI conducted a manual page-by-page review of the entire multi-subject file identified in his FOIA request, *i.e.*, FBI Case No. 245-IP-71386-UUUUUU, or of only those pages identified through the FBI's term search within that file. *See* Pl.'s Surreply at 4-5 (suggesting that searching only the pages returned from

---

[7] The first declaration filed by this declarant was attached to defendants' February 13, 2026, status report, and explained the FBI's delays in complying with the Court's initial summary judgment order. *See* Defs.' Status Report, Ex. C, Decl. of Shannon R. Hammer, Assistant Section Chief of the Record/Information Dissemination Section, FBI's Information Management Division, ECF No. 65-3.

a term search could fail to locate pages with misspellings or variant names). The FBI's declarations adequately state, however, that the FBI "reviewed the entire subfile" and conducted both a term search and an independent "*manual page-by-page review* within this multi-subject file," indicating that all pages, not just those returned by the term search for "Bola" and "Tinubu," were reviewed for responsiveness. Second Hammer Decl. ¶¶ 3-4 (emphasis in original). Moreover, even if the FBI reviewed only the pages returned by its term search, that would not necessarily defeat the adequacy of the agency's search. *See Kowal*, 107 F.4th at 1029 (noting that "variant searches" for aliases or phonetic variations "are not always required" and concluding that speculation about the existence of additional records, in which the search subject is identified by such variants, "is insufficient to demonstrate the agencies' searches were unreasonable or performed in bad faith").

Accordingly, defendants are entitled to summary judgment as to the adequacy of the FBI's search for responsive records.

**B. Defendants Withholdings Require Further Justification**

Plaintiff contests defendants' withholdings pursuant to the seven FOIA Exemptions 3, 5, 6, 7(C), 7(D), 7(E), and 7(F), as insufficiently justified and unwarranted under the FOIA Improvement Act's foreseeable harm requirement. *See* Pl.'s Mem. at 2; Pl.'s Opp'n, Pl.'s Statement of Genuine Issues in Opp'n to Defs.' Cross-Mot. for Summ. J. ¶¶ 3-17 ("Pl.'s Opp'n Issues Stm."), ECF No. 104-2.[8] For the reasons that follow, defendants are entitled to summary

---

[8] In addition to his objections to defendants' withholdings under certain FOIA exemptions, plaintiff argues that defendants cannot withhold records solely "on the ground that they are sealed" and requests, to the extent defendants do so, that defendants be ordered to "move promptly, in the appropriate court, to unseal the charges and related records concerning Tinubu and Agbele, or to state under oath why they cannot." Pl.'s Mem. at 22. Defendants have not represented that any documents are withheld solely because they are under seal and have instead invoked one or more FOIA exemptions to justify each withholding, and thus no separate relief is warranted on this issue. *See generally* Defs.' Opp'n; Defs.' Reply; *see also Morgan v. U.S. Dep't of Just.*, 923 F.2d 195, 198-99 & n.5 (D.C. Cir. 1991) (explaining that even if an agency "may not rely on the seal to justify its decision to withhold" records, withholding would still be appropriate if "a specific FOIA exemption applies").

judgment only as to the FBI's withholdings pursuant to Exemption 5. Defendants have otherwise failed to establish that the withholdings fall within the scope of the exemptions they invoke, that all reasonably segregable portions of the exempt records have been released, or that disclosure of responsive records would result in reasonably foreseeable harm.

While the Court generally "expects the FBI [and DEA] to be vigilant in [their] submission[s] of supporting materials, and to provide the Court with documents that will enable review of [their] FOIA withholdings 'in the first instance[,] rather than waiting to be prompted to do so by Court Order,'" given the various additional considerations at issue and overlapping exemptions subject to segregability and foreseeable harm analyses, defendants are granted an "additional opportunity to justify [their] withholdings fully," which they must do promptly "through submission of a supplemental declaration [from each agency] that addresses the concerns the Court has expressed in this Opinion and any others that the agenc[ies] might identify" in their efforts to comply with the Court's corresponding order. *Brick v. U.S. Dep't of Just.*, 293 F. Supp. 3d 9, 12 (D.D.C. 2017) (K.B. Jackson, J.) (quoting *Schoenman v. FBI*, 576 F. Supp. 2d 3, 10 (D.D.C. 2008)). Each of defendants' asserted exemptions are addressed *seriatim* below, clarifying the information any supplemental declaration ought to address, unless defendants otherwise release the withheld material at issue.

### 1. *Exemption 3*

Defendants invoke FOIA Exemption 3 to withhold records that they contend fall within the protections of Federal Rule of Criminal Procedure 6(e) (protecting secrecy of grand jury materials); the Pen Register Act, 18 U.S.C. § 3123 (nondisclosure requirement for pen register and trap and trace device orders); Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-20 (nondisclosure requirements for wiretap orders, applications and related materials); and Section 6103(a) of the Internal Revenue Code (nondisclosure requirements for tax

returns and return information). *See* Defs.' Opp'n at 10-12. Exemption 3 applies to matters "specifically exempted from disclosure by statute" if that statute either (1) "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or (2) "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A)(i)-(ii). "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage." *Morley*, 508 F.3d at 1126 (quoting *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987)). An agency defendant thus "need only show that the statute claimed is one of exemption as contemplated by Exemption 3 and that the withheld material falls within the statute." *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (citing *Fitzgibbon v. CIA*, 911 F.2d 755, 761-62 (D.C. Cir. 1990)). Moreover, withholdings pursuant to Exemption 3 are expressly excluded from and not subject to the FOIA Improvement Act's foreseeable harm requirement. *See* 5 U.S.C. § 552(a)(8)(B).

As a threshold matter, plaintiff asserts that defendants failed to justify their Exemption 3 withholdings by failing to "explain, document by document, why the specific withheld content falls within the cited statute." Pl.'s Mem. at 20 (citing *King v. U.S. Dep't of Just.*, 830 F.2d 210, 224 (D.C. Cir. 1987)); *see also* Pl.'s Opp'n at 28. In the context of Exemption 3 withholdings, however, the D.C. Circuit has "encourag[ed] a categorical approach to the Exemption 3 analysis and explain[ed] that courts 'need not evaluate the revelatory characteristics of every individual document in each case before it.'" *Ryan v. U.S. Dep't of Just.*, No. 23-cv-3815 (SLS), 2026 WL 2676048, at *4 (D.D.C. Sept. 11, 2026) (quoting *Lopez v. U.S. Dep't of Just.*, 393 F.3d 1345, 1349 (D.C. Cir. 2005)); *see also Zynovieva v. U.S. Dep't of State*, No. 19-cv-3445 (RDM), 2021 WL

3472628, at *5 (D.D.C. Aug. 5, 2021) ("Nor is the agency necessarily required to justify its Exemption 3 withholdings on a document-by-document basis, given that 'the sole issue for decision [under Exemption 3] is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage.'" (quoting *Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978)). Defendants may therefore justify their Exemption 3 withholdings by "giv[ing] the reviewing court a reasonable basis to evaluate the claim of privilege," even if that basis is not document-specific. *Gallant v. NLRB*, 26 F.3d 168, 172-73 (D.C. Cir. 1994).

Defendants' Exemption 3 withholdings in conjunction with four distinct statutes are considered *seriatim* below. After clarifying which information falls within those statutes' protections, plaintiff's additional argument—that even if certain information falls within the scope of a protective statute, it has already entered the public domain and thus lost its Exemption 3 protection—is addressed. *See infra* Part III.B.1.e.

*a) Withholdings of Grand Jury Materials Under Rule 6(e)*

The FBI first asserts Exemption 3 in conjunction with Federal Rule of Criminal Procedure 6(e), to withhold information on about eight pages, all with overlapping application of other exemptions. *See* Driver Decl. ¶¶ 30-32; Second Hammer Decl. ¶ 5; *see also* Hudgins Decl. ¶¶ 11-16 (explaining EOUSA's requested withholdings as part of its FBI consultation); Driver Decl., Ex. G., Exemption Application Index ("FBI *Vaughn* Index") at 3, 5-6, 8, ECF No. 100-2 (referring to Rule 6(e) at Bates numbers 23-cv-1816(FBI)-1923, -3098, -3100, -3115-16, -3119, -3125, -3205).[9] Rule 6(e) prohibits disclosure of "a matter occurring before the grand jury," FED.

[9] A *Vaughn* index is a document that "describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015); *see also Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) (originating the term "*Vaughn* index"). It "is a now standard tool conceived by the District of Columbia circuit to facilitate resolution of FOIA disputes." *Union Leader Corp. v. U.S. Dep't of Homeland Sec.*, 749 F.3d 45, 49 n.3 (1st Cir. 2014) (internal quotation marks and citation omitted). Even though the FBI does not refer to its "Exemption Application Index" as a *Vaughn* index, that document

R. CRIM. P. 6(e)(2)(B), and "is a qualifying statute under Exemption 3," *Labow v. U.S. Dep't of Just.*, 831 F.3d 523, 529 (D.C. Cir. 2016). Resultantly, certain grand jury materials may not be disclosed even if otherwise responsive to a FOIA request. *See Fund for Const. Gov't v. Nat'l Archives & Recs. Serv.*, 656 F.2d 856, 867-68 (D.C. Cir. 1981).

The Supreme Court has stressed the indispensable necessity for grand jury secrecy to fulfill the "proper functioning" of a grand jury and catalogued the multiple "distinct interests served by safeguarding the confidentiality of grand jury proceedings" to include: (1) "if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony," (2) "witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements," (3) "[t]here also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment," and (4) "by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 424 (1983) (quoting *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218-19 (1979)); *see also Empower Oversight Whistleblowers & Rsch. v. United States* (*In re United States for an Ord. Pursuant to 18 U.S.C. 2705(B)*), 166 F.4th 173, 180 (D.C. Cir. 2026) ("A closed grand jury investigation that investigated but did not charge individuals criminally may still be subject to grand jury secrecy to protect their reputations from unwarranted aspersions, and to ensure that future grand jury witnesses are not dissuaded from testifying fully and frankly.").

---

functions as a *Vaughn* index. *See* FBI *Vaughn* Index (describing each document withheld and identifying the FOIA exemptions applied to each page).

The grand jury secrecy rule does not, however, "draw a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury." *Labow*, 831 F.3d at 529 (internal quotation marks omitted) (quoting *Senate of P.R. v. U.S. Dep't of Just.*, 823 F.2d 574, 582 (D.C. Cir. 1987)). Rather than creating a "*per se* rule against disclosure of any and all information which has reached the grand jury chambers," the "touchstone" for proper withholdings under Rule 6(e) is "whether disclosure would tend to reveal some secret aspect of the grand jury's investigation," including, for example, "the identities of witnesses or jurors, the substance of testimony, the strategy or direction of the investigation, [or] the deliberations or questions of jurors." *Senate of P.R.*, 823 F.2d at 582 (internal quotation marks and citation omitted).

Here, the FBI invokes Rule 6(e) to exempt records "about one or more federal grand juries empaneled in relation to the investigation at issue," which records "summariz[e] and analyz[e] information obtained from [federal grand jury] subpoenas and returns" and "contain[] detailed information concerning the [federal grand jury] subpoenas and returns." Driver Decl. ¶¶ 30-31. EOUSA also attested that the withheld records detail "the targets of the grand jury proceeding and when it was convened." Hudgins Decl. ¶ 14; *see also* Second Hammer Decl., Ex. A, Suppl. Decl. of Natasha Hudgins, Attorney-Advisor, EOUSA ¶ 17 ("Second Hudgins Decl."), ECF No. 110-2. The FBI asserts that, if disclosed, the withheld information "would reveal the identities of witnesses and producing parties, the sources of information relied on to develop the facts of the grand jury investigation, the types of evidence the grand jury sought and reviewed, and the overall focus and strategy of the grand jury investigation." Driver Decl. ¶ 31. Those witness, producing party and source identities, as well as the strategy of the grand jury investigations, are the types of material that the D.C. Circuit has held would "tend to reveal some secret aspect of the grand jury's investigation." *Senate of P.R.*, 823 F.2d at 582 (citation omitted). In addition, although the D.C.

Circuit has cautioned against automatically exempting evidence returned as a result of grand jury subpoenas, *see Labow*, 831 F.3d at 530 ("The mere fact the documents were subpoenaed fails to justify withholding under Rule 6(e)."), withholding is appropriate where the records "would reveal to the requester that they had been subpoenaed" by a grand jury, *id.* at 529. Here, the FBI states that all its withholdings contain "a clear nexus to federal grand jury proceedings on the face of the responsive documents," Driver Decl. ¶ 32, which clarifies that disclosure of even "the types of evidence the grand jury . . . reviewed" would reveal to plaintiff secret information about the federal grand jury proceedings, *id.* ¶ 31; *see also* Second Hammer Decl. ¶ 5 ("The FBI is unable to reveal any additional information regarding this information because doing so would clearly violate the secrecy of the grand jury proceedings and could reveal the inner workings of a federal grand jury."); *Senate of P.R.*, 823 F.2d at 584 (indicating Exemption 3 withholding is permissible if there is "some affirmative demonstration of a nexus between disclosure and revelation of a protected aspect of the grand jury's investigation"). The FBI thus properly invoked Exemption 3 to withhold records regarding grand jury materials in conjunction with Rule 6(e).

*b) Pen Register Act Withholdings*

The FBI and DEA next invoke Exemption 3 in conjunction with the Pen Register Act, 18 U.S.C. § 3123. *See* Driver Decl. ¶¶ 33-34; Second Hammer Decl. ¶ 6; Davis Decl. ¶¶ 27-30. The "Pen Register Act is a qualifying statute under Exemption 3" because this law requires the sealing of "[a]n order authorizing or approving the installation and use of a pen register or a trap and trace device." *Labow*, 831 F.3d at 527-28 (quoting 18 U.S.C. § 3123(d)). "Exemption 3 of FOIA, as regards the Pen Register Act, primarily authorizes the government to withhold a responsive pen register order itself," but the D.C. Circuit has declined to address whether the statute authorizes withholding of "all information that may be contained in or associated with a pen register order."

*Id.*; *see also Leopold v. United States*, 964 F.3d 1121, 1130 n.7 (D.C. Cir. 2020) (noting that the scope of proper withholdings pursuant to the Pen Register Act, beyond the pen register order itself, is an open question after *Labow*).

Here, the FBI cited the protections of the Pen Register Act to withhold "a) identities and phone numbers of the individuals targeted by the pen registers; b) individuals whose information was collected due to their contacting the targets of the pen registers; c) the location of the pen register devices; and d) information gathered by the devices." Driver Decl. ¶ 34. DEA stated only that the withheld records "contained information related to wiretaps and pen register/trap and trace devices." Davis Decl. ¶ 30. To the extent defendants are withholding "information contained exclusively in a pen register order, the information would necessarily fall under the Pen Register Act's nondisclosure requirements and thus would be shielded under Exemption 3 (assuming the pen register order remains sealed)." *Labow*, 831 F.3d at 529. Insofar as defendants "withheld information found in other responsive documents on the ground that a pen register order also contained the same information," however, the applicability of Exemption 3 is "far less clear." *Id.*

Considering the open questions in this Circuit's case law, DEA's boilerplate assertion that the withheld records contain information that "relate[s]" to pen register devices does not suffice to justify its Exemption 3 withholding. Davis Decl. ¶ 30. The FBI, on the other hand, provides further details about its withholdings, demonstrating that they include "[i]nformation at the crux of a pen register order," such as the orders' targets, information about individuals contacted by the targets, location of the pen registers, and reports generated as a result of the orders, and are thus properly withheld. *Labow v. U.S. Dep't of Just.*, 278 F. Supp. 3d 431, 441-42 (D.D.C. 2017) (collecting cases holding that information beyond that contained exclusively in a pen register order itself falls within the scope of Exemption 3); *see* Driver Decl. ¶ 34. The FBI thus properly invoked

Exemption 3 to withhold information on five pages of records in conjunction with the Pen Register Act, all with overlapping exemptions. *See* FBI *Vaughn* Index at 2-3 (referring to the Pen Register Act at Bates numbers 23-cv-1816(FBI)-1887, -1894, -1901, -1908, -1915). DEA, however, has failed to meet its burden and summary judgment is denied as to that agency's withholding of a single page in conjunction with the Pen Register Act. *See* Am. DEA *Vaughn* Index at 19, ECF No. 100-3.

*c) Title III Withholdings*

Defendants withhold information on approximately fifty pages of records pursuant to Exemption 3 and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520 ("Title III"), all with overlapping exemptions. *See* Driver Decl. ¶¶ 35-36; Second Hammer Decl. ¶ 6; Davis Decl. ¶¶ 27-30; FBI *Vaughn* Index at 1-8, 12-14 (referring to Title III at Bates numbers 23-cv-1816(FBI)-599, -1888-89, -1895-96, -1902-03, -1909-10, -1913, -1916-17, -1920, -1922-23, -3066, -3086-87, -3090-91, -3103, -3112, -3118-19, -3124-25, -3144, -3148, 3156-57, -3199, -3204-05, -3331, -3337, -3355); Am. DEA *Vaughn* Index at 8, 15, 17, 23, 24 (referring to Title III at page numbers 78, 80, 149-50, 166, 168, 170, 213-19). Title III "exempts from disclosure any kind of information that is electronically intercepted, regardless of its subject matter," *Lam Lek Chong v. DEA*, 929 F.2d 729, 733 (D.C. Cir. 1991), and "'falls squarely within the scope' of Exemption 3 because its language clearly evinces Congress' intent that intercepted material, except in a few well-defined circumstances, remain secret." *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (quoting *Lam Lek Chong*, 929 F.2d at 733-34).

The FBI asserts that "the information withheld from disclosure pursuant to the provisions of Title III consists of the identities of the individuals targeted for interception through wiretap, and the information obtained from the Title III wiretap." Driver Decl. ¶ 36. Such information

falls within the scope of Title III's protections from disclosure, and plaintiff does not contend otherwise. *See* Pl.'s Opp'n Issues Stm. ¶ 3 (objecting only on the ground that the information is in the public domain). DEA, however, states only that its withholdings "contain[] information related to wiretaps," Davis Decl. ¶ 30, in "a single sentence" that plaintiff argues is insufficient, *see* Pl.'s Opp'n Issues Stm. ¶ 4. DEA's imprecise and scant justification for its Title III withholdings does not suffice, as withholding any information "related to wiretaps" would surely expand the scope of Title III's protections. Davis Decl. ¶ 30; *see Dalal v. U.S. Dep't of Just.*, 643 F. Supp. 3d 33, 59 n.8 (D.D.C. 2022) (criticizing withholding of records where the agency merely stated that they "involved wiretap-related information"). Therefore, the FBI properly invoked Exemption 3 to withhold information on thirty-six pages of records in conjunction with Title III. *See* FBI Vaughn Index at 1-8, 12-14. DEA, however, has failed to meet its burden and summary judgment is denied as to that agency's withholding of fourteen pages of responsive records in conjunction with that statute. *See* Am. DEA *Vaughn* Index at 8, 15, 17, 23, 24.

*d) Withholdings Pursuant to I.R.C. § 6103(a)*

Finally, the FBI, at the request of the IRS, invokes Exemption 3 in conjunction with Section 6103(a) of the Internal Revenue Code (I.R.C.) to withhold information on approximately 35 pages of responsive records, all with overlapping exemptions. *See* Driver Decl. ¶ 84; Mircan Decl. ¶¶ 6, 9; FBI Vaughn Index at 4, 6, 10-11 (referring to Section 6103(a) at Bates numbers 23-cv-1816(FBI)-3092, -3134-36, -3246, -3250-53, -3271-75, -3277, -3281-90, -3293-302). Section 6103(a) exempts from disclosure tax "[r]eturns and return information," I.R.C. § 6103(a), and is a qualifying statute under Exemption 3, *see Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1240 (D.C. Cir. 2018).[10] "The first category, 'returns,' is defined in section 6103(b)(1)," and

[10] Section 6103(a)'s disclosure bar is subject to "thirteen tightly drawn categories of exceptions," *see id.* at 1237 (citing I.R.C. § 6103(a), (c)-(o)), but plaintiff does not argue that any of those exceptions apply here.

"[t]he second category, 'return information,' includes (among other things): 'a taxpayer's identity, the nature, source, or amount of his income, [and] . . . whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing.'" *Id.* at 1241 (quoting I.R.C. § 6103(b)(2)(A)). The D.C. Circuit has observed that the term "return information" in Section 6103 "seems deliberately sweeping," reaching materials that "arrived at the IRS," even "with no indication that [the IRS] used them in any way or subjected them to anything more than minimal processing." *Landmark Legal Found. v. IRS*, 267 F.3d 1132, 1136 (D.C. Cir. 2001).

The IRS's explanations for its recommended withholdings, pursuant to Section 6103(a), state that the records include (1) details about "the IRS's criminal investigation of a taxpayer who is not the plaintiff-requester in this case for possible liability under the Internal Revenue Code," Mircan Decl. ¶ 9(a)-(d), (i)-(j); (2) social security numbers "since an identifying number sourced from IRS records constitutes confidential return information," *id.* ¶ 9(f), (h)-(i); and (3) "confidential return information shared by an IRS-CI Special Agent on the IRS's investigation of a taxpayer who is not the plaintiff-requester in this case for possible liability under the Internal Revenue Code," ¶ 9(k). Plaintiff objects that the IRS declaration "does not explain why any withheld page consists of 'return information' rather than the investigative facts the Moss Affidavit already recites, and it does not address segregability at all," Pl.'s Opp'n at 30, which objection defendants make no effort to rebut in their reply, *see* Defs.' Reply at 3-4 (addressing only the FBI's Rule 6(e), Pen Register Act, and Title III withholdings under Exemption 3).

Nonetheless, the IRS provided sufficient information in its declaration to confirm that the withholdings protect "return information," under the "deliberately sweeping" language of Section 6103, which "reaches far beyond what the phrase 'return information' would normally conjure up." *Landmark Legal Found.*, 267 F.3d at 1136, 1138; *see also S. Poverty Law Ctr. v.*

*IRS*, 589 F. Supp. 3d 79, 85 (D.D.C. 2022) (holding that "confidential, tax-payer-specific records related to the taxpayer's alleged criminal liability under the tax code" "surely" constitute "return information"). Plaintiff's segregability argument has more merit and is addressed comprehensively below. Putting the agency's segregability obligation aside for now, the FBI properly invoked Exemption 3 to withhold information on approximately thirty-five pages of records regarding return information in conjunction with Section 6103(a). *See* FBI *Vaughn* Index at 4, 6, 10-11.

*e) Public Domain Doctrine and Segregability*

Plaintiff objects to each of defendants' asserted withholdings under Exemption 3 contending that some of the withheld records seem to contain information that "is already a matter of public record by virtue of" the Moss Affidavit and public filings he identifies from the prosecution of Lee Andrew Edwards. Pl.'s Mem. at 21; *see also* Pl.'s Opp'n at 30 ("The fact of the IRS's investigation of Intervenor, his family, Akande, Agbele, the bank accounts involved, and even the VIN of his 1990 Nissan 240X were placed in the public record by USDOJ in 1993."); *id.* at 28 ("The FBI's own FD-302 transcriptions of the Title III intercepts in this investigation—bearing file number 245F-IP-71386, the very file at issue, identifying the telephone intercepted and its subscriber, and naming the Special Agent who monitored each call—were introduced into evidence in *United States v. Edwards* and remain in the public case file."); Pl.'s Opp'n Issues Stm. ¶¶ 3-4.

Surprisingly, defendants do not address this argument in their declarations from relevant federal agencies, *see* Driver Decl. ¶¶ 29-36; Second Hammer Decl. ¶¶ 5-6; Davis Decl. ¶¶ 26-30; Hudgins Decl. ¶¶ 11-16; Second Hudgins Decl. ¶¶ 14-19; Mircan Decl. ¶¶ 6, 9, notwithstanding this Court's consternation in the first round of summary judgment briefing that "[t]he affidavits

provided by the FBI and DEA . . . [did] not even acknowledge that the existence of the criminal investigation of Tinubu has already been made public, much less explain why, in light of that reality" the agencies' withholdings were appropriate, *Greenspan*, 2025 WL 1040834, at *12.[11] Defendants' only acknowledgments of this issue consist of two paragraphs in their opposition brief asserting that the public domain exception is "narrow" and does not reach the withheld documents, Defs.' Opp'n at 18, and repetitive statements in their response to plaintiff's statement of undisputed facts that such allegations of prior disclosure would not "be material because it does not affect the outcome of this suit under the governing law," Defs.' Resp. to Pl.'s SUMF at 2-7 (citing *Kowal*, 107 F. 4th at 1031 ("[O]ur circuit has cast doubt on the proposition that 'practically obscure' material remains public.")). As discussed below, that contention is incorrect.

"Under [the D.C. Circuit's] public-domain doctrine, materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999). Defendants, thus, "cannot rely on an otherwise valid exemption claim to justify withholding information that has been 'officially acknowledged' or is in the 'public domain.'" *Davis*, 968 F.2d at 1279; *see also Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 273 (D.C. Cir. 2024) (explaining that the D.C. Circuit "use[s] the terms 'public domain' and 'official acknowledgment' interchangeably" to describe this doctrine). This exception to Exemption 3's "otherwise absolute rule" barring disclosure has its limits. *Cottone*, 193 F.3d at 554. Specifically, the requested information, having "already 'been made public through an official and documented disclosure,'" must be "as specific as the

[11] The FBI's supplemental declaration attached to defendants' reply brief hints at this issue by specifying that disclosure of "withheld information" pursuant to the Pen Register Act and Title III "would reveal non-public details about the use of pen registers and information collected and analyzed as a result of this technique." Second Hammer Decl. ¶ 6 (emphasis added). Defendants do not, however, define what information they deem to be public, and their other submissions suggest any definition they are using is underinclusive. *See* Defs.' Resp. to Pl.'s SUMF at 2-7 (suggesting that the court filings identified by plaintiff did not "remain[] public" (quoting *Kowal*, 107 F.4th at 1031)).

information previously released" and must "match[] 'the information previously disclosed.'" *Nat'l Sec. Archive*, 104 F.4th at 273 (quoting *Fitzgibbon*, 911 F.2d at 765).

This Court's prior summary judgment decision already held that defendants officially acknowledged, via the Moss Affidavit, that the FBI and DEA criminally investigated Agbele and Tinubu in relation to the alleged money-laundering operation, related to a Chicago-based heroin distribution ring. *See Greenspan*, 2025 WL 1040834, at *7-10; *see also id.* at *8 (observing that "public court filings by DOJ constitute official acknowledgment of the filed documents, which acknowledgment binds not only DOJ but also any of its components," including the FBI and DEA). The Moss Affidavit not only names Agbele and Tinubu but describes the government's view that they engaged in illegal conduct, including that Tinubu possessed funds "involved in financial transactions in violation of 18 U.S.C. §§ 1956 and 1957 and represent[ing] proceeds of drug trafficking," Moss Aff. ¶ 2; that "Agbele sold white heroin . . . on numerous occasions," *id.* ¶ 11; that, after Agbele sold heroin to a law enforcement officer, he was arrested and became a cooperator in the DEA's investigation of the larger heroin distribution network, *id.* ¶¶ 11-12; that Tinubu "worked . . . in the [heroin] distribution organization," *id.* ¶ 21; that another member of the distribution organization deposited $80,000 into Tinubu's bank account five days after he opened the account, *id.* ¶¶ 23, 40; and that several seizure warrants were issued for Tinubu's accounts, including multiple warrants from a Magistrate Judge in the Northern District of Illinois and one from the Southern District of New York, *id.* ¶¶ 39, 43. The Moss Affidavit also revealed other identifying information, such as multiple addresses and company names tied to individuals involved in the money-laundering investigation, *id.* ¶¶ 15-22, 27-28, 36-37, 44-45; the taxable income of one of those companies, obtained from a corporate tax return, *id.* ¶ 20; the details of Tinubu's financial transactions, including information obtained from a Trans Union Credit report,

*id.* ¶¶ 22-31, 34-35; and the fact that Tinubu, though earning interest income from deposits made into United States banks, failed to file tax returns here for several years, *id.* ¶ 38.

Beyond the Moss Affidavit, plaintiff points to several documents from the criminal prosecution of Lee Andrew Edwards, one of the individuals identified in the Moss Affidavit as participating in the Chicago-based heroin ring, including excerpts of testimony from Edwards' sentencing hearing. *See* Pl.'s Decl., Ex. B, Excerpt of *Edwards* Sentencing Testimony, ECF No. 85-4 at 22-24 (presenting materials from *United States v. Edwards, et al.*, Case No. 2:92-cr-00113-RL (N.D. Ind.)); Pl.'s Opp'n, Suppl. Decl. of Plaintiff Aaron Greenspan in Supp. of Pl.'s Mot. ("Pl.'s Suppl. Decl."), Exs. G-J, ECF No. 104-3, at 8-111 (same). "The D.C. Circuit has treated trial witness testimony as being in the 'public domain,' which, like 'information that has been "officially acknowledged,"' 'the government cannot rely on an otherwise valid exemption claim to justify withholding,'" *Mid-Atl. Innocence Project v. FBI*, No. 23-cv-2112 (BAH), 2026 WL 775907, at *10 n.12 (D.D.C. Mar. 19, 2026), *reconsideration denied*, No. 23-cv-2112 (BAH), 2026 WL 2085467 (D.D.C. July 20, 2026) (quoting *Davis*, 968 F.2d at 1282), so the sentencing testimony identified by plaintiff likewise constitutes defendants' official acknowledgement of those facts, as components of DOJ.[12] Plaintiff also includes as attachments to his declaration documents that he contends are FBI Form FD-302 transcriptions of intercepted telephone conversations occurring between August and October 1990. *See* Pl.'s Suppl. Decl. ¶ 11; *see also* Pl.'s Suppl. Decl., Ex. J, FBI FD-302 Intercept Transcriptions from FBI File No. 245F-IP-71386, ECF No. 104-3 at 103-11. To the extent those documents are publicly filed and accessible, they, too, have "los[t] their protective cloak." *Cottone*, 193 F.3d at 554; *Knight First Amend. Inst. v.*

[12] Plaintiff's citation to a news article regarding the identified FBI Special Agents does not constitute an official acknowledgement. *See* Pl.'s Mem. at 7; Pl.'s Suppl. Decl. ¶ 17; *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (recognizing that an agency can still withhold information that "is the subject of widespread media and public speculation" if it has not been "official[ly] acknowled[] by an authoritative source").

*CIA*, 11 F.4th 810, 817 (D.C. Cir. 2021) ("[I]f a Department of Justice prosecutor introduces certain records as evidence in court, other DOJ components may not claim FOIA exemptions as to those records.").

Insofar as defendants contend that the materials plaintiff identifies as publicly available filings from court cases are not subject to the public domain doctrine under *Kowal*, they misread that case by construing its reasoning too broadly. *See* Defs.' Resp. to Pl.'s SUMF at 2-7 (citing *Kowal*, 107 F. 4th at 1031). In *Kowal*, the D.C. Circuit declined to apply the public domain doctrine to "the FBI's withholding of a testifying witness's plea agreement," despite the requester's argument that the document was "admitted into evidence at trial and discussed in open court," citing the fact that the plea agreement was not "filed with the court and preserved." *Kowal*, 107 F.4th at 1031. In doing so, the Court explained that documents are not subject to the public domain doctrine if they are not "preserved in a permanent public record," *id.* (quoting *Cottone*, 193 F.3d at 554), and noted that "our circuit has cast doubt on the proposition that 'practically obscure' material remains public," *id.* (quoting *Davis*, 968 F.3d at 1279). This holding, however, was based on the fact that the plea agreement was not "preserved" by being "accessible on the public or electronic docket." *Id.* Here, by contrast, plaintiff does not merely contend that certain documents were discussed in open court, he identifies and attaches copies of those documents to his briefs, demonstrating that several of the documents bear courts' "CM/ECF header stamps" showing they were filed on "that court's electronic filing system," Pl.'s Opp'n at 14-15, and attests that other documents were acquired from "a public court record, easily obtainable from the National Archives," *id.* at 5; *see also* Pl.'s Decl. ¶ 19; Pl.'s Suppl. Decl. ¶¶ 7-11. Unlike the plea agreement in *Kowal*, the documents plaintiff asserts are in the public domain were indisputably "preserved." 107 F.4th at 1031.

Identifying each of these publicly filed documents is only part of plaintiff's burden, however. He must also assert that this "'specific' information" he points to is "identical to that being withheld." *Davis*, 968 F.2d at 1280. Since Exemption 3 generally imposes an absolute bar on disclosure, *see Cottone*, 193 F.3d at 554, and is not subject to the foreseeable harm requirement, *see* 5 U.S.C. § 552(a)(8)(B), the limits of the public domain doctrine must be strictly enforced for withholdings under this exemption to avoid frustrating the nondisclosure objectives of the statutes this exemption is intended to effectuate, *see Am. Jewish Congress v. Kreps*, 574 F.2d 624, 628 (D.C. Cir. 1978) (explaining that the "unmistakable thrust" of Exemption 3 "is to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch" by tying disclosure determinations to the text of the underlying qualifying statute); *Wisconsin Project v. U.S. Dep't of Com.*, 317 F. 3d 275, 280 (D.C. Cir. 2003) ("Exemption 3 has evolved from its original text to require that Congress, not the agencies of the Executive Branch, determine the need for nondisclosure."). The public domain doctrine thus entitles plaintiff to release of only those withholdings that are "as specific as the information previously released" and that "match[] the information previously disclosed." *Nat'l Sec. Archive*, 104 F.4th at 273 (internal quotation marks and citation omitted)); *see also Kowal*, 107 F.4th at 1018 (declining to apply the public domain doctrine because "[a]n agency's summary is not the same as the conversation itself" and the requester "has not shown 'there is a permanent public record of the exact' record she seeks" (quoting *Davis*, 968 F.2d at 1280)); *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) ("[T]he fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption."); *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (observing that releasing the same information in a different form "might well provide new information . . . that the agency may safeguard"). That reality

"makes for a curious tension: if a [FOIA] requester can establish that the information he seeks is freely available, there would be no reason to invoke the FOIA to obtain access to the information." *Lenz v. CIA*, No. 1:20-CV-3327-RCL, 2025 WL 2390005, at *6 (D.D.C. Aug. 18, 2025) (internal quotation marks omitted) (quoting *Davis*, 968 F.2d at 1279-80).[13] Even so, "as courts have routinely held, 'a FOIA requester is nonetheless free to press the point.'" *Id.* (quoting *Jud. Watch, Inc. v. U.S. Dep't of Def.*, 963 F. Supp. 2d 6, 12 (D.D.C. 2013)).

Plaintiff satisfied this demanding aspect of his burden only as to the redactions of the Moss Affidavit released by the FBI, which he specifically identifies as matching the public filing of that document that he attached to his briefing. *See* Pl.'s Mem. at 6; Pl.'s Opp'n at 17.[14] Yet the FBI applied redactions to that document pursuant to Exemptions 6 and 7(C), *see* FBI's Redacted Moss Aff., meaning that match has no bearing on defendants' Exemption 3 withholdings. "It is not the Court's role to search through a party's exhibits, even those of a *pro se* litigant, with the hope of finding the alleged matching pieces," *Stephens v. U.S. Dep't of Just.*, 26 F. Supp. 3d 59, 71 (D.D.C. 2014), and plaintiff has not identified other withholdings—*e.g.*, by pointing to certain entries on defendants' *Vaughn* indices or particular redactions on documents that have been withheld in part under Exemption 3—that he contends are improper under the public domain doctrine, *see, e.g.*,

---

[13] The "curious tension" descriptor puts it mildly. *Lenz*, 2025 WL 2390005, at *6. The burden on FOIA plaintiffs to identify "a permanent public record of the exact record" they seek, *Kowal*, 107 F.4th at 1030 (internal quotation marks and citation omitted), and withholdings that precisely "match[] the information previously disclosed," *Nat'l Sec. Archive*, 104 F.4th at 273 (internal quotation marks and citation omitted), establishes a nearly impossible hurdle to overcome in order to obtain any relief under the public domain doctrine. Only the independent foreseeable harm and segregability requirements give the objectives of the doctrine any traction under existing D.C. Circuit case law. *See* 5 U.S.C. § 552(a)(8)(A), (b).

[14] Plaintiff also asserts that the FBI is withholding several seizure warrants and supporting affidavits, identified by Bates number in the IRS's declaration, that are "court records" and thus presumptively public. Pl.'s Opp'n at 17-18 (citing Mircan Decl. ¶ 9(d), (f)). He does not, however, attach copies of those warrants or otherwise demonstrate that they are publicly accessible. Even court records can be removed from the public domain if they are "destroyed or placed under seal," *Cottone*, 193 F.3d at 554; *see also Kowal*, 107 F.4th at 1031, so plaintiff has not established that those records are subject to disclosure under the public domain doctrine to overcome the FBI's valid assertion of Exemption 3 in conjunction with Section 6103(a).

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 728 F. Supp. 3d 113, 127 (D.D.C. 2024) ("[Plaintiff] attempts to identify duplication by pinpointing *Vaughn* index entries of withheld records that have similar captions and timeframes as the entries of now-disclosed records."); *Ctr. for Pub. Integrity v. U.S. Dep't of Energy*, 287 F. Supp. 3d 50, 63 (D.D.C. 2018) (noting that the plaintiff challenged "redactions to two e-mail communications" under the public domain doctrine). Thus, plaintiff is not entitled to summary judgment as to defendants' Exemption 3 withholdings.

Defendants' requests for summary judgment, however, fare no better. Agencies' obligations under FOIA do not cease once they demonstrate that Exemption 3 applies to certain records; instead, they must still establish that "[a]ny reasonably segregable portion of a record" has been provided to the requester "after deletion of the portions which are exempt" from disclosure. 5 U.S.C. § 552(b); *see Elec. Priv. Info. Ctr.*, 910 F.3d at 1240-41 (assessing whether "the IRS violated its duty to segregate and disclose any non-exempt records" regarding its Exemption 3 withholdings); *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material.").[15] To repeat, information is no longer exempt from disclosure if it has been publicly

[15] The parties assume in their briefing that the segregability requirement applies to Exemption 3 withholdings. Another Judge on this Court has held that "the FOIA Improvement Act carved out exemption 3 from FOIA's general segregability requirements," so "segregation is not required for records properly withheld under exemption 3." *Husch Blackwell LLP v. U.S. Dep't of Com.*, No. 24-cv-2733 (JDB), 2026 WL 933498, at *4 (D.D.C. Apr. 7, 2026), *appeal docketed*, No. 26-5173 (D.C. Cir. May 20, 2026); *see also Advocs. for Hum. Rts. v. U.S. Citizenship & Immigr. Servs.*, No. 24-cv-01295 (APM), 2026 WL 241917, at *3 (D.D.C. Jan. 29, 2026) (citing that case with approval). Citing the "'last-in-time' rule" under which the "more recent legal pronouncement controls" and the notion that "a 'specific provision' typically controls one 'of more general application,'" *Husch Blackwell LLP v. U.S. Dep't of Com.*, No. 24-cv-2733 (JDB), 2025 WL 2959639, at *3 n.4 (D.D.C. Oct. 17, 2025), the court concluded that Congress no longer "wanted to keep the segregability requirement as to exemption 3 information," *Husch Blackwell LLP*, 2026 WL 933498, at *4. This holding and issue of statutory interpretation is currently pending before the D.C. Circuit, *see* Appellant Brief at 22-23, *Husch Blackwell LLP v. U.S. Dep't of Com.*, No. 26-5173 (D.C. Cir. Sept. 8, 2026), but the alternative answer—*i.e.*, that the segregability requirement of Section 552(b) was not displaced as to Exemption 3 by the FOIA Improvement Act—appears more faithful to the statutory scheme. After all, the FOIA Improvement Act's "reiteration of FOIA's reasonable segregation requirement" in Section 552(a)(8)(A)(ii)(II), *Husch Blackwell LLP*, 2026 WL 933498, at *4, left the original segregation requirement in Section 552(b) untouched, and the Act's

disclosed and officially acknowledged by the agency responding to the FOIA request. *See Davis*, 968 F.2d at 1279 ("[T]he government cannot rely on an otherwise valid exemption claim to justify withholding information that has been 'officially acknowledged' or is in the 'public domain.'"); *Citizens for Resp. & Ethics in Wash.*, 728 F. Supp. 3d at 127 ("When identical *information* appears in a 'reasonably segregable portion[]' of a withheld record, the government must release the public portions of the document with redactions." (citing *Citizens for Resp. & Ethics in Wash.*, 58 F.4th at 1273)).

Plaintiff's failure to conduct the matching exercise required to earn affirmative entitlement to the release of information pursuant to the public domain doctrine does not relieve defendants of their standard burden, present in every FOIA case, to justify their withholdings defensively. *See Hum. Rts. Def. Ctr.*, 126 F.4th at 713 ("Th[e] strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents. The burden is the same when the agency seeks to redact a portion of a document as when it seeks to withhold a document in its entirety." (internal quotation marks and citation omitted)); *Citizens for Resp. & Ethics in Wash.*, 728 F. Supp. 3d at 127 (observing that, even if records "are not identical" to the public versions, "identical *information*" must be released if that information is "reasonably segregable"). That principle is particularly salient where, as here, plaintiff satisfied his burden of production by attaching to his briefing various publicly filed documents related to the subject of

disclosure carve-out for Exemption 3 applies only to the requirements of "this paragraph," meaning paragraph (a)(8). Absent contrary guidance from the D.C. Circuit, and considering the fact that the parties did not address this issue, the *Husch Blackwell LLP* court's anomalous conclusion is not adopted here. *See* 2025 WL 2959639, at *3 n.4 (collecting cases from this Court and the D.C. Circuit that have "continued to analyze segregability of exemption 3 records under FOIA subsection (b)'s general requirement" following enactment of the FOIA Improvement Act).

his FOIA requests because it absolves defendants of the "daunting task of proving a negative: that requested information had not been previously disclosed." *Cottone*, 193 F.3d at 554.[16]

Defendants have provided no assurance that "[a]ny reasonably segregable portion of a record," withheld pursuant to Exemption 3 but containing facts already shown to be in the public domain, has been provided to plaintiff "after deletion of the portions which are exempt," 5 U.S.C. § 552(b), because "[n]either the declaration[s] nor *Vaughn* ind[ices]" supporting defendants' withholdings address the public filings identified by plaintiff, *Hettena v. CIA*, 145 F.4th 1354, 1357 (D.C. Cir. 2025). As a result, "we cannot tell whether every redacted statement about [those public facts] reveals something new" and "[w]ithout more from [defendants], we see no basis in the record to conclude that such [public facts] are protected under FOIA." *Id.* at 1357-58.

Defendants are, therefore, not entitled to summary judgment as to their Exemption 3 withholdings at this time and, to maintain those withholdings, they must provide supplemental declarations attesting to a thorough review of the records to determine if publicly-disclosed facts in the withheld records can be segregated and released. *See Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("In order to demonstrate that all reasonably segregable material has been released, the agency must provide a 'detailed justification' for its non-segregability." (quoting *Mead Data*, 566 F.2d at 261)). To be clear, information in the public domain may still be properly withheld if it would reveal new information, *see Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836 (D.C. Cir. 2001) ("[W]e must be confident that the information sought is truly public and that the requester receive no more than what is publicly available." (quoting *Cottone*, 193 F.3d at 555)), or if it is "inextricably intertwined with exempt"

---

[16] In so holding, the Court does not suggest that federal agencies, in order to conduct a proper segregability analysis, must scour the public record for previously disclosed and officially acknowledged facts. Defendants' obligation, here, is tailored to the circumstances of this case, where plaintiff has provided a small universe of public filings against which defendants can cross-check their withholdings.

information, *Mead Data*, 566 F.2d at 260, but given FOIA's "strong presumption in favor of disclosure," *Hum. Rts. Def. Ctr.*, 126 F.4th at 713 (citation omitted), defendants must attest to those facts before they can obtain summary judgment.

* * *

In sum, the FBI properly invoked Exemption 3 to withhold responsive records in conjunction with Federal Rule of Criminal Procedure 6(e); the Pen Register Act, 18 U.S.C. § 3123; Title III, 18 U.S.C. §§ 2510-2520; and Section 6103 of the I.R.C., but failed adequately to attest that all reasonably segregable, nonexempt information identified by plaintiff as already existing in the public domain has been released. DEA, on the other hand, failed on both fronts: it did not adequately justify its Exemption 3 withholdings in conjunction with the Pen Register Act and Title III, nor did it sufficiently justify its determination that publicly disclosed information could not be reasonably segregated and released. As a result, neither the FBI nor DEA are entitled to summary judgment as to their Exemption 3 withholdings.

#### 2. *Exemption 5*

Plaintiff next challenges the FBI's assertion of FOIA Exemption 5 to withhold information on two pages of responsive records. *See* FBI *Vaughn* Index at 5 (invoking Exemption 5 at Bates numbers 23-cv-1816(FBI)-3100-01). Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C § 552(b)(5). "This exemption 'incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant—including . . . the attorney-client privilege, the work product privilege, and the deliberative process privilege.'" *Nat'l Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 596 F. Supp. 3d 130, 139 (D.D.C. 2022) (quoting *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008)). As the D.C. Circuit explained, "[i]f not for that exemption, a party opposed to the government in litigation would be

barred from obtaining the government's privileged attorney work product through discovery but could still gain access simply by filing a FOIA request," but "Exemption 5 prevents FOIA from forcing the government to bear that kind of asymmetric disadvantage in litigation: where opposing counsel would have access to the government's litigation strategy notwithstanding the work-product privilege but the government would have no parallel ability to overcome the privilege in the reverse direction." *Georgia v. U.S. Dep't of Just.*, 148 F.4th 724, 728 (D.C. Cir. 2025).

Here, the records withheld in part by the FBI, following its consultation with EOUSA, consist of "notes from [an] FBI special agent memorializing the advice and information provided by an Assisted United States Attorney (AUSA) . . . in regard to a criminal investigation involving multiple defendants," including "the AUSA's plan regarding the prosecution of multiple third-party defendants." Hudgins Decl. ¶ 8; *see also* Second Hudgins Decl. ¶ 11. Those notes qualify as "inter-agency or intra-agency memorandums or letters," 5 U.S.C § 552(b)(5); *see Georgia*, 148 F.4th at 735 (explaining that "Exemption 5's protection of 'memorandums or letters'" extends to a broader set of materials, including "interview notes," "agency notebooks," and "handwritten notes"), and defendants submitted an affidavit asserting that the records "are core to the attorney work product and attorney-client privileges," Hudgins Decl. ¶ 10; *see also* Second Hudgins Decl. ¶ 13, which privileges are incorporated into Exemption 5, *see Nat'l Wildlife Fed'n*, 596 F. Supp. 3d at 139. The FBI thus properly invoked Exemption 5.

Although conceding that "notes reflecting prosecutorial strategy can fall within Exemption 5 in appropriate circumstances," plaintiff argues that defendants have failed to meet their independent burden to demonstrate foreseeable harm resulting from the release of these four pages. Pl.'s Opp'n at 29 (citing 5 U.S.C. § 552(a)(8)(A)(i)). Specifically, plaintiff objects that

"the prosecutorial judgments at issue concern conduct more than thirty years old, as to defendants who were never charged or who are now deceased," Pl.'s Opp'n at 29, and that defendants' asserted harm does not match their purported interests in withholding information protected by the attorney-client and work product privileges and instead provides "the rationale for the deliberative process privilege," Pl.'s Surreply at 4.

At first blush, plaintiff's argument makes sense, since disclosure of prosecutorial choices made in a decades-old investigation into offense conduct that is far beyond the statute of limitations would likely have zero effect, let alone any harm, on that investigation. Yet, adverse effect on that specific investigation is not the harm defendants identify as being put at risk by disclosure of the prosecutors' strategy notes; rather, the risk is that disclosure of such notes would reveal strategic considerations by government counsel that may apply more broadly and be employed in future investigations. Specifically, the FBI has provided a declaration from an Attorney Advisor for EOUSA, as part of its consultation process with the FBI, explaining that allowing plaintiff "access to the internal deliberation of USAO personnel with FBI federal law enforcement partners" would cause foreseeable harm because it "would reveal the government attorneys' legal strategies, opinion and legal impression of the strength or weakness of potential prosecutions that would result from the investigation" and "because it would hinder USAO personnel from effectively and honestly draft[ing] plans for the execution of their duties on behalf of the United States due to fear of public consumption and interpretation." Hudgins Decl. ¶¶ 9-10; *see also* Second Hudgins Decl. ¶¶ 12-13.

While some of the agency's justification appears tailored to a deliberative process privilege, the potential revelation of "government attorneys' legal strategies, opinion and legal impression of the strength or weakness of potential prosecutions" is directly related to the FBI's

asserted work product privilege. Hudgins Decl. ¶ 9; *see also* Second Hudgins Decl. ¶ 12. Moreover, unlike in the Exemption 3 context described above, the segregability requirement does not alter the analysis because "the work-product doctrine simply does not distinguish between factual and deliberative material," so "any part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine and falls under exemption 5." *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 432 F.3d 366, 371 (D.C. Cir. 2005) (first quoting *Martin v. Off. of Special Counsel*, 819 F.2d 1181, 1187 (D.C. Cir. 1987); then quoting *Tax Analysts v. IRS*, 117 F.3d 607, 620 (D.C. Cir. 1997)). Thus, even if the information in records withheld pursuant to Exemption 5 contain publicly disclosed and officially acknowledged facts, "segregability is not required" because that "factual material is itself privileged when it appears within documents that are attorney work product." *Id.* Since the FBI submitted declarations attesting that the limited number of pages withheld in part pursuant to Exemption 5 would foreseeably harm the interests protected by the work product privilege, it is entitled to summary judgment as to the assertion of Exemption 5.

### 3. *Exemption 6 and 7(C)*

Defendants withheld a substantial portion of responsive records pursuant to FOIA Exemptions 6 and 7(C), which plaintiff challenges as beyond the scope of those exemptions and incompatible with the foreseeable harm requirement. *See* Pl.'s Mem. at 12-17; Pl.'s Opp'n at 14-26. Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6)). Exemption 7(C) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such [materials] . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C)). While similar, "Exemption 7(C)'s privacy language is broader than the comparable language in

Exemption 6," *U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 756 (1989), so courts "need not 'consider Exemption 6 separately,'" *Cabezas v. FBI*, 109 F.4th 596, 605 (D.C. Cir. 2024) (quoting *Roth*, 642 F.3d at 1173)); *see also Hawkins v. FBI*, No. 20-cv-1483 (BAH), 2022 WL 905577, at *6 (D.D.C. March 2, 2022) ("Where all information that would fall within the scope of one asserted exemption would also be immune from disclosure under another asserted exemption, there is no need to consider both." (internal quotation marks, citations and alterations omitted)).

To fall within Exemption 7(C)'s more protective ambit, a record must "be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption." *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 203 (D.C. Cir. 2014). If that threshold requirement is satisfied, the agency must then show that "the [asserted] privacy interest . . . categorically outweighs any public interest in disclosure." *Bartko v. U.S. Dep't of Just.*, 898 F.3d 51, 64 (D.C. Cir. 2018). This balancing act requires, on one hand, that "[t]he privacy interest at stake belongs to the individual," *Hawkins*, 2022 WL 905577, at *6, and acknowledges, on the other hand, that "the only public interest . . . is one that focuses on 'the citizens' right to be informed about what their government is up to,'" *Davis*, 968 F.2d at 1282 (quoting *Reps. Comm.*, 489 U.S. at 773). The requester "must (1) 'show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) 'show the information is likely to advance that interest.'" *Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 387 (D.C. Cir 2007) (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).

Plaintiff does not dispute, as to any of defendants' Exemption 7 withholdings, that the records at issue were "compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7); *see*

*Greenspan*, 2025 WL 1040834, at *11 n.9; Pl.'s Opp'n Issues Stm. ¶¶ 6-7, so the parties' dispute turns on whether the release of responsive records "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), and, if so, whether "the agenc[ies] reasonably foresee[] that disclosure would harm an interest protected by [the] exemption," *id.* § 552(a)(8)(A)(i)(I). Plaintiff raises various arguments as to the impropriety of defendants' withholdings pursuant to Exemption 6 and 7(C). As a threshold matter, plaintiff contends that the Court's prior findings when rejecting the FBI and DEA's *Glomar* responses, "substantially govern the privacy analysis now before the Court," Pl.'s Mem. at 11 (cleaned up), invoking the law-of-the-case doctrine to support his proposition that the privacy analysis is controlled by the prior analysis "on a record that has not materially changed," *id.* at 11-12. At the same time, he acknowledges that "individualized 7(C) analysis remains available for documents that reveal genuinely new information beyond what was officially acknowledged." *Id.* at 11. As already explained in response to plaintiff's motions to compel production, *see supra* Part I.D., the prior summary judgment decision assessed only the first of two privacy interests potentially at play—*i.e.*, "Tinubu's interest in keeping secret the *fact* that he was under investigation"—and the pending cross-motions for summary judgment present the first opportunity to address the second interest—*i.e.*, "Tinubu's privacy interest in the *contents* of [any] investigative files." *Greenspan*, 2025 WL 1040834, at *12 (internal quotation marks and citation omitted); *see also* Min. Order (Oct. 15, 2025); Min. Order (Apr. 8, 2026). Thus, contrary to plaintiff's argument, this second inquiry is not limited by the law-of-the-case doctrine and weighing the pertinent privacy and public interests in the contents of the withheld information is required.

Plaintiff's remaining challenges to the withholdings under Exemptions 6 and 7(C) fall into five main categories: (1) that no substantial privacy interest inheres in information already in the

public domain, including information contained in the Moss Affidavit; (2) that intervenor-defendant Tinubu has a diminished privacy interest due to his role as a public official; (3) that defendants failed to account for the fact that individuals implicated in responsive records may be deceased and thus without substantial privacy interests; (4) that defendants and intervenor-defendant mischaracterize the substantial public interest at stake; and (5) that defendants failed to satisfy the foreseeable-harm requirement. *See* Pl.'s Mem. at 12-17; Pl.'s Opp'n at 14-26; Pl.'s Surreply at 1-3. As the proceeding analysis of each of these arguments explains, defendants have failed to provide sufficient information to accept their Exemptions 6 and 7(C) withholdings and must supply additional information to justify any, or more limited, Exemption 6 and 7(C) withholdings they may continue to assert.

*a) Information in the Public Domain*

Plaintiff first argues that "[t]he fact and general nature of the investigation" of money laundering by a Chicago-based heroin ring "have been public since 1993" due to the DOJ's filing of the Moss Affidavit, which "describes Bola Tinubu's role in the money-laundering operation and identifies him as having committed at least six federal crimes." Pl.'s Mem. at 12. As a result, plaintiff argues, "the categorical claim Defendants assert as to entire documents and entire categories of withholdings cannot survive" as a valid assertion of Exemptions 6 and 7(C). *Id.* at 13. The Court agrees.[17]

---

[17] On September 4, 2026, Karl Von Batten, a *pro se* non-party to this case, moved to file an amicus brief in support of plaintiff, *see* Non-Party Mot. for Leave to File Amicus Br., and a few days later, submitted supplemental exhibits in support of this proposed amicus brief, *see* Non-Party Notice of Suppl. Exs., ECF No. 103. Although the proposed amicus brief was purportedly to be filed in support of plaintiff, plaintiff opposes this amicus filing and objects to the accuracy of materials included in the proposed amicus brief. *See* Non-Party Mot. for Leave to File Amicus Br. ¶ 11. "Courts have wide discretion in deciding whether to grant a third party leave to file an amicus brief." *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 58 (D.D.C. 2019); *see also In re Domestic Airline Travel Antitrust Litig.*, No. 15-mc-1404 (CKK), 2025 WL 2760374, at *7 (D.D.C. Sept. 29, 2025) ("District courts have inherent authority to appoint or deny *amici* which is derived from Rule 29 of the Federal Rules of Appellate Procedure." (citation omitted)). The primary argument asserted in the proposed amicus brief is that a public statement made by an official in the Nigerian government on social media, regarding the instant lawsuit and records at issue, diminishes

As discussed with regard to defendants' Exemption 3 withholdings, *see* discussion *supra* Part III.B.1.e, the FBI and DEA officially acknowledged, via the Moss Affidavit, that they investigated Agbele and Tinubu for criminal conduct in relation to the alleged money-laundering operation, *see Greenspan*, 2025 WL 1040834, at *7-10 (citing Moss Aff.). The Moss Affidavit not only names Tinubu and Agbele but also describes their alleged criminal activity in detail, mentions warrants issued in relation to the investigation, and reveals multiple addresses, company names, financial transactions, and information obtained from tax documents tied to targets of the investigation. *See generally* Moss Aff.; *see also supra* Part III.B.1.e (providing paragraph-by-paragraph details about the affidavit's contents). In addition, the Moss Affidavit names several individuals in addition to Agbele and Tinubu—including their relatives and other individuals under investigation, *e.g.*, Lee Andrew Edwards and Adegboya Mueez Akande, *see* Moss Aff. ¶¶ 7, 9—and the verified complaint to which the Moss Affidavit is attached identifies two Assistant United States Attorneys, Michael J. Shepard and Marsha A. McClellan, who worked on the civil forfeiture matter, *see* Forfeiture Compl. at 3. The documents plaintiff identifies from the criminal prosecution of Lee Andrew Edwards, which likewise constitute official acknowledgments by the FBI and DEA, *see* discussion *supra* Part III.B.1.e, provide further details about the investigation, *see* Pl.'s Decl., Ex. B, Excerpt of *Edwards* Sentencing Testimony (presenting materials from

intervenor-defendant's asserted privacy interest under Exemption 7(C). *See* Non-Party Mot. for Leave to File Amicus Br. ¶¶ 4-6. The second argument merely repeats plaintiff's arguments that there is a strong public interest in understanding defendants' conduct, independent of any interest in intervenor-defendant's alleged criminal activity. *Id.* ¶¶ 7-8. Considering that the proposed amicus brief primarily seeks "to provide the Court with the official statement," *id.* ¶ 9, the accuracy of which plaintiff disputes, *see id.* ¶ 11, and otherwise repeats plaintiff's arguments about the appropriate balancing of intervenor's diminished privacy interest against the strong public interest in disclosure, the motion for leave to file an amicus brief is **DENIED**. *See Vanda Pharms., Inc. v. FDA*, 436 F. Supp. 3d 256, 277 (D.D.C. 2020) (denying a motion to file an amicus brief where the arguments were "either impermissible or duplicative"); *WildEarth Guardians*, 368 F. Supp. 3d at 59 (same where the proposed "amicus brief [did] not have 'unique information or perspective that can help the [C]ourt'" (internal citation omitted)); *In re Domestic Airline Travel Antitrust Litig.*, 2025 WL 2760374, at *7 (same where "the information presented in the proposed amicus brief mirrors what was already argued by [parties] in their summary judgment briefs").

*United States v. Edwards, et al.*, Case No. 2:92-cr-00113-RL (N.D. Ind.)); Pl.'s Suppl. Decl., Exs. G-J (same). Plaintiff largely references these documents to show that Agbele was indicted, and that certain FBI and DEA Special Agents assisted in that indictment. *See* Pl.'s Mem. at 6-7; Pl.'s Opp'n at 16-17.

Defendants' assertions of Exemptions 6 and 7(C) do not adequately grapple with these official acknowledgments. The FBI organized the responsive records into several categories and justified its withholdings by category. *See Am. First Legal Found. v. FBI*, No. 23-cv-2172 (BAH), 2024 WL 4607496, at *7 (D.D.C. Oct. 29, 2024), *aff'd*, No. 24-5258, 2025 WL 1188974 (D.C. Cir. Apr. 22, 2025) (approving of such categorical treatment). Those categories include names and identifying information of: (1) FBI special agents and professional staff; (2) third parties who provided information; (3) third parties merely mentioned; (4) third parties of investigative interest; (5) non-FBI federal government personnel; and (6) local law enforcement personnel. *See* Driver Decl. ¶¶ 42-50. The FBI did not, however, address the fact that individuals falling into several of those categories have already been identified by name, and at times by additional personal information, in the Moss Affidavit, corresponding verified complaint, and materials from the Edwards prosecution. *See id.* For example, Agbele is likely considered a third party who provided information, *see* Moss Aff. ¶ 12; both Agbele and Tinubu undoubtedly qualify as third parties of investigative interest, *see, e.g.*, *id.* ¶¶ 2, 11-12; Agbele and Tinubu's family members may constitute third parties merely mentioned, *see, e.g.*, *id.* ¶¶ 9-10, 25; and the magistrate judge, AUSAs, and IRS special agent identified in the affidavit and corresponding complaint could be classified as non-FBI federal government personnel, *see id.* ¶¶ 1, 39; Forfeiture Compl. at 3. Yet the FBI does not treat these individuals, whose identities and personal information have already been exposed and, thus, whose privacy interests are diminished, any differently than individuals

whose connection to the alleged criminal activities has not been publicly acknowledged in these court filings or otherwise. *See* Driver Decl. ¶¶ 42-50; *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.* (*CREW I*), 746 F.3d 1082, 1091 (D.C. Cir. 2014) (observing that an individual's "obvious privacy interest in keeping secret the fact that he was the subject of an FBI investigation" is diminished when that fact becomes public); *Mid-Atl. Innocence Project*, 2026 WL 775907, at *8 ("In the face of the already public nature of the identities of testifying witnesses and names of other individuals disclosed by government witnesses or the prosecutor, defendants have an uphill battle to defend redactions of this already public information.").[18] DEA's justification for invoking Exemptions 6 and 7(C) is even less tailored to the circumstances of this case, stating only that the responsive records "contain the names and other identifying information, including addresses and phone numbers," of individuals with protected privacy interests. Davis Decl. ¶ 34.

Defendants admit that certain facts were described in DOJ filings from the early 1990s but contend that the "public domain exception" is "narrow," so the Moss Affidavit and trial testimony from the Edwards prosecution "does not render the specific documents at issue . . . as being within the public domain." Defs.' Opp'n at 18 (citing *Cottone*, 193 F.3d at 554-55). They also assert in their responses to plaintiff's statement of undisputed material facts that the "content of the [Moss Affidavit] is not material because it does not affect the outcome of this suit under the governing law." Defs.' Resp. to Pl.'s SUMF at 2-3 (citing *Kowal*, 107 F.4th at 1031); *see also id.* at 3-8

[18] The declaration from an Attorney-Advisor for EOUSA provides slightly more information, stating that the records sought by plaintiff include "specifics about the individual defendants that were not made public through the public docket, including specific bank account information." Hudgins Decl. ¶ 22; *see also* Second Hudgins Decl. ¶ 25. Such detail in the agency's declaration comes closer to meeting the burden for withholding responsive records, but still does not sufficiently address whether those "individual defendants" are the individuals identified in the Moss Affidavit and other public filings identified by plaintiff, such as Agbele and Tinubu, and if so, whether the withheld material (1) contains any details not yet released or (2) is reasonably likely to cause further harm to those individuals' privacy interests.

(making the same response as to specific details contained in the Moss Affidavit and documents from the Edwards prosecution).

To be sure, to benefit from the public domain exception, "the requester [must] point to 'specific' information identical to that being withheld." *Davis*, 968, F.2d at 1280; *see also Wolf*, 473 F.3d at 378 ("Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure."). Indeed, the requested information, having "already 'been made public through an official and documented disclosure,'" must be "as specific as the information previously released" and must "match[] the information previously disclosed.'" *Nat'l Sec. Archive*, 104 F.4th at 273 (internal quotation marks omitted) (quoting *Fitzgibbon*, 911 F.2d at 765); *see also id.* at 274 (explaining that the D.C. Circuit "use[s] the terms 'public domain' and 'official acknowledgment' interchangeably"). As discussed above, therefore, a strict application of the public domain doctrine entitles plaintiff only to the unredacted version of the Moss Affidavit, which he already possesses. *See* discussion *supra* Part III.B.1.e; FBI's Redacted Moss Aff. (showing that Exemption 6 and 7(C) are the bases for the FBI's redactions).

In contrast to the analysis under Exemption 3, however, for proper application of Exemption 6 and 7(C), the fact of prior public disclosure is not only relevant to whether the public domain doctrine demands disclosure of records otherwise validly withheld pursuant to those exemptions or reasonably segregable nonexempt information, but also factors into whether the withholdings are valid in the first place. Specifically, the latter two exemptions require a weighing of the private interest asserted by the withholding agency in a balancing analysis against the public interest in disclosure. *See Reps. Comm.*, 489 U.S. at 776. Moreover, even if that balancing analysis were found to support nondisclosure, the withholdings are still subject to a subsequent and

independent foreseeable harm analysis. *See* 5 U.S.C. § 552(a)(8)(A)(i)(I). Thus, when a requester points to information that has already entered the public domain and asserts a diminished privacy interest in those details, an agency cannot categorically withhold information—some of which has been made public elsewhere—without addressing the fact of public disclosure. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Just.*, 18 F.4th 712, 718-20 (D.C. Cir. 2021) (factoring into the private interest side of the Exemption 7(C) balancing analysis the fact that the redacted identities of individuals named in a report were "already publicly known"); *ACLU v. U.S. Dep't of Just.*, 750 F.3d 927, 936 (D.C. Cir. 2014) (noting that a plaintiff bears the "burden of production" to identify public information that may alter "the Exemption 7(C) balance").

Here, plaintiff has adequately identified public information about identified individuals—particularly the subjects of plaintiff's FOIA requests, Agble and Tinubu—in the Moss Affidavit, as well as the fact, contained in the testimony from the Edwards prosecution, that Agbele was indicted. As a result, the privacy interests asserted by defendants to justify their Exemptions 6 and 7(C) withholdings cannot support categorical withholding. *See CREW I*, 746 F.3d at 1091, 1096 (holding that "a *categorical* rule" for withholding under Exemption 7(C) "is inappropriate" where the fact of a criminal investigation of the subject of a FOIA request had already been publicly disclosed). If defendants, in subsequent declarations, continue to assert Exemptions 6 and 7(C) for withholding instead of releasing the information, they "must attempt to make a more particularized showing as to what documents or portions thereof are exempt," so the Court may "weigh what information may be withheld under Exemption 7(C) and whether any information is reasonably segregable and may be disclosed." *Id.* at 1096. In doing so, defendants must distinguish between (1) records identifying Agbele, Tinubu, and others already acknowledged in DOJ court filings, and (2) records naming as yet unidentified individuals. Defendants must also

distinguish between (3) records that contain the same or fewer details as are present in the Moss Affidavit and the testimony from the Edwards prosecution regarding Agbele and Tinubu's alleged involvement in the heroin distribution organization, and (4) records that disclose specific details that reveal new information, beyond what has already been officially acknowledged. To be clear, Agbele, Tinubu, and other identified individuals maintain a privacy interest in details of the heroin ring investigation that have not yet entered the public domain. *See Elec. Priv. Info. Ctr.*, 18 F.4th at 719. The scope of defendants' withholdings, however, may not exceed the scope of those identified individuals' reasonable privacy interest, and defendants have not yet provided sufficiently detailed declarations distinguishing between records reiterating information that already exists in the public domain and records containing information that has not yet been exposed to the public to enable the Court to assess whether the proper balance was applied here.

*b) Privacy Interests of Public Officials*

Plaintiff next contends that "[p]ublic officials," like Tinubu, "have substantially-reduced privacy interests in records pertaining to their public roles and conduct." Pl.'s Mem. at 14; *see also* Pl.'s Opp'n at 18-20. Defendants do not disagree, *see generally* Defs.' Opp'n at 15-19, and the FBI even acknowledged this consideration, *see* Driver Decl. ¶ 41 (stating that the FBI's policy is "to release names of high-ranking FBI officials as well as individuals in public positions, as they have diminished privacy rights while acting in their official capacity"). The parties' positions find support from the D.C. Circuit, which "ha[s] indeed stated that public officials 'may have a somewhat diminished privacy interest' in the Exemption 7(C) balancing analysis." *Elec. Priv. Info. Ctr.*, 18 F.4th at 719 (quoting *CREW I*, 746 F.3d at 1092).

Of course, public officials "do not surrender all rights to personal privacy when they accept a public appointment," *Am. First Legal Found.*, 2024 WL 4607496, at *27 (quoting *CREW I*, 746

F.3d at 1092), and, at times, the "degree of intrusion" caused by disclosure of information could be "potentially augmented by the fact that the individual is a well known figure and the investigation one which attracts . . . much national attention," *Fund for Const. Gov't*, 656 F.2d at 865. In addition, case law about whether a similar diminishment of privacy interests exists for public *figures*, such as candidates for office or corporate officials, is more "equivocal." *Elec. Priv. Info. Ctr.*, 18 F.4th at 719 (citing *Fund for Const. Gov't*, 656 F.2d at 865; *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 894 n.9 (D.C. Cir. 1995)).

Intervenor-defendant Tinubu, for his part, suggests that he "should retain his full privacy interests because he was not president in 1993," and his "subsequent election to a foreign presidency should not diminish his privacy interests in records from three decades prior." Intervenor-Def.'s Am. Opp'n at 8-9 (emphasis omitted). The FBI seemingly endorses a similar principle, noting that its policy of releasing names of individuals in public positions "was applied to the individual's position at the time of the document(s), and not the present." Driver Decl. ¶ 41. Whether a FOIA request concerns a timeframe during which a subject of the request was a public official may be relevant when assessing the weight of the privacy interests at stake, *see CREW I*, 746 F.3d at 1092 (noting that the individual may have a somewhat diminished privacy interest "as a public official *at the time*" (emphasis added)), but Tinubu was "a candidate for, and then the holder of, a seat in the Nigerian Senate" during the timeframe implicated by plaintiff's FOIA request and was thus a public official at all relevant times, albeit not in the highest political office in Nigeria as he is now, Pl.'s Opp'n at 19 (citing Pl.'s Suppl. Decl., Ex. Q, U.S. Congressional Record, 139 Cong. Rec. 30047 (Nov. 18, 1993); Ex. S, Embassy of the Federal Republic of Nigeria, Tel Aviv, Israel, "Auto-Biography – President Bola Ahmed Tinubu GCFR"; Ex. T, Aug. 18, 1993 News Articles of Quoting Senator Bola Tinubu). Intervenor-defendant's argument that

he maintains "his full privacy interests" in the requested records, Intervenor-Def.'s Am. Opp'n at 8, is thus rejected, and defendants must address in any future declarations the extent to which Tinubu's privacy interests were diminished due to his status as a public official and how that factored into defendants' balancing of the private and public interests at stake, *see CREW I*, 746 F.3d at 1094 (noting that courts "may consider the rank of the public official involved and the seriousness of the misconduct alleged in conducting Exemption 7(C) balancing'" because an investigation implicating a "prominent" public official "further raises the stakes" (internal quotation marks and citation omitted)).

*c) Privacy Interests of Deceased Individuals*

Plaintiff's third argument is that "[t]he privacy interests protected by Exemptions 6 and 7(C) are personal interests of living individuals which are 'reduced if not extinguished' upon death," Pl.'s Mem. at 17 (quoting *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003)), and defendants allegedly failed to "take reasonable steps" to determine whether individuals identified in responsive records "[are] living before assuming the existence of a privacy interest under 7(C)," *id.*; *see also* Pl.'s Opp'n at 22-23. The FBI's declarant, however, attests that the agency "took several steps to ascertain the current life/death status of the individuals whose names are withheld," including by using each individual's date of birth, where discernable, "to apply the judicially recognized '100-year rule,' *i.e.*, if the individual was born more than 100 years ago, the FBI presumes that he or she is dead and the name was released," and by "us[ing] institutional knowledge gained from prior FOIA requests or internal records" to "identify with sufficient certainty the life/death status of certain individuals." Driver Decl. ¶ 41. DEA, by contrast, does not represent that this agency undertook any such efforts to assess the vital status of individuals appearing in responsive records. *See generally* Davis Decl.

Plaintiff is correct that "a court must assure itself that the Government has made a reasonable effort to ascertain life status" when balancing privacy interests against the interest in public disclosure under FOIA Exemption 7(C). *Schrecker*, 349 F.3d at 662. That responsibility is not boundless, however, as "it would be inappropriate for the court to mandate 'a brightline set of steps for an agency to take in this situation.'" *Id.* (quoting *Johnson*, 310 F.3d at 776). Instead, "[t]he adequacy of an agency's search is measured by a 'standard of reasonableness'" and "must be assessed in light of the accessibility of the relevant information." *Id.* (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)); *see also Davis v. U.S. Dep't of Just.*, 460 F.3d 92, 98 n.3 (D.C. Cir. 2006) ("We measure the reasonable sufficiency of the government's effort on the basis of the aggregate of the steps it took, not on the basis of any individual step alone."). Here, some of plaintiff's objections to the FBI's vital status search mirror those rejected in *Schrecker* itself. *See* Pl.'s Opp'n at 23 (objecting that individuals who were young adults in the 1990s "will not approach the 100-year presumption for decades" and that the FBI describes "no Social Security Death Index search"); *Schrecker*, 349 F.3d at 663-65 (holding that searching the FBI's Social Security Death Index is not required unless the individual's social security number appeared in the responsive pages and that 100 years is not an unreasonably long time period upon which to base the rule).

At the same time, however, the FBI's assertion that it used "institutional knowledge" gained from "prior FOIA requests or internal records" has been deemed insufficiently specific to enable courts to determine if the agency's vital status search was reasonable. *Davis*, 460 F.3d at 98-100; *see also* Davis Decl. ¶ 41; *Brick*, 293 F. Supp. 3d at 12 ("[T]he declarant's cryptic statement that, in addition to attempting to apply the 100-year rule, the FBI used 'institutional knowledge gained from prior FOIA requests or internal records' to evaluate the individual's death

status is also of no help, because, frankly, this Court ha[s] no idea what that means." (internal quotation marks and citations omitted)). In any forthcoming supplemental declarations, should Exemptions 6 and 7(C) continue to be asserted rather than releasing the information, both the FBI and DEA must provide additional detail describing the efforts taken to assess whether implicated individuals are deceased, so a proper evaluation of the reasonableness of those efforts may be made and an accurate balancing of relevant privacy interests against the public interest in disclosure may be performed. *See Brick*, 293 F. Supp. 3d at 12.

*d) Public Interest*

In addition to these disputes about the relevant privacy interests at stake, the parties debate the strength of the public interest in disclosure of the records responsive to plaintiff's requests. Plaintiff asserts a strong public interest in defendants' investigation, prosecution, and overall handling of "the matter of an individual whom the IRS, and in turn via reference, USDOJ publicly accused of six federal crimes in 1993 and who is now a foreign head of state," noting that this interest "exists independent of, and in addition to, the public interest in Tinubu's own fitness for office." Pl.'s Mem. at 16; *see also* Pl.'s Opp'n at 23-24. Both intervenor-defendant and defendants misrepresent plaintiff's clearly asserted public interest in their efforts to dispute and minimize it.

Intervenor-defendant argues that the only public interest plaintiff "advances in his filings is the Nigerian public's general interest in Intervenor's background," citing references in plaintiff's complaint and first motion for summary judgment briefing regarding the impact of Tinubu's decisions on the population of Nigeria. Intervenor-Def.'s Am. Opp'n at 9. He also suggests that plaintiff's requests are aimed at uncovering information about Tinubu as an individual, not "to discover anything about the agency," and are thus unsupported by the only public interest recognized by FOIA. *Id.* at 10-11. While true that the only valid cognizable public interest in a

FOIA case "is one that focuses on the citizens' right to be informed about what their government is up to," *Davis*, 968 F.2d at 1282 (internal quotation marks and citation omitted), and that purpose "is not fostered by disclosure of information about private citizens . . . that reveals little or nothing about an agency's own conduct," *Reps. Comm.*, 489 U.S. at 773, intervenor-defendant's assertions are unsupported by the record. Plaintiff clearly asserts a public interest "independent of" any interest in Tinubu as an individual or as the leader of a large nation, Pl.'s Mem. at 16, and that asserted interest is both "significant" and "more specific than having the information for its own sake," *Elec. Priv. Info. Ctr.*, 18 F.4th at 718 (citation omitted).[19] Here, as in *CREW I*, "the relevant public interest is not to find out what [Tinubu] himself was 'up to' but rather how the FBI and the [DEA] carried out their respective statutory duties to investigate and prosecute criminal conduct." 746 F.3d at 1093. Plaintiff's requests thus involve a "weighty public interest in shining a light" on defendants' handling of a criminal investigation of a sitting foreign public official, as "[d]isclosure of the records would likely reveal much about the diligence of [defendants'] investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches." *Id.*

Defendants and intervenor-defendant also raise the related and distinct argument that, where "the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure" and "must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."

---

[19] Even if intervenor-defendant's argument is correct that plaintiff is pursuing his FOIA requests because he plans to use the records "to generate traffic" to his "for-profit website," Intervenor-Def.'s Am. Opp'n at 1, this consideration "does not affect [the Exemption 7(C) balancing] inquiry" because "the particular purpose for which the document is being requested" and "the identity of the requester" are not relevant, *CREW I*, 746 F.3d at 1095 n.4 (internal quotation marks and citations omitted).

Defs.' Opp'n at 18 (quoting *Favish*, 541 U.S. at 174); *see also* Intervenor-Def.'s Am. Opp'n at 13-14. That statement of law is correct but inapplicable to the case at hand. Plaintiff "alleges no impropriety" by defendants and has "established a sufficient reason for disclosure independent of any impropriety" because "[m]atters of substantive law enforcement policy are properly the subject of public concern, whether or not the policy in question is lawful." *CREW I*, 746 F.3d at 1095 (internal quotation marks omitted) (quoting *ACLU v. U.S. Dep't of Just.*, 655 F.3d 1, 14 (D.C. Cir. 2011)). Plaintiff has thus established a significant public interest that defendants must contend with when determining whether to assert FOIA Exemptions 6 and 7(C) as a basis for withholding records. Where privacy interests are diminished because information has already been disclosed about individuals named in those records, or those individuals are public officials or figures or are deceased, this significant public interest will likely cause the balance to tip in favor of disclosure.

*e) Foreseeable Harm*

Even if, after accounting for the considerations described above, defendants conclude that responsive records still fall within the scope of Exemptions 6 and 7(C), they must also contend with the "additional, crosscutting obligations" imposed by the FOIA Improvement Act. *Hum. Rts. Def. Ctr.*, 126 F.4th at 713 (citing Pub. L. No. 114-185, 130 Stat. 538 (2016)); *see also Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 104-05 (summarizing the Act's enactment process and its goal of stemming the "troubling trend" of agencies overusing FOIA exemptions). In particular, each defendant must disclose information, even if covered by an exemption, unless "the agency reasonably foresees that disclosure would harm an interest protected by an exemption." 5 U.S.C. § 552(a)(8)(A)(i)(I). This "independent and meaningful burden on agencies" requires defendants to "identify the nature of the harm and show that it will likely result from disclosure of the particular information the agencies seek to withhold." *Hum. Rts. Def. Ctr.*, 126 F.4th at 713

(quoting *Reps. Comm.*, 3 F.4th at 369); *see also id.* at 716 ("[W]hether a record falls within an exemption and whether nondisclosure of that record is permissible under the Improvement Act's foreseeable harm standard are distinct, consecutive inquiries" (internal quotation marks and citation omitted)). That burden cannot be satisfied by invoking "generalized assertions" or "abstract fears"; each agency must "'specifically focus its foreseeable harm demonstration' on [the implicated individual's] privacy interests." *Jigsaw Prods., Inc. v. SEC*, 824 F. Supp. 3d 56, 61 (D.D.C. 2026) (quoting *Reps. Comm.*, 3 F.4th at 369-70); *see also Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 106 (noting that "general explanations" and "boiler plate language" do not satisfy the foreseeable-harm requirement).

Surprisingly, given that meeting the foreseeable harm requirement has been part of an agency's burden to justify withholdings under FOIA Exemptions 6 and 7(C) now for a decade, defendants do not even discuss this requirement in their briefing, *see* Defs.' Opp'n at 15-19; Defs.' Reply at 4-5, and the agency declarations submitted in support of defendants' cross-motion give this requirement the barest of lip-service. The FBI declaration states that potential harm could result from disclosure of identifying information about each category of individuals implicated in the responsive records, yet most of these statements speak only in generalities.[20] The declarations

[20] *See* Driver Decl. ¶ 43 ("[I]t is foreseeable that individuals targeted by such investigations, and those sympathetic to those targeted, could seek to inflict violence on an [FBI Special Agent] based on their participation in an investigation."); *id.* ¶ 44 (stating that FBI professional staff "could be targeted for reprisal based on their involvement in specific investigations/investigative activities" or for harassment to gain "unauthorized access to investigations"); *id.* ¶ 46 ("It is foreseeable that disclosure of the identities of individuals who willingly provide information to the FBI could subject these individuals to harassment or embarrassment, undue public attention, and/or unwanted inquiries for information related to their assistance . . . retaliation . . . legal or economic detriment, negative professional and social repercussions, possible physical harm, or even death."); *id.* ¶ 47 (contending that disclosing identifying information about third parties "merely mentioned" in responsive records "would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them"); *id.* ¶ 48 (asserting that third parties of investigative interest could suffer "harassment or embarrassment," "undue public attention," and "professional and social repercussions, due to resulting negative stigmas"); *id.* ¶ 49 (stating that publicity "concerning the assistance of these other agency employees in an FBI investigation would seriously impair their effectiveness in assisting or participating in future FBI investigations/investigative activities" and could subject non-FBI government employees to "revenge" or "hostility"); *id.* ¶ 50 (averring that local law enforcement officers could "be targeted for reprisal" or "unnecessary and unwelcome harassment").

from consulting agencies and DEA are similarly vague.[21] The only specific harms identified in the agencies' declarations are "two recent examples of threats against FBI agents and their families," Driver Decl. ¶ 43 n.24, and one example of a drug cartel using information to "intimidate and, in some instances, kill potential sources," *id.* ¶ 46 n.25. While such "specific, concrete examples of past serious threats" can at times substantiate allegations of foreseeable harm by identifying the nature of the harm at issue, *Informed Consent Action Network v. Nat'l Insts. of Health*, No. 23-cv-926 (SLS), 2026 WL 585104, at *6 (D.D.C. Mar. 3, 2026) (citation omitted), agencies must still "show that [this harm] will likely result from disclosure of the particular information the agencies seek to withhold," *Hum. Rts. Def. Ctr.*, 126 F.4th at 714. Here, the information defendants seek to withhold stems from a criminal investigation that is over thirty years old, so defendants' citations to recent examples of retaliation in recent cases do not establish that the asserted harms are reasonably foreseeable. *See Mid-Atl. Innocence Project*, 2026 WL 775907, at *9 (rejecting an assertion of harm "as entirely speculative" because "no evidence [was] proffered as to why such harassment or retaliation would occur now when the events of the trial occurred more than thirty years ago"). Any argument to establish foreseeable harm is particularly dubious as to the individuals already identified in documents within the public domain, *see supra* Part III.B.1.e, for whom "[t]he cat is out of the bag" and defendants have not "indicate[d] that there

---

[21] *See* Clark Decl. ¶¶ 13-14 (asserting that disclosure of personally identifiable information of government agents and third-party individuals recommended for withholding by ICE "could cause harm to the individual, expose the individual to identity theft and may reasonably lead to unwanted contact from persons that might seek to harm the individual," and ICE employees could face "harassment or harm" because they "have received an increase in threats, intimidation and personal attacks in recent years"); Second Hudgins Decl. ¶ 24 (contending that disclosure of redacted information recommended for withholding by EOUSA could "lead[] to efforts of individuals to gain access to [third parties'] personal financial information, or subject them to harassment or harm" and generate "additional stigma and scrutiny" for criminal defendants); Second Hudgins Decl. ¶ 21 (same); Davis Decl. ¶ 48 ("DEA considered the foreseeable harm standard when reviewing responsive records and . . . determined that disclosure would foreseeably harm protected interests by . . . constituting an unwarranted invasion of personal privacy, subjecting individuals to harassment or safety risks . . . ."); *see generally* Mircan Decl. (failing to address foreseeable harm).

is something distinct" about the yet-to-be-disclosed information that could cause additional harm, *Jigsaw Prods., Inc.*, 824 F. Supp. 3d at 61, 63; *see also Mid-Atl. Innocence Project*, 2026 WL 775907, at *9 ("[T]he fact that these individuals were publicly named in a trial more than three decades ago makes any further reputational risk than that which they may have experienced at the time, highly speculative. Such speculative harm is foreclosed by Congress's creation of the foreseeable harm requirement.").

As a result, defendants are not entitled to summary judgment as to the assertion of Exemptions 6 and 7(C), and must address each of the aforementioned considerations—as to the relevant privacy interests, public interest in disclosure, and foreseeable harm—when submitting supplemental declarations in support of any continued withholdings in reliance on Exemptions 6 and 7(C).

### 4. *Exemption 7(D)*

Defendants' assertion of Exemption 7(D) to protect "confidential source information," including "reports of investigation, defendant disposition reports, personal history reports, identification records, and other law enforcement requests," Defs.' Opp'n at 21-22, is also challenged by plaintiff as insufficiently justified, *see* Pl.'s Mem. at 19-20; Pl.'s Opp'n at 27-28; Pl.'s Opp'n Issues Stm. ¶¶ 10-11. Exemption 7(D) "exempts from disclosure agency records 'compiled for law enforcement purposes' . . . if release of those records 'could reasonably be expected to disclose' the identity of, or information provided by, a 'confidential source.'" *U.S. Dep't of Just. v. Landano*, 508 U.S. 165, 167 (1993) (quoting 5 U.S.C. § 552(b)(7)(D)). The exemption allows agencies to "categorically exempt[] from disclosure 'information furnished by a confidential source' in criminal investigations," without elaborating on "a specific interest . . . served by withholding records." *Brown v. FBI*, 143 F.4th 481, 488 (D.C. Cir. 2025) (quoting 5 U.S.C. § 552(b)(7)(D)).

Plaintiff objects that defendants fail to make an individualized showing that Exemption 7(D) applies to the withheld records, in part because defendants do not address the fact that "Agbele's cooperation with, and interview by, the DEA and FBI was disclosed in open court and filed on the public docket by the United States." Pl.'s Opp'n Issues Stm. ¶¶ 10-11. He further elaborates that defendants impermissibly "appl[y] the same 'confidential sources information' label" to withhold documents categorically under Exemption 7(D). Pl.'s Mem. at 19-20 (citing *Landano*, 508 U.S. at 181); *see also* Pl.'s Opp'n at 27-28. As to this latter point, plaintiff is correct insofar as "the Government is not entitled to a presumption that a source is confidential within the meaning of Exemption 7(D) whenever the source provides information to the [agency] in the course of a criminal investigation." *Landano*, 508 U.S. at 181. Yet "in the context of a serious or violent crime we may infer an assurance of confidentiality because of the risks of exposing a 'criminal enterprise . . . inclined toward violent retaliation.'" *Kowal*, 107 F.4th at 1032 (quoting *Mays v. DEA*, 234 F.3d 1324, 1330 (D.C. Cir. 2000)). The D.C. Circuit has permitted "an inference of confidentiality for each source" who "provided information about an extensive drug trafficking operation and therefore faced a threat of violent reprisal," *id.*, which are the circumstances here regarding defendants' investigation of a money-laundering scheme tied to a heroin distribution organization, *see* Moss Aff. (describing the investigation). Defendants' assertions of Exemption 7(D) therefore do not require the "source by source" showing that plaintiff desires. Pl.'s Mem. at 19; *see also* Defs.' Reply at 5 (explaining that DEA used "similar justification paragraphs and entries" because those entries applied to "the same types of investigative records" warranting "similar reasoning"). Moreover, the FBI has amply met this requirement by providing specific justifications for different categories of confidential source information and distinguishing between express and implied assurances of privacy. *See* Driver Decl. ¶¶ 51-67.

Plaintiff's further objection that defendants did not tailor their justifications to the fact that some confidential source information has already been publicly disclosed warrants closer attention. *See* Pl.'s Opp'n Issues Stm. ¶ 10. As discussed with regard to defendants' assertions of Exemptions 3, 6 and 7(C), "when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *ACLU/CIA*, 710 F.3d at 426. Although, "[u]nlike Exemptions 6 and 7(C), Exemption 7(D) requires no balancing of public and private interests," *Roth*, 642 F.3d at 1184, application of the latter exemption is still subject to the FOIA Improvement Act's foreseeable harm requirement, *see* 5 U.S.C. § 552(a)(8)(A)(i)(I), and FOIA's segregability requirement, *see* 5 U.S.C. § 552(b). Defendants thus must still provide sufficient explanation for invoking Exemption 7(D) as to information that is in the public domain, such as Agbele's involvement as a source of information. That is not to say that public disclosure of such facts necessarily defeats a claim for withholding under Exemption 7(D). *See, e.g.*, *Parker v. U.S. Dep't of Just.*, 934 F.2d 375, 379-80 (D.C. Cir. 1991) ("[P]ublic testimony by 'confidential sources' does not waive the FBI's right to invoke Exemption 7(D) to withhold the identity of a confidential source or information furnished by a confidential source not actually revealed in public."). Instead, "[t]he government is obligated to disclose only the 'exact information'" which has already entered the public domain, *Davis*, 968 F.2d at 1281 (quoting *Dow Jones & Co. v. Dep't of Just.*, 917 F.2d 571, 577 (D.C. Cir. 1990)), and which, if disclosed, would not cause reasonably foreseeable harm to the interest Exemption 7(D) protects, *see* 5 U.S.C. § 552(a)(8)(A)(i)(I).

Here, defendants have not adequately addressed whether their withholdings contain information about confidential sources that has already been publicly disclosed and officially acknowledged, such that those "materials normally immunized from disclosure under FOIA [have]

los[t] their protective cloak." *Cottone*, 193 F.3d at 554. Withholdings in that circumstance would be improper, and the Court is unable to make any assessment that this problem is avoided here without adequate basis supplied by defendants. To establish entitlement to summary judgment as to their assertions of Exemption 7(D), defendants must affirm that, upon careful review of responsive records against information in the Moss Affidavit and materials provided by plaintiff from the Edwards prosecution, none of the withheld details exactly match those in the public domain. *See Mid-Atl. Innocence Project*, 2026 WL 775907, at *11 (granting summary judgment where the defendants confirmed, "pursuant to [a] line-by-line review of the records against [public] trial transcripts, that none of the details are an exact match to the information withheld"). Insofar as defendants believe they must withhold even information that exactly matches those public details, defendants must sufficiently explain why they reasonably foresee that disclosure would harm their interest in protecting confidential source information. *See id.* (deeming "persuasive" the defendants' arguments that disclosing already-public information would "run the risk of revealing that the information was provided by *another* confidential source" not yet identified "potentially allowing plaintiff or others to narrow down the identities of other confidential sources"). Without such attestations, both plaintiff's and defendants' motions for summary judgment as to the Exemption 7(D) withholdings are denied.

**5. *Exemption 7(E)***

Plaintiff objects to defendants' invocation of FOIA Exemption 7(E), which protects records "compiled for law enforcement purposes" to the extent those records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The text of the exemption looks "not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain

risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009). Exemption 7(E) thus "sets a relatively low bar for the agency to justify withholding." *Pub. Emps. for Env't Responsibility*, 740 F.3d at 205 (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)). To clear this bar in justifying a withholding under Exemption 7(E), the agency "must demonstrate only that release of a document might increase the risk 'that a law will be violated or that past violators will escape legal consequences.'" *Id.* (quoting *Mayer Brown*, 562 F.3d at 1193). The agency's burden is thus not the "highly specific" one "of showing how the law will be circumvented," but only of "demonstrat[ing] logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42 (internal quotation marks and citation omitted).

The FBI invoked Exemption 7(E) to withhold approximately 122 pages of responsive records, all with overlapping application of other exemptions. *See* FBI *Vaughn* Index at 1-9, 11-15 (noting Exemption 7(E) withholdings at Bates numbers 23-cv-1816(FBI)-600-01, -614, -617, -621, -646, -1862, -1887, -1889-90, -1894, -1896-97, -1899, -1901, -1903-04, -1908, -1910-11, -1915, -1917-18, -2024, -3063-64, -3067-68, -3073, -3077-78, -3081-83, -3086-88, -3090-92, -3096, -3098, -3104-05, -3109-10, -3112-13, -3116, -3147, -3149-53, -3156, -3162, -3187, -3190, -3197, -3200-01, -3206, -3209, -3227, -3243-45, -3281, -3292, -3303-11, -3313-17, -3319-21, -3331-46, -3353-54, -3357, -3366-76, -3388-92). Here, per the FBI's description, four categories of responsive information have been withheld under this exemption: (1) methods used to collect and analyze information for investigative purposes; (2) specific law enforcement techniques used, or considered to be used, to conduct a drug trafficking investigation; (3) surveillance techniques;

and (4) undercover operations. *See* Driver Decl. ¶¶ 70-79. The FBI provides detailed justifications for each category, one by one, explaining how disclosure of information "logically . . . might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42 (internal quotation marks and citation omitted). The FBI's declarant attests that releasing "the identity of methods used in the collection and analysis of information," methods which "are still in use today," would foreseeably "enable subjects of FBI investigations to circumvent these or similar currently used techniques" thereby diminishing the "relative utility" of the techniques. Driver Decl. ¶¶ 71-72.

For example, disclosure would "enabl[e] criminals to educate themselves about the techniques employed" by the FBI and allow them to "to develop and take countermeasures to circumvent the [techniques'] effectiveness" and continue to engage in criminal activities. *Id.* ¶ 72. As for specific techniques used in drug trafficking investigations, disclosure of "non-public details concerning controlled drug purchases," such as "the quantities and types of drugs" involved, would foreseeably enable those involved in drug trafficking to "detect[] and avoid[] circumstances where the technique might be at play, thereby diminishing the effectiveness of the technique." *Id.* ¶ 74. Similarly, disclosure of information about another sensitive, non-public technique described to the Court in an *in camera*, *ex parte* declaration would foreseeably "enable criminals and foreign adversaries targeted by this technique to predict when it will be used, who might be targeted with its use, and with this knowledge . . . to circumvent its use in similar situations." *Id.* ¶ 75.[22]

[22] Shortly after the FBI was granted leave to file *ex parte*, *in camera* declarations, plaintiff moved for "entry of an order establishing procedural safeguards that should accompany the use of any *in camera* affidavits." Pl.'s Mot. for Entry of Procedural Safeguards at 1. Plaintiff acknowledges that the reason "why *ex parte* treatment may be warranted for declarations addressing Exemptions 7(E) and 7(F)" is already stated on the record. *Id.* at 2 (citing Min. Order (Aug. 20, 2026)). After reviewing the declarations submitted by the FBI, which were limited to those two exemptions, the Court is satisfied that "as much as possible of the *in camera* submission" has been made available to plaintiff. *Montgomery v. IRS*, 40 F.4th 702, 714 (D.C. Cir. 2022) (citation omitted). In other words, none of the *ex parte*, *in camera* declarations can be released without compromising information protected by Exemption 7(E) or 7(F). *See Arieff v. U.S. Dep't of Navy*, 712 F.2d 1462, 1470-71 (D.C. Cir. 1983) (holding that consideration of *ex parte*, *in camera* affidavits is appropriate where "(1) the validity of the government's assertion of exemption cannot be evaluated without information beyond that contained in the public affidavits and in the records themselves, and

Information regarding the "targets, locations, and monitoring utilized in surveillance operations conducted by the FBI in relation to the investigations at issue [in plaintiff's FOIA requests]" could, if disclosed, "jeopardize the FBI's ability to operate surveillance covertly in similar circumstances, and risk[] circumvention of the law." *Id.* ¶¶ 77-78. Finally, the FBI contends that "[s]ecrecy and discretion are essential when conducting effective undercover operations," so disclosing non-public details about those operations "would have devastating operational consequences and would jeopardize future use of undercover operations." *Id.* ¶ 79.

DEA invoked similar reasoning, stating that disclosure of "the techniques and procedures utilized in DEA's law enforcement operations . . . could reasonably be expected to permit individual[s] to circumvent the law and investigative procedures of the DEA." Davis Decl. ¶ 41; *see also* Am. DEA *Vaughn* Index at 1 (noting that Exemption 7(E) was also used "to protect unique identifiers assigned to each criminal case that provides insight as to DEA information gathering for investigative purposes").

These justifications meet the "relatively low bar for [defendants] to justify withholding" the asserted non-public details of their law enforcement methods under Exemption 7(E), *Pub. Emps. for Env't Responsibility*, 740 F.3d at 205 (citation omitted), a point that plaintiff largely concedes, *see* Pl.'s Opp'n at 29 ("Plaintiff does not dispute that the FBI may withhold non-public details of investigative techniques still in use where disclosure could reasonably be expected to risk circumvention of the law."). Plaintiff protests that "[t]o the extent any technique reflected in [the requested] 1990-1994 records is now obsolete or already publicly known, no risk of

(2) public disclosure of that information would compromise the secrecy asserted"). Moreover, as discussed below, *see infra* Part III.B.6, the portions of the *ex parte*, *in camera* declarations regarding Exemption 7(F) had no bearing on the resolution of the pending cross-motions for summary judgment. Thus, insofar as plaintiff's motion requests that the FBI's *ex parte*, *in camera* declarations be limited to Exemptions 7(E) and 7(F) and that as much information as possible be posted on the public docket, that relief merely reflects applicable law and is met, and plaintiff's motion is otherwise **DENIED** as moot. *See* Pl.'s Mot. for Entry of Procedural Safeguards at 4-5 (specifying requests for relief).

circumvention remains." Pl.'s Mem. at 19; *see also* Pl.'s Opp'n at 30. The D.C. Circuit, however, has permitted agencies to use Exemption 7(E) to "withhold confidential details of a program whose general contours were publicly known." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1112 (D.C. Cir. 2007) (citation omitted); *see also Jud. Watch, Inc. v. U.S. Dep't of Com.*, 337 F. Supp. 2d 146, 181 (D.D.C. 2004) ("While Exemption 7(E)'s protection is generally limited to techniques or procedures that are not well-known to the public, even commonly known procedures may be protected from disclosure if the disclosure could reduce or nullify their effectiveness." (citation omitted)).

Moreover, defendants' declarations assert an interest in continuing to use the law enforcement techniques they seek to protect, disclaiming any argument that such techniques are obsolete. *See, e.g.*, Driver Decl. ¶ 71 (stating that FBI methods "are still in use today"); *id.* ¶ 74 (seeking to preserve "the effectiveness of the technique" for future use); *id.* ¶ 77 (asserting that certain techniques are "currently utilized by the FBI in current criminal and national security investigations today"); Davis Decl. ¶ 41 (describing use of relevant methods in the present tense). Plaintiff's argument that details about "the 'targets, locations, and monitoring' of surveillance conducted between 1990 and 1994 . . . reveals nothing about how the FBI conducts surveillance today" holds some water, Pl.'s Opp'n at 29, but the FBI's assertion that such details "about who, when, how, and under what circumstances the FBI conducts surveillance would allow current and future subjects of FBI investigations and other potential criminals to develop and utilize countermeasures" in similar surveillance efforts, Driver Decl. ¶ 78, presents "the chance of a reasonably expected risk" that is sufficient to invoke the exemption, *Mayer Brown LLP*, 562 F.3d at 1193.

Defendants also satisfy the FOIA Improvement Act's additional foreseeable harm requirement by attesting that they reasonably foresee disclosure of the withheld information enabling criminals to evade investigation and prosecution. *See* Driver Decl. ¶¶ 71-72; Davis Decl. ¶ 41; *Cato Inst. v. FBI*, No. 20-cv-3338 (JEB), 2026 WL 2687271, at *8 (D.D.C. Sept. 14, 2026) (holding that, since "an agency must show that disclosure of the withheld information would be reasonably expected to risk circumvention of the law" to invoke Exemption 7(E), foreseeable harm "is effectively embedded in the test for whether the exemption applies"). Once again, defendants fail to account for the fact that several details about the law enforcement methods used in the investigation of the Chicago-based heroin ring have already been publicly disclosed and officially acknowledged via the Moss Affidavit and testimony in the Edwards prosecution. *See, e.g.*, Moss Aff. ¶ 8 (mentioning "an ongoing DEA investigation, FBI investigations, surveillances of Source A, [and] consensual recordings of conversations"); *id.* ¶ 11 (discussing a controlled sale of heroin to "a law enforcement officer working in an undercover capacity"); *cf. Neuman v. United States*, 70 F. Supp. 3d 416, 426 (D.D.C. 2014) (K.B. Jackson, J.) (assessing the public-domain exception in the context of Exemption 7(E) withholdings). As discussed above, however, with the exception of identifying the redacted Moss Affidavit, plaintiff fails to meet his burden to match the public information he identifies to specific withholdings based on the FBI's and DEA's *Vaughn* indices. *See* FBI *Vaughn* Index; Am. DEA *Vaughn* Index; *Nat'l Sec. Archive*, 104 F.4th at 273 (discussing the limits of the public-domain exception). Thus, the public disclosure of facts about law enforcement techniques used in the early 1990s investigation does not take documents containing those facts outside the scope of Exemption 7(E) and instead factors into the foreseeable harm and segregability analyses. Since, in the Exemption 7(E) context, the inquiries about the scope of the exemption and foreseeable harm effectively overlap, *see Cato Inst.*, 2026 WL 2687271, at *8, and

harm could result from disclosing new information about these techniques, *see Afshar*, 702 F.2d at 1130 (observing that releasing the same information in a different form "might well provide new information . . . that the agency may safeguard"), defendants clear the independent foreseeable harm hurdle.

As a result, the only hurdle remaining between defendants and their goal of obtaining summary judgment as to the invocation of Exemption 7(E) is the segregability requirement. *See* 5 U.S.C. § 552(b). Yet, for the same reasons discussed with regard to Exemption 3, *see* discussion *supra* Part III.B.1.e, defendants' attestations that they conducted a segregability review are not sufficiently detailed to reach their desired result, *see* Driver Decl. ¶¶ 25, 87-88; Second Hammer Decl. ¶ 11; Davis Decl. ¶ 47; *Citizens for Resp. & Ethics in Wash.*, 728 F. Supp. 3d at 127 (observing that, even if records "are not identical" to the public versions, "identical *information*" must be released if that information is "reasonably segregable"). Since defendants do not acknowledge that certain facts related to the subjects of plaintiff's FOIA requests have been publicly disclosed and officially acknowledged in court filings identified by plaintiff, "we cannot tell whether" those exact facts are included in their Exemption 7(E) withholdings and, if so, whether "every redacted statement about [those public facts] reveals something new." *Hettena*, 145 F.4th at 1358. Therefore, insofar as defendants seek to maintain their Exemption 7(E) withholdings, they must provide supplemental declarations confirming that they conducted a thorough review of responsive records and that no publicly disclosed facts remaining in the withholdings can be segregated and released.

**6. *Exemption 7(F)***

Defendants invoke Exemption 7(F) to protect a substantial portion of their withholdings, *see* FBI *Vaughn* Index; Am. DEA *Vaughn* Index, and, according to plaintiff, do so without sufficient specificity, *see* Pl.'s Mem. at 19. Exemption 7(F) covers the release of "records or

information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). "The exemption does not require that a particular kind of individual be at risk of harm; 'any individual' will do," and "[d]isclosure need not *definitely* endanger life or physical safety; a reasonable expectation of endangerment suffices." *Pub. Emps. for Env't Resp.*, 740 F.3d at 205 (emphasis in original). In cases decided before the FOIA Improvement Act's addition of the foreseeable harm requirement, courts "consistently deferred to executive affidavits predicting harm to the national security, and . . . found it unwise to undertake searching judicial review," *id.* (quoting *Ctr. for Nat'l Sec. Stud. v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003)), and other cases suggest that such "D.C. Circuit[] precedents defining the substantive standards under Exemptions 7(E) and 7(F) . . . continue[] in force, even though much of it predates the FOIA Improvement Act," *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 525 F. Supp. 3d 181, 192 (D.D.C. 2021) (collecting cases). Since "to fall within" Exemption 7(F), like Exemption 7(E), "release of a record also must threaten a particular harm," *Pub. Emps. for Env't Resp.*, 740 F.3d at 202, "[t]he proper assertion of [7(F)] goes a long way to show the risk of foreseeable harm from disclosure," *Kendrick v. FBI*, No. 20-cv-2900, 2022 WL 4534627, at *10 (D.D.C. Sept. 28, 2022).

The FBI applied Exemption 7(F) to protect "names and identifying information of third parties who provided information regarding criminal activities or are associated with or participated in a specific drug trafficking investigation," and assert that releasing such information would subject those individuals to "violent retaliation." Driver Decl. ¶ 81 (cleaned up). The FBI's declarant elaborated that the undisclosed individuals could be "violently targeted" because the information they provided to the FBI "would shed light on the criminal activities of" and "is likely

derogatory and/or incriminating to individuals who were involved in the drug trafficking investigation." *Id.* Additional justifications for application of Exemption 7(F) were submitted to the Court in an *ex parte*, *in camera* declaration, which has been reviewed and considered but which provided explanations for withholdings that are untethered to the facts of this case. *See* Defs.' Opp'n at 26 n.8; Driver Decl. ¶ 81 n.33; Defs.' Notice of Compliance, ECF No. 101. Indeed, rather than providing more specifics about individuals who may have been involved in the federal investigation in the early 1990s and thus at heightened risk of retaliation in the present day, the *ex parte*, *in camera* declaration brought to the Court's attention violent acts abroad, none of which are related to this case nor credibly likely to increase as a result of the release of decades-old information that has been in the public sphere for many years. As part of the consultation process, ICE also recommended withholding three pages of records due to "the increase in threats to ICE personnel" "since February 2025" and the risk that ICE employees would "be[] targeted by those who would undermine the critical work conducted by ICE on a daily basis." Clark Decl. ¶ 28. DEA similarly invoked Exemption 7(F) to protect the identities of "law enforcement personnel, and in particular DEA employees," explaining that those law enforcement officials "routinely approach and associate with violators in a covert capacity," many of whom "are armed" or "have known violent tendencies," so disclosure of their identities could endanger their life or safety. Davis Decl. ¶¶ 43-46.

Plaintiff's arguments about the lack of specificity in defendants' justifications largely mirror his objections to withholdings under Exemption 7(D)—*i.e.*, that an asserted "danger to life or physical safety—for 1990s records about an investigation described in public court filings, whose principal subjects are deceased or holding public office, is not self-evident." Pl.'s Mem. at 19; *see also* Pl.'s Opp'n Issues Stm. ¶¶ 14-15. As is true for each of defendants' other

withholdings, defendants' declarations do not grapple with the fact that the investigation at the heart of plaintiff's record request is decades old and that several details implicating Agbele and Tinubu have been in the public domain for equally long. *See* Driver Decl. ¶ 81; Second Hammer Decl. ¶ 9; Davis Decl. ¶¶ 42-46. Since, as previously discussed, *see* discussion *supra* Part III.B.1.e, plaintiff has not matched the documents in the public domain to identical withholdings, other than the Moss Affidavit, the public domain doctrine does not remove records including public details from the scope of Exemption 7(F) and the fact of their prior public disclosure instead factors into the foreseeable harm and segregability analyses.

While "Exemption 7(F) does not require concrete evidence in every case" and an agency "need only demonstrate that it reasonably estimated that sensitive information could be misused for nefarious ends," the Court is not presently satisfied that defendants have adequately "demonstrate[d] that [they] reasonably estimate[] that sensitive information could be misused," *Pub. Emps. for Env't Resp.*, 740 F.3d at 206, to "endanger the life or physical safety of any individual," 5 U.S.C. § 552(b)(7)(F). In particular, the justification invoked in the FBI's *ex parte*, *in camera* declaration does not sufficiently establish how the feared danger to life or safety relates to the decades-old information about alleged crimes in the United States, particularly when substantial information about the underlying money-laundering and drug-trafficking investigation has already entered the public domain. If defendants continue to invoke Exemption 7(F), they must provide, in supplemental declarations, more specific explanations to support their withholdings, tailoring their justifications to account for the aging nature of these files and the fact that some information is already public, and any such declarations must address the additional foreseeable-harm and segregation requirements. *See Leopold*, 94 F.4th at 37.

**7. *Segregability***

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt" from disclosure. 5 U.S.C. § 552(b). Producing segregable information is essential for an agency's FOIA compliance, and "district courts cannot approve withholding exempt documents 'without making an express finding on segregability.'" *Machado Amadis v. U.S. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) (quoting *Morley*, 508 F.3d at 1123); *see also Sussman*, 494 F.3d at 1116 ("Before approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.").

In evaluating segregability, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman*, 494 F.3d at 1117. Even under that presumption, "the agency must provide a 'detailed justification' for [the exempt material's] non-segregability," but need not "provide so much detail that the exempt material would be effectively disclosed." *Johnson*, 310 F.3d at 776 (quoting *Mead Data*, 566 F.2d at 261). Affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination that "no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," in conjunction with a *Vaughn* index describing the withheld records, suffice. *Id.*; *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are sufficient for the segregability determination).

The FBI confirms that it conducted "an extensive line-by-line review of the documents at issue" and "determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information." Driver Decl. ¶ 88; *see also*

Second Hammer Decl. ¶ 11. Likewise, DEA attests that "[a]ll responsive information was examined to determine whether any reasonably segregable information could be released," Davis Decl. ¶ 47, and provides a *Vaughn* index specifying the types of information that necessitated redactions or withholdings of entire pages, *see generally* Am. DEA *Vaughn* Index.

As discussed above regarding Exemptions 3 and 7(E), however, defendants' segregability attestations lack detailed justification as to any withholding of publicly disclosed and officially acknowledged facts identified by plaintiff in court filings from the early 1990s. In subsequent declarations seeking to justify any continued withholdings pursuant to Exemptions 3, 6, and 7, defendants must provide more detailed declarations, attesting that further segregation, particularly as to facts in the public domain, is not possible without revealing the underlying exempt information or, where applicable, causing foreseeable harm. *See Leopold*, 94 F.4th at 37 (explaining that segregability obligations "extend[] to both steps of FOIA's sequential inquiry," so an "agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects").

**C. Plaintiff's Limited Discovery Requests are Irrelevant to This Case**

Over the course of briefing the instant cross-motions for summary judgment, plaintiff moved, pursuant to "Federal Rule of Civil Procedure 26(d)(1) and this Court's inherent authority," for leave to seek limited discovery from intervenor-defendant regarding "distributed denial-of-service ('DDoS') attacks" on plaintiff's website, through which he "earns his personal income and has published the record of this litigation and resulting document production." *See* Pl.'s Discovery Mot. at 1. Plaintiff separately requests that judicial notice be taken of the existence and contents of over one hundred pages of records, without regard to "the truth of any allegation they contain," in support of his motion for limited discovery. Pl.'s Mot. for Judicial Notice at 1.

The requested discovery includes "six interrogatories, four requests for admission, and one request for production" to be served on intervenor-defendant and one "subpoena for documents under Rule 45 on DCI Group AZ, L.L.C. and/or its parent company ('DCI Group'), a registered agent of the Government of Nigeria," related to "repeated, large-scale DDoS attacks" on plaintiff's website that have "cost Plaintiff mitigation services, engineering time, money, and, on the days they succeeded, the ability to use his own site." Pl.'s Discovery Mot. at 1-2. Without accusing intervenor-defendant of being responsible for those DDoS attacks, *id.* at 2, plaintiff argues that the attacks suggest "behavior of someone who is A) watching this case closely and B) has a strong incentive to prevent public access to case and case-related materials," *id.* at 6, and that obtaining this discovery could help uncover the source.

"A district court's discretion to order discovery, although broad, is clearly 'cabined by Rule 26(b)(1)'s general requirements,' which allow parties to discover 'any nonprivileged matter that is relevant to [a] claim or defense and proportional to the needs of the case.'" *In re Clinton*, 973 F.3d 106, 114 (D.C. Cir. 2020) (first quoting *AF Holdings, LLC v. Does 1-1058*, 752 F.3d 990, 995 (D.C. Cir. 2014); then quoting FED. R. CIV. P. 26(b)(1)). While "[g]enerally speaking, 'relevance' for discovery purposes is broadly construed," the "relevance standard of Rule 26 is not without bite" and "no one would suggest that discovery should be allowed of information that has no conceivable bearing on the case." *Food Lion v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1012 (D.C. Cir. 1997) (citation omitted). Discovery in FOIA cases is "rare," *In re Clinton*, 973 F.3d at 113 (quoting *Baker & Hostetler LLP v. U.S. Dep't of Com.*, 473 F.3d 312, 318 (D.C. Cir. 2006)), and generally only permitted "where a plaintiff raises a sufficient question as to the agency's good faith in searching for or processing documents," *Cole v. Rochford*, 285 F. Supp. 3d 73, 76 (D.D.C. 2018).

Plaintiff's requests do not even approach the relevancy required to authorize the extraordinary grant of limited discovery of an intervenor-defendant and a non-party in this FOIA matter because, as plaintiff recognizes, the discovery requests are not directed at either of the defendant agencies nor related to any agency's "search[] for or processing [of] documents." *Cole*, 285 F. Supp. 3d at 76; *see* Pl.'s Discovery Mot. at 7-8 (acknowledging that "discovery is uncommon in FOIA litigation" and he "does not seek discovery on" the question of the adequacy of defendants' searches or withholdings). Plaintiff's arguments instead focus on the proportionality of his discovery requests, noting that the requests to intervenor-defendant "are confined to the period since the filing of this action," "can be answered in a few pages," "require no deposition and no adjustment of the summary judgment schedule, which is fully briefed," and impose a "minimal" burden on intervenor-defendant, Pl.'s Discovery Mot. at 8, and that his requested subpoena is "confined" to a defined date range and "burdens no protected petitioning activity," *id.* at 9. These proportionality arguments falter, however, because the discovery requests must be "proportional *to the needs of the case*," FED. R. CIV. P. 26(b)(1) (emphasis added), meaning that they must be assessed by reference to factors including "the importance of the discovery in resolving the issues [at stake in the action]," *Strike 3 Holdings, LLC v. Doe*, 964 F.3d 1203, 1207 (D.C. Cir. 2020) (alteration in original) (quoting FED. R. CIV. P. 26(b)(1)). Determining the source of DDoS attacks on plaintiff's website cannot aid in resolving the adequacy of the FBI and DEA's searches and withholdings in response to plaintiff's FOIA requests. Thus, the lack of relevancy and proportionality to the claims at issue in this case is fatal.

There is simply no "reasonable likelihood that allowing discovery . . . will lead to discovery of evidence relevant to the underlying action," so plaintiff's motion for limited discovery is denied. *Food Lion*, 103 F.3d at 1013. In addition, since plaintiff's request for the Court to take

judicial notice of certain records was filed solely to support plaintiff's discovery motion, and the resolution of that discovery motion is not affected by the existence and contents of those records, plaintiff's motion to take judicial notice is denied as moot. *See, e.g.*, *Park v. Bank-Fund Staff Fed. Credit Union*, No. 25-cv-01653 (DLF), 2026 WL 1802905, at *6 (D.D.C. June 23, 2026); *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209, 235 (D.D.C. 2022).

## IV. CONCLUSION

For the foregoing reasons, the FBI is entitled to summary judgment as to the adequacy of its search and its withholdings pursuant to Exemption 5. The remainder of defendants' cross-motion for summary judgment is otherwise denied, as is plaintiff's motion for summary judgment. Insofar as defendants seek to continue to withhold responsive records in light of the discussions above, defendants are directed promptly to prepare supplemental declarations to support any renewed motion for summary judgment and a proposed schedule for expedited briefing, after conferral with plaintiff.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: October 30, 2026

**BERYL A. HOWELL**
United States District Judge